**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ANDREW JAMES MCGONIGLE,**, *on behalf of himself and all others similarly situated*, <br><br> *Plaintiff,* <br><br> v. <br><br> **SHOPPERSCHOICE.COM, L.L.C.** <br><br> *Defendant.* | Case No: **25-cv-00152-SDD-RLB** <br><br> <u>Presiding:</u> <br> **Hon. SHELLY D. DICK** <br> <u>Referral:</u> <br> **Hon. RICHARD L. BOURGEOIS** |

## <u>DECLARATION OF EXPERT AARON WOOLFSON</u>

I, Aaron Woolfson, state and declare as follows:

1.      I have been retained by the Plaintiff to determine whether there is a reliable methodology for analyzing the text messaging records in this lawsuit reflecting the text messaging done by or on behalf of the Defendant ShoppersChoice.com ("ShoppersChoice" or "Defendant" as captioned).

2.      More specifically, I have been asked to opine whether there is a reliable method to identify those text messages within the Call Detail Records ("CDRs") maintained by or on behalf of Defendant that were sent to telephone numbers that (a) were text messaged two (2) or more times in a twelve (12) month period after being reassigned and (b) were registered on the National Do Not Call Registry ("DNC") list for more than thirty (30) days before the date of each of the texts.

3.      As described in this Declaration, it is my conclusion that, by using records of the texts sent by or on behalf of Defendant, there is a reliable method to identify which text messages were sent to telephone numbers that (a) were text messaged two (2) or more times in a twelve (12) month period after being reassigned and (b) were registered on the DNC for more than thirty (30) days before the date of each of the texts.

4.      It is also my opinion that there is a reliable method to identify text messages with

1

other particular criteria based on the additional types of information included in the CDRs, including whether they were sent on a date after an inbound text message from the telephone number to which the text message was sent, and/or other records maintained by or on behalf of Defendant.

5.     The methodology that I have applied to the text messages in the CDRs demonstrates a reliable manner to achieve the identification of all text messages within the CDRs maintained by Defendant to identify text messages to reassigned, DNC registered telephone numbers.

6.     This report reflects the results of my study of the underlying facts, independent analysis of the data and documents provided by the Defendant and third parties. My rate is $440.00 per hour for expert engagements, and $675.00 per hour for depositions, trial, and arbitration appearances.

7.     I am personally familiar with the matters that are contained within this declaration, and if called to testify, I can accurately and competently testify as to them.

**Qualifications and Expert Engagements.**

8.     I have over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls. I have implemented call recording and call data collection and retention systems for commercial, government, aerospace, telecommunications, and payroll industries. My professional experience includes serving as an expert witness in cases where I evaluated the technical aspects of telephone systems, including whether they had a random or sequential number generator.

9.     My qualifications and curriculum vitae are attached to this expert report as Exhibit 1. A list of the other cases in which I have testified as an expert at trial or by deposition during the previous four years is attached as Exhibit 2. I have been qualified by both Federal and State courts.[1]

---

[1] *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court ...") *(ABM Industries Overtime Cases, A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018)).* (Exhibit 3).

Declaration of Aaron Woolfson                                    Case No. 25-cv-00152-SDD-RLB

My testimony has been relied upon by courts in both individual and class actions,[2] by plaintiffs and defendants. My opinions have also been relied upon in arbitrations, including TCPA claims.

10.   I was the developer of the automated Verification of Deposit ("VOD") and Verification of Mortgage ("VOM") system that was used by Chase, Wells Fargo, Bank of America, as well as some regional banks and mortgage lenders, to facilitate the review of mortgage applications by call center staff. These systems required a great deal of integration between the telephone systems and the financial institution's computer systems, and relied heavily on my deep understanding of database and time keeping integration technologies. It also required me to build interfaces to the ACH[3] exchanges, and with Global Payments and other large automated electronic inter-exchanges of financial information. Other processes necessitated integrating fax and OCR[4] capabilities as well as enhanced call routing – inbound and outbound – including predictive elements of enhanced call processing, and the precise timings of these events.

11.   I am the inventor of "Canvas", a programming language that I developed for interfacing between telephone systems and telephone networks, capable of processing hundreds of thousands of calls a day. To date, hundreds of millions of calls have been handled by Canvas on behalf of call centers, financial institutions, conference calling companies, and organizations offering Interactive Voice Response ("IVR") services. [5]

---

[2] "The Court notes that Mr. Woolfson's expert report appears to include information related to the merits of the case in addition to class certification issues." *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, Case No 3:13-cv-01556-JLS-DHB (S.D. Cal.), Sep. 21, 2015 ECF 132 at page 3.

[3] Automated Clearing House ("ACH").

[4] The OCR ("Optical Character Recognition") process as integrated into the automatic monitoring of telephone calls in real time to determine whether the call was a voice or fax call, and if a fax call, decoding the contents of each fax-page into machine readable text *while* a fax was being transmitted to the bank's computers for integration with a database.

[5] IVR is a technology that allows a computer to interact with humans through the use of voice and/or DTMF tones input via a telephone keypad. DTMF ("Dual Tone Multi Frequency") is the signal you generate when you press a telephone's touch keys.

3

12. I have developed highly available, upwardly scalable databases for use in the telecommunications industry. The databases and telephone systems that I have personally developed and/or coded are used by telephone companies and call centers throughout the United States and Canada to catalogue and index various customer-calling activities. Some of the companies that have used my databases and/or telephone equipment (which I personally created and manufactured) have included Japan Telecom, Experian, Bank of America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone Telecom (ANPI), Aion Networks, Smartcall Conferencing, and First National Collection Bureau, Inc., and the United States government, including the Department of Justice.

13. Through my hands-on work experience in developing databases and telephone systems, I have become very familiar with the technology related to telephone systems and their interfaces with the networks through which calls are processed, received, and transmitted. I am also familiar with how dialing systems work, and how telephone systems handle inbound and outbound calls.

14. I have been responsible for the design and development of specialized hardware and software systems that are highly dependent upon the capabilities of the computers upon which they run, and are in use at mission-critical applications, including Patriot Missile (SAIC, Patriot RTOS), Air Traffic Control Systems (Kongsberg Geospatial Corporation), and Point Lepreau Nuclear Generating Station, New Brunswick, Canada (Energié NB).

15. I held a CPCN[6] ("Certificate of Public Convenience and Necessity") – a special license and compliance certification granted to companies that provide essential public services, such as telephone corporations. The California Public Utilities Commission granted my most recent CPCN on July 18, 2017. This was a reissue of my initial CPCN granted to TelSwitch on June 10, 1994, which I held for approximately 18 years before taking a hiatus from providing public telephone

---

[6] Certificate of Convenience and Necessity U-5410-C granted to TelSwitch, Inc. on 06-10-1994 (Decision 94-06-022). Reissued as U-7327-C on 07-18-2017 (Decision 17-07-009).

Declaration of Aaron Woolfson                                    Case No. 25-cv-00152-SDD-RLB

services. The license originally granted to me in 1994 allowed me to interconnect the equipment that I designed, built, and programmed with the phone network for the purpose of providing wholesale and retail telecommunications services.

16.   I have also been qualified as an expert in matters involving the TCPA and have previously been engaged on behalf of defendants and plaintiffs to analyze records of calls.

17.   For example, in *Wright v. eXp Realty, LLC*, No. 6:18-cv-01851-PGB-EJK (M.D. Fla.), I was engaged on behalf of the defendant in a case in which the Court certified a class of consumers who received pre-recorded calls to their cellular telephone numbers.

**Expertise Specifically Related to Database work.**

18.   I was relied upon as an expert witness in the case of *Hines v. KFC*, filed in the United States District Court, Southern District of California (Case No. 09cv2422 JM (POR). In *Hines*, the court granted plaintiff's motion for class certification and certified plaintiff's meal period and rest break claims based on my analysis after finding that I am an "expert in the compilation and analysis of databases …."

19.   I was expert for the plaintiffs in *Albert H. Cicairos, Frank A. Daniel, Richard Wheeler and George Thompson v Summit Logistics, Inc.* and *Kenneth Bluford v Safeway Stores, Inc.* (Case No. CV014837 [Consolidated with Case No. CV028541] Superior Court of California, County of San Joaquin). I have been told that, among other cases, *Bluford v Safeway, Inc.* established the framework for what eventually became known as AB1513 and Labor Code section 226.2, which governs compensation in the piece rate context.

20.   In addition, I served as an expert in the *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court). Relying heavily upon my expert finding, the Appellate Court reversed the trial court's ruling and certified the plaintiffs' proposed wage and hour classes. The court noted that there was sufficient evidence contained within my expert report to support certification of the classes and subclasses, and that my experience was sufficient to allow my expert report to be admitted as evidence for that purpose. (Exhibit 3).

21.   I was also expert in *Beatriz Aldapa And Elmer Avalos v. Fowler Packing Company,*

5

*Inc., Ag Force, LLC, Fowler Marketing International LLC,* (Case No. 1:15-CV-00420-DAD-SAB ED, Ca.), where the employer used Datatech to maintain an accounting of piece-work and non-piece-work hours worked by agricultural workers. The court order in *Fowler Packing* is attached as Exhibit 4.

22. I have applied similar methods to structure large amounts of unstructured data on behalf of defendant *Verizon Wireless* and *Collecto* in *Lofton v. Verizon* (Case No. 3:13-cv-05665) and *Lofton v. Collecto* (Case No. 4:13-cv-03293-YGR). In *Lofton v. Collecto*, I was ordered by the District Court of the Northern District of California to reconstruct a database from information that was in defendant Verizon's possession that Plaintiff stated was "un-structurable" and useless for purposes of analysis and determination of the results of calls that took place. I was able to complete the re-structuring of Verizon's data so that the parties could reach a successful settlement. The portion of the Court's Order from *Lofton v. Verizon* instructing me to create a database from Verizon's unstructured data is attached as Exhibit 5.

23. I engaged on behalf of plaintiff Michael Anthony in Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc. and FDE Marketing Group LLC (Case No. 1:21-cv-02509, ND, Il, Eastern Div.) in which I undertook a comprehensive analysis of the Defendants records in support of class certification. The order granting class certification is attached as Exhibit 6.

24. I was also engaged on behalf of plaintiff Robert Mason in Robert Mason et al v. Spring EQ, LLC (Case No. 5:24-cv-01833-MWC-AGR, CD, Ca). In the court's order denying defendant's motion to decertify the class, the course stated that the plaintiff has sufficiently identified a method by which an expert can separate residential from business numbers and that "The fact that most of the numbers identified by Defendant did not appear in the post-Waterfall dataset, as Mr. Woolfson attests, further suggests the method is reliable. Defendant's new evidence does not compel a different result" (ECF 166, page 12 of 14). The court's order is attached as Exhibit 7.

Declaration of Aaron Woolfson        Case No. 25-cv-00152-SDD-RLB

**Materials and Documents Reviewed and Relied Upon.**

25.     In conducting my analysis and preparing my conclusions and opinions, I relied upon the following materials and information:

    I.    **Materials that I relied upon:**

        (a)    The Complaint, ECF 1.

        (b)    The CDRs produced by Defendant in the electronic files:

                "*BBQGUYS00059.csv*" and "*BBQGUYS00060.csv*"

    II.    **Electronic database resources that are available to me:**

        (a)    FTC's National Do Not Call Registry ("DNC") Database[7].

        (b)    FCC's Reassigned Number Database ("RND")[8].

**Methods and Tools Used to analyze Records.**

26.     I create and analyze databases using Structured Query Language (SQL). A database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information. Tables that share at least one attribute in common are "related." Tables without a common attribute may still be related via other tables with which they do share a common attribute. The pathways relating those separate tables are called "joins." Once tables have been related by a join, a user may view the combined information in the joined tables to derive new and/or useful information. To access such information, a user sends queries to the database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages." The most common query language is SQL. A proper query in this language consists of one or more "clauses." Common types of clauses are SELECT, WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses. Thus, to compose a proper inquiry, a user must understand the structure and

---

[7] TelSwitch, Inc's FTC Organization ID is 10159990-70991, Subscription Account Number (SAN) 10376173-476173-26.

[8] TelSwitch, Inc. is registered as a consumer and reseller of the RND. Somos Registration ID # C657465476.

Declaration of Aaron Woolfson             Case No. 25-cv-00152-SDD-RLB

content of the relational database as well as the complex syntax of the specific query language.

27. When analyzing call or text message records, I start by creating a database to serve as a repository for the call or text records and any other related records. I then create database tables to accumulate the results of the associated DNC Database fields, which contains the *isDNC* and *DNC_30* fields for each call, and the RND fields, which contains the *somosStatus* and *somosChangeDate* fields.

28. By using a set of standardized SQL queries, I am able to tag each call or text record according to (a) any data field contained in the call or text records, including the telephone number called, the date of a telephone call, and the disposition of the call; (b) any data field contained in any associated leads records; (c) any data field maintained in the DNC Database, including whether the number was on the DNC, and if so, whether the number had been on the database for at least thirty (30); and (d) any data field maintained in the RND, including the status of the telephone number during a particular date range.

29. This is precisely the task that I undertook for Plaintiff in this matter, guided by my many years of experience with these precise tasks. I construct all SQL statements myself and am the sole author of all work product associated with the methodologies I propose.

**Steps I took to Organize and Analyze the Call Detail Records.**

30. I started by opening the files containing the text message records data (the "CDRs"). I did this to (a) determine the format that the records are stored in, and then (b) to determine what pre-processing that I would need to conduct in order to achieve an import of the records. I did not need to apply any pre-process to the CDRs, as they were already Electronic Data Interface capable.

31. The CDRs included records of 44,466,716 inbound text messages in the aggregate that were sent between 10/24/2020 and 08/27/2025. I imported the text messages that were contained within the CDRs into a SQL database table named *dbo.calls_complete* using Microsoft SQL™ Server Management Studio.

32. I then ran SQL statements to exclude any text messages that (a) were not sent to

8

Declaration of Aaron Woolfson                                    Case No. 25-cv-00152-SDD-RLB

standard 10 digit telephones numbers or telephone numbers within the FTC's list of valid TCPA eligible area codes, (b) were not associated with properly formatted dates and times in the CDRs, and/or (c) were duplicative of other text messages in the CDRs. This resulted in the exclusion of 1,113,082 text messages.

33. I then tagged each of the remaining 43,353,634 text messages with information from the National DNC Database, including whether each of the telephone numbers was on the DNC for more than thirty (30) days before the date of each of the text messages, and excluded any text messages that were not sent to a telephone number that had been on the DNC for more than thirty (30) days and/or that were not sent within 365 days of another such text message. This left 27,731,279 text messages that were sent to 281,471 unique telephone numbers

34. For each remaining unique telephone numbers, I then tagged the earliest date that a text message had been sent to that number and the latest date that a text message had been sent to that number with information from the RND as to the active or disconnected status of the telephone number on the RND updates[9] closest in date before and closest in date after the dates of each of the text messages, and excluded all text messages to any telephone number for which the RND data did not indicate a likely reassignment in the time between the dates of the earliest and latest text messages to that telephone number. This left 1,470,996 text messages sent to 13,865 unique, potentially reassigned telephone numbers, which included 828,111 calls to 5,781 unique numbers that had transitioned from *disconnected* to *active* between the first and last text dates.

35. I then selected the 5,781 reassigned telephone numbers that had been sent a total of 828,111 outbound text messages to identify which text messages were sent after the dates the telephone numbers were reassigned. I tagged each of the text messages to with information from the RND, including the status of each of the telephone numbers on the RND updates closest in date before and closest in date after the dates of each of the text messages. I then ran SQL statements to compare the statuses of each of the text messages in the RND updates before and after each text to

---

[9] The RND updates on the 16th of every month.

9

determine the date the associated telephone number transitioned from *disconnected* to *active*, and excluded 512,791 text messages that were sent on a date before the transition from *disconnected* to *active*.

36.     I then I then ran SQL statements on the remaining 315,320 text messages to 5,703 unique telephone numbers to determine which of the remaining text messages were sent within 365 days of another remaining text message, and excluded seventy-nine (79) text messages that were not sent within 365 days of another remaining text message to the same number. As a result, from the total of 828,111 outbound text messages that had been sent to 5,781 unique telephone numbers, I was able to identify 315,241 text messages to 5,626 telephone numbers that were (a) sent after the number was reassigned, (b) more than thirty (30) days after the number was registered on the DNC, and (c) within 365 of another such text message.[10]

37.     An output of these text messages is attached as Exhibit 8. An output reflecting the quantity of these text messages sent to each telephone number is attached as Exhibit 9.

**Conclusions.**

38.     It is my opinion that using the text message records maintained by or on behalf of Defendant there is a reliable method to identify which text messages were sent to telephone numbers that (a) were text messaged two (2) or more times in a twelve (12) month period after being reassigned and (b) were registered on the DNC list for more than thirty (30) days before the date of each of the texts.

39.     It is also my opinion that there is a reliable method to identify and/or exclude text

---

[10] It is my understanding that Plaintiff has requested the call detail records for the inbound text messages from the 5,626 unique telephone numbers that received the 315,241 text messages after reassignment. Once these are produced, I can then run SQL statements to exclude any text messages to any telephone number that sent an inbound text message on a date on or after the RND update date (the 16th of the month) of the month preceding the reactivation of the telephone number. To the extent other types of data is received regarding these 5,626 unique telephone numbers, I can also run other SQL statements to exclude other text messages based on any criteria relating to the additional data, including for example whether the person associated with the telephone number made a purchase during a certain timeframe before the text messages.

10

Declaration of Aaron Woolfson                                    Case No. 25-cv-00152-SDD-RLB

messages with other particular criteria based on the additional types of records maintained by Defendant, including whether they were sent on a date after an inbound text message from the telephone number to which the text message was sent, and/or were sent within a certain timeframe of a purchase.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.  Executed April 28, 2026 in Champaign, Illinois.

_____

Aaron Woolfson

11

Declaration of Aaron Woolfson                              Case No. 25-cv-00152-SDD-RLB

# EXHIBIT 1

**Curriculum Vitae**                                      **Aaron David Woolfson**

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

## Career Summary

25 Years of Experience developing extremely large scale, highly efficient and accurate Database Applications, for commercial, government, aerospace, telecommunications and payroll industry, with special emphasis in IVR systems.

- Database transition planning and disaster recovery experience
- Client-Server Database Application Design and Development
- Developed extremely high performance IVR system  (1.5m calls/day)

- Efficient Database Design through Data modeling
- Full understanding of Database libraries, and transaction handlers
- Deep knowledge of Electronic Time Keeping Techniques

- Efficient Database Table Structuring and Indexing Techniques
- RDO/ADO interface techniques, incl. port 1433 direct interface
- Point of Sale Time Keeping Integration with Payroll

- Comprehensive data transformation, tallying through data analysis
- VB6 and .NET(2.0) bounded and unbounded objects
- GPS "as-Time Keeping" object, tracking, and analysis techniques

- Presentation of sophisticated data in easily-understood terms
- Web-Services data integration and multi data-source integration
- Networked Multi-Location Database Components related to Timekeeping

- An early investor in, and partial developer of QL2, a data-analysis tool for turning web-pages into rich-data searchable sources of information. QL2's customers include 7 of the top 10 global airlines, 5 of the top global online travel agencies, and Global 100 energy, car rental, retail, pharmaceutical and life science companies.

## Professional Experience *(consulting that resulted in deliverables)*

**University of Illinois, Champaign-Urbana** (1986, 1987, 1988). Employed to Program computer terminals attached to a Mainframe computer system (PLATO) that were used to generate databases containing class schedules based upon prospective students' interests and SAT scores.  Curriculum was graphically represented on Plasma Display Terminals attached to the University's PLATO computer Plato Computer Mainframe.  Student Curriculums included travel time between classrooms in different buildings and items related to classroom proximity.  Worked under the auspices of Don Bitzer, inventor of the Plato Computer System and co-inventor of the Plasma Display Panel, and Hugh Satterlee, Ombudsman of the University of Illinois, Champaign-Urbana.

**Computer Services Office, San Joaquin Delta College, Stockton California** (1991, 1992).  Maintained campus-wide network of mainframe-based computer terminals used for class scheduling and curriculum development;

**Delta Telecommunications, Stockton, Ca** (1993). Founded a California Based Public Utility (U-5410-C) focusing on a network of telephone switching systems connected to databases that were used to route telephone calls of customers within the State of California.  I invented the efficient IXC-10 Network Switch and the associated databases, as there were no highly efficient telephone switches during that time that took up a small amount of space, yet could handle the demands of a full-scale telephone switching office.

**Curriculum Vitae**                                          **Aaron David Woolfson**

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

**TelSwitch, Inc., Stockton, Ca** (1994). I authored the Airnet Billing and Call Collection Database software that was used at TelSwitch, Inc for the purpose of billing residential and commercial long distance customers for the calls that they made. I wrote database formulas to establish the rating of telephone calls based upon the elements provided by the switching network: call setup, call type, call routing, and rate plan assigned to customer. Determined the rates and taxes to charge the customers on each call, based upon the rate plans assigned, the time of day, the time and duration of the call, and whether that call was intrastate, interstate, or Intra-lata. Processed millions of telephone calls through my database.

**Japan Telecom America, San Ramon, Ca** (1996). I adopted the Airnet Billing Software and Call Collection Database that I had authored to specifically meet the needs of an international telecommunications corporation doing business in the United States, Japan, and in Canada, presenting bills to customers in multiple languages and font sets, accepting various currencies, which all had to be computed against the dollar in real time.

**Oersted Corporation (Sunstrand Contract)** (1997). Designed and authored an Automation Control and Database system used for the mass-production of mission-critical magnetic armatures used in Air Conditioning, and Electric Vehicle, and Aerospace applications. I created the process control mechanism that allowed the machine to "manufacture the part" and measure the results, and report the results to a master database that contained Quality Control statistics. This machine continues to operate at a Sunstrand Corporation facility in Wisconsin and has successfully manufactured hundreds of thousands of components.

**Network Services Solutions, LLC., Reno, Ca** (2001). Customized a database for tracking the overlapping time elements of telephone calls, and establish audit trails of telephone calls through the phone network, based upon origination, destination, time, and jurisdiction. The system is in use to track the costs for telephone lines and services to hundreds of schools, dozens of hospitals, and is the backbone for a national communication network, with over five million transactions being tracked through my database monthly.

**Decisionet, St. Charles, Il. (Experian Project)** (2004). I was contacted to build a Database and Electronic Gateway "Appliance" Device for customers to acquire credit reports from Experian's secure database. The system was used to facilitate the delivery of 7.2 million credit reports to commercial users, including credit unions, banks, car dealerships. The system tracked usage, report lengths, type of reports, and reporting tools to Experian's customers to view the quantities of reports that were used through the system, types of reports, and other information pertaining to the acquisition of reports. The service allowed Decisionet to extend the life of legacy interface environments between Experian and its' clients by several years.

**BankVOD / Billing Solutions, Inc. - (Bank of America, Wells Fargo Bank, JP Morgan Chase, PNC, Bank of the West)** (2005). Designed and built a network of Database Applications for the mortgage industry using Microsoft SQL and ASP.net. The system created a protocol for banks and mortgage brokers to exchange information on the status underwriting of loan applications, providing tracking of Verification of Income, Verifications of Deposit and Verification of Mortgage applications, as well as providing the analysis back to the banks for items such as Check Verification(s). The database also triggered the disbursements of processing costs and reimbursements toward the banks. To date, my system has been an integral part of the processing of over 1.2 million mortgage applications.

**SAIC - Patriot Missile Systems / Training Division  (Subcontract)  (DPAS Rated)** (2007). Designed the hardware, software, and firmware used within the modern-day re-instrumented version of Patriot Missile consoles. I was tasked with developing a hardware and software combination that retained full compatibility with both modern and legacy equipment, that could provide data to commercial and proprietary databases efficiently and reliably in extreme environments. I am proud that my work is considered to be an integral part of the battle-field readiness and preparedness of ground troops, and that dozens of our implements are in use throughout the world.

**Curriculum Vitae**                                                              **Aaron David Woolfson**

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

**Department of Justice, Sacramento California** (2007). Authored a specialized interface to work with a telephone company database.

**Practice Technologies, Inc.** (2007).  I was contracted to develop the database to maintain the billing and session tracking portion of Real Deal Docs, part of the Real Practice Suite of document management tools used by dozens of law firms, including Littler.  I had been tasked with developing the billing methods for tracking the use of Real Deal Docs, a Web Site that indexes the documents that are filed by publicly-held companies, into searchable terms, and maintaining presentations.

**Cogent Communications, Inc.** (2008).  I was tasked with authoring the database system for tracking the timings and overlaps of telephone calls, and establishing an audit trail of telephone calls through the phone network, based upon time, duration, origination, destination, and other characteristics.  The database continues to be used to capture hundreds of thousands of telephone transaction per month that traverse the Cogent Communications Network, and maintains a detailed audit trail of service changes and inventories of equipment and.

**Gallium Visual Systems - ATS (Air Traffic Control System)** (2008). Incorporate modern software, hardware, and firmware into Aircraft Control Training Systems. I was tasked with manufacturing Operator Keyboards and Consoles using modern day technologies as part of the Air Traffic Control Training System, enabling ATS equipment to work with USB-enabled computers, and modern data collection systems, including databases.

**First National Collection Bureau, Reno, Nv.** (2008).  Built a system of interconnected databases and computers capable of capturing over 250 million telephone records per year, and deep-content analyze the telephone calls for type-of-call, timing characteristics, and customer contact effectiveness.  System had to maintain a minimum of 56 million phone calls per year, any of which could be instantly retrieved.  The Microsoft SQL database components required that I author an exacting set of high-performance SQL database analysis scripts in conjunction with several inter-related computers, all operating autonomously operating software programs that I wrote.  I have been told that I wrote the highest performance (civilian use) telephone call analysis system in the world.

**American Automated Payroll, Charleston, Sc** (2009) - Payroll and Time Keeping.  I Authored a set of scripts to work with databases to allow payroll companies to integrate their payroll systems with the telephone network.  The program that I wrote allows the electronic entry of time keeping records via telephone. Employees can use a telephone to clock in and out of work sites, or an employer can use the telephone to enter time entries into their payroll production.   I am an ongoing consultant to American Automated in the area of timekeeping, payroll database integration, paycheck and time clock reporting, and phone network integration.  Additionally, I authored a database system that comprises of an automated inbound and outbound calling interface for customers of payroll companies to be able to input their daily time sheets into payroll programs, for purposes of generating payroll.  The software and hardware mechanism that I authored interfaces with system such as "Evolution" (a popular and widely used payroll program), as well as Microsoft SQL, Oracle, and mySQL American Automated Payroll and TelSwitch, Inc. are engaged in an ongoing partnership tasked with developing further market verticals for my software.

**Reunion Communuications, La Grange, Il** (Airlink Wireless) (2010).  Database for keeping track of usage, balances, and remaining minutes for a National Prepaid Wireless provider. I authored a database, and associated network interface protocol, so that customers may access real-time information about their accounts via telephone calls from their handsets. The system also maintains real-time analysis of telephone the telephone companies' databases to determine where the telephone callers are going to be routed, based upon their "OEM" handset ID, calling characteristics, and other factors.  The Database, located downtown Los Angeles, is used tens of thousands of times every day by prepaid mobile carriers and their

**Curriculum Vitae**                                                           **Aaron David Woolfson**

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

customers all over the country, who rely my high-performance database application's speed and accuracy to delivery timely information on real-time usage.

**Rapid Announce, a Product of TelSwitch, Inc.** (2010). I authored the combined software (database) and hardware application that is used to conduct millions of daily inquiries into several linked databases.  The databases, which contain approximately three hundred thousand new collection accounts per day, are analyzed to determine to whom automated dialers should call and what those called individuals are being contacted regarding.  The calls are indexed, and are reported to time tracking databases for later analysis and quality assurance.  The system is currently in use by collection bureau(s), and makes decisions on hundreds of thousands of transactions per day. The system is also had been used for automated notifications in several non-collection industries.

**SAIC - Patriot Missile Systems / Training division** (2011).  Tasked with adopting some of the database SQL analysis tools that I use in expert database analysis toward use in personnel management and battlefield equipment positioning.  Expand the methods I developed for analyzing GPS data points, so that data points coming from disparate data sources could uniformly be applied into databases and then analyzed.  According to SAIC, the database formulas that I had applied in my capacity as an expert in the Moreno, et al. v. J. Redfern, Inc. (RG08375539) closely mimic the GPS data point analysis that is conducted GPS data points from projectiles (missiles) and personnel movement.

**AggravationSense and VoiceVault, a Product of TelSwitch, Inc.** (2011).  Built a database to analyze the voice characteristics of telephone calls in real-time, to determine when someone becomes aggravated, so that they can be proactively routed to customer Service supervisors.  VoiceVault contains approximately 130 characteristics of the human voice, and can be used to determine whether a telephone caller is who they say they are, with a very high degree of accuracy.  The partners in this project were Qwest, AT&T Business Services, Network Services Solutions LLC, and American Automated Payroll;

## Education:

San Joaquin Delta College (1991-1994); Majored in Sociology and Cultural Anthropology.

## Publications, Awards, Authored Works

1996, Young Entrepreneur of the year, San Joaquin County; California.

Authored Foundational White Paper on Voice Over Internet Protocol, and filed patent application on Wide Area Centrex using Internet as Communication Backbone, as part of the Tempo Networks LLC partnership between me and two of the co-founders of Worldcom.

Authored patent application for SMS (Text Message) Initiation of a telephone call between two people by connecting two outbound calls initiated by a phone switch in a foreign country.  One leg was placed to the "initiating party" and the other leg to the "called party", which were connected together to create a circuit through an intermediate county.

Co-wrote a paper presented to DARPA on the best-practices method of designing a database to conduct the analysis of large volumes of Telephone Calls.  Authored in conjunction with Ted Kubaitis, the founder and Chief Software Architect of QL2.

Analysis of Scheduled Flights and the Merger Effect on Flight Availability re: Merger of United Airlines and Continental Airlines (Declaration) – In Matter of the Merger of United Airlines and Continental Airlines, before the Senate Judiciary Subcommittee to Examine United/Continental Merger, May 27th, 2010, 2:15pm – Dirksen-226

**Curriculum Vitae**                                          **Aaron David Woolfson**

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

Professional Certifications:

1994-2011; Certification Granted by California Public Utilities Commission  (U-5410-C) to operate as a California Public Utility, after passing the standards for expertise necessary related to the operation of telephone communication systems and telephonic records database recording and billing / rating mechanisms.

2004; NACHA certification achieved for network integration of Payment Transaction Processing between financial institutions; (Bank Interchange Network).

2006-2012; Credit Card Interchange Network Certification issued by Global Payments for Software written by Aaron Woolfson related to the Networked Interchange of card member payment transactions between merchants and correspondent banks, on behalf of Master Card/Visa/American Express/Discover.

2010-2012; Certificate of PCI DSS Compliance issued by Security Metrics for maintaining best-practices in database management related to secure transaction processing between mechanized database systems.

2016-2023: Participant in the Apple Developer Program for handset based applications and programs running under iOS.

2017; Certification Granted by California Public Utilities Commission  (U-7327-C) to operate as a California Public Utility as Tel-One Network Services, Inc.  The company continues to operate as a *stand-alone* company.

2017-2023; TelSwitch, Inc. is registered with the Federal Trade Commission ("FTC") as Organization ID is 10159990-70991, Subscription Account Number ("SAN") 10376173-476173-21 for the daily download and use of the Federal Do-Not-Dall database.

2019-2023; Certificate of PCI DSS Compliance issued by Trusted Site for maintaining best-practices related to secure transaction processing between interconnected computer systems.

2023; Authorized reseller of iConnectiv for resale of WDNC data used for maintaining compliance with TCPA; availability of, and use of data authorized by FCC-15-35A1 (03/27/2015).

Summary:

I continue to be actively involved in the development of telecommunications technology, including that used by call centers.  I also continue to maintain Airnet AMS, which is used by providers of telecommunications services to bill their customers and conduct network planning.

Additionally, I been retained as either a consulting or testifying expert in database analysis in over 1,000 cases involving the analysis of timekeeping, payroll records, telephone call records, Do-Not-Call ("DNC") database records, credit card records, reimbursement records, travel records (e.g., GPS data and locations where employees worked), as well as provide analysis of technology related to Call Center and Collection Operations.

I have worked with both plaintiffs and defendants, and have been qualified by State and Federal courts as an expert in databases and as an expert in telecommunications.

**Curriculum Vitae**                                                                 **Aaron David Woolfson**

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

<u>Materials, and supplies – billed to client:</u> Airfare, Hotels, Meals, Parking, Gasoline, Car Rental.

Billable travel time charged at ½ of the regular rate, and is calculated as a measurement of the most efficient routing, not the actual duration of the flights that we choose. You will be billed for the lesser of (a) the amount of time for the flight that is actually booked, or (b) the amount of time for the alternative flight that would have been most efficient, even if we elect to take a longer flight or a flight with more connections.  Time is capped at eight hours per day.

**<u>Payments are due at time of deposition by deposing party.</u>**

No deposition will be provided if the requesting counsel (e.g. opposing counsel) owes a balance for work done for that firm in other matters.  In other words, no depositions will be given to any parties where balances are owed. This is non-negotiable.

# EXHIBIT 2

**Aaron Woolfson's List of Cases in which Testimony was Provided (as a Deponent or as an Expert at Trial within approx. previous four years)**

- *Taylor Carroll et.al. v SGS Automotive Services, Inc.* (Case No. 16-537-SDD-RLB (MD, La)

- *Adrian Diaz et. al. v. Bald Eagle Security Services, Inc.* (Case No. 37-2018-00009703-CU-OE-CTL, Superior Court of California, Los Angeles County)

- *Christopher Dueker et. al. v. CRST Expedited, Inc.* (Case No. 2:18-cv-08751-FMO-FFM, ND Ca)

- *Bruce Wright, Jorges Valdes, Edwin Diaz, individually and on behalf of himself and all others similarly situated, v. eXp Realty, LLC, a Washington Limited Liability Company* (Case No. 6:18-CV-01851-PGB-TBS MD Fl)

- *Joseph Cabardo, Donnabel Suyat, Mactabe Bibat, Marissa Bibat, Alicia Bolling, Renato Manipon, Carlina Cabacongan, And John Dave Cabacongan, on behalf of all current and former employees and the State Of California v Marilyn Patacsil and Ernesto Patacsil* (Case No. 2:12-cv-01705-TLN-KLN, ED, Ca, Sacramento Div.)

- *Robert Fischer et al v. Trivita, Inc.* (Case No. 6:19-cv-02333-CEM-EJK, MD Fl, Orlando Division)

- *Austin and Marrero et al v Public Reputation Management* (Case No. 9:20-CV-80161-RS, SD Fl.)

- *Deanna Hicks et al v Houston Baptist University* (Case No. 5:17-cv-00629-FL, E.D., NC, Western Div.)

- *Paramjit Lalli et al v. First Team Real Estate Orange County* (Case No. 8:20-cv-000270-JLS-ADS, C.D. Cal., Southern Division)

- *Jodi Judson et al v. Goldco Direct, LLC* (Case No. 2:19-cv-06798-PSG-PLA, CD, Ca)

- *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court)

- *Kenneth Johansen, et al. v. Bluegreen Vacations Unlimited, Inc.* (Case No. 9:20-cv-81076-SMITH, S.D. Fla.)

- *Jeremy Gilmore et al v. Vansh, Inc.*
  (Case No. HG18930348, Superior Court of California, County of Alameda)

- *Aldapa et al. v. Fowler Packing, Co., et al.*
  (Case No. 1:15-CV-00420-DAD-SAB, ED, Ca, Fresno Division)

- *Anderson et al v. The Berry Man, Inc. and All About Produce, Inc. et al.*
  (Case No. 16-cv-0377, Superior Court of California, County of San Luis Obispo)

- *Raymunda E. Menjivar v Angelo's Gourmet Deli, Inc., Jae Choi, Anna Lee, et al*
  (Case No. C20-00885, Superior Court of California, County of Contra Costa)

- *Amanda Boardman et al v Green Dot Corporation*
  (Case No. 21-cv-00174-FDW-DSC, W.D., Nc, Charlotte Div.)

- *Annette Barnes et al v. Allsup Employment Services, LLC.*
  (Case No. 1:21-cv-21121, S.D. Fl,, Miami Div.)

- *Pineda et al. v Lithographix, Inc.*
  (Case No. BC612372, Superior Court of California, County of Los Angeles)

- *Andrew Perrong et al. v Victory Phones LLC.*
  (Case No. 2:20-cv-05317-GEKP, E.D. PA)

- *Floyd Steve Bales et al v. Bright Solar Marketing, LLC*
  Case No. 5:21-cv-00496-JSM-PRL, M.D. Fl, Ocala Div.

- *George Moore et al v. Club Exploria, LLC*
  Case No.1:19-cv-02504, ND. Illinois, Eastern Div.

- *Eric Laguardia, Sophia Wingate, Lindsay Rucker and Nicole R. Austin v Designer Brands Inc., F/K/A DSW, Inc., an Ohio Corporation; and DSW Shoe Warehouse, Inc., a Missouri Corporation.* (Case No. 2:20-cv-02311-SDM-EPD, SD OH, Eastern Div.)

- *Varas et al v Paras et al* (Case No. RG20072221, Superior Court of California, County of Alameda, Eric C. Davidson Courthouse)

- *Marisol Gomez and Ignacio Osorio et al, v. J Jacobo Farm Labor Contractor, Inc. et al*
  (Case No. 1:15-cv-01489, ED, Ca)

- *Robert E. Stafford, Jr., Melissa Bonetti, Michelle Layton, Herbert Mallet, Jacqueline Johnson, Cathrine Allen, Devron Jones, Laura Shope, Tabitha Daniel, Damian Prentice, Debra Call, Laquasha Osaghee, Ronda Cole, Marquita Smith, Jennifer Wester et al v. Bo Jangles' , Inc.* (Case No. 3:20-cv-266-MOC, WD, Nc, Charlotte Div.)

- *Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc. and FDE Marketing Group LLC* (Case No. 1:21-cv-02509, ND, Il, Eastern Div.)

- *Mark Fitzhenry v Brokers Data, Inc.* (Case No 2:21-cv-04043-RMG, DC, Sc)

- *Nathan Rowan v Brock Pierce* (Case No 2:21-cv-04043-RMG, DC, PR)

- *Samantha Doup v Van Tuyl Group LLC et al* (Case No. 3:20-cv-02742-X, ND, TX)

- *Teresa E. Mendez Villegas, Maria Navarro, Loyda Aguilar, Olimpia Cano De Peral et.al. v. Duarte Nursery, Inc., Jeff Duarte, John Duarte, Patricia Lopez, Engracia Lopez* (Case No. 2014-212, Superior Court of Stanislaus County)

- *Annette Bayles v Hertz Corporation* (Case No. 1:22-cv-01092-JRS-MKK, SD, IN, Indianapolis Div.)

- *Dennis Glazer et al v. Sunnyvale Massage LLC and Lisa Meteyter* (Case No. CIV 527399 Superior Court of California, County of San Mateo).

- *Juan Navas et al. v. Fresh Venture Foods, et al.* (Case No. 17-CV-02222, Superior Court of California, County of Santa Barbara)

- *Carbajal et al v. Imperial Maintenance et al* (Case No. STK-CV-UOE-2016-0001100, Superior Court of California, County of San Joaquin)

- *Faucett et al v. Move.com et al* (Case No. 2:22-cv-04948-ODW-AS, CD, Ca, Western Div.)

- *Mackey et al v. Bankers Life & Casualty et al.* (Case No. JCCP No. 4954, Superior Court of California for the County of San Diego)

- *Dancey et al v.* Walmart, Special Coordinated Proceeding 5136, *Tamara Dancy v. Walmart Inc., et al* (Superior Court, County of Santa Clara, Case No. 19CV360648)*;*

and *Lynette Branco v. Walmart Associates, Inc.* (Superior Court, County of Santa Clara, Case No. CV-20-002265).

- *Mohamed Mallem et al, v C&C Security Patrol, Inc.*; and, *C&C Security Patrol, Inc.* (cross-complainant) v *Manning & Kass, Ellrod, Ramirez, Trester LLP* (cross-defendant); and, *Manning & Kass, Ellrod, Ramirez, Trester LLP* (cross-complainant) v *C&C Security Patrol, Inc.* (cross-defendant)  (Case No. RG16814153, Superior Court of California, County of Alameda)

- *US EEOC and Anonymous Plaintiff Intervenors 1 through 4 v. Fresh Venture Foods LLC, and Babe Farms, Inc.* (Case No. 2:21-CV-07679-CBM-DFM, CD, Ca)

- *Ma de Jesus Vergara, Pahola Ramos, Roberto Reyes, et al v. Kombu Kitchens SF, LLC (dba Nybll), Keven Thibeault, Kristen Thibeault, Alfonso Ventura et al* (Case No. RG20057449, Superior Court of California, County of Alameda) and *Aja de Coudreaux, Zena Evans, Daeun Hwang, Vera Lopez, Myriah Sims, Nicole Vassallo et al v. Kombu Kitchens SF, LLC (dba Nybll), Keven Thibeault, Kristen Thibeault, et al* (Case No. RG20058323, Superior Court of California, County of Alameda)

- *Julie Campbell, Diana Bickford And Kerrie Mulholland, Et Al V. Sirius Xm Radio, Inc.* (Case No. 2:22-cv-02261-CSB-EIL, CD, Il, Urbana Division)

- *Dan L. Boger v. The Maids International, LLC* (Case No. 8:24-cv-01466-TDC, DC, Md.)

- *Robert Hubble v. Loan Depot.com LLC* (Case No. 1:24-cv-11173-TLL-PTM, ED, Mi.)

- *Michael Smith et al v. Examworks, LLC and GEICO et al*. (Case No. 8:21-cv-02746-PX, DC, Md)

- *Byron Espanol et al v. Capital Vision Services, LLC, d/b/a myEye Dr. Optometry of Florida, LLC* (Case No. 6:24-cv-01024-PGB-DCI, MD. Fl)

- *Michael Osborn et al v. Hogarth California LLC et al* (Case No. CGC-22-598537, State of California, County of San Francisco)

- *Lee Abraham et al v. Loan Depot LLC* (Case No. 2:23-cv-00728-SMB, DC, Az)

- *Diaz et al. v Tri-City Auto Wash, Inc. et al* (Case No. 21CV003425, Superior Court of California, County of Alameda)

- *Robert Mason v. Spring EQ LLC* (Case No. :24-cv-01833-MWC-AGR, CD, Ca)

- *Tatiana Eastman et al v. United Parks and Resorts, Inc.* (Case No. 6:24-cv-01534-PGB-DCI, MD. Fl, Orlando Div.)

- *Sara Reyes V Five Diamond Cold Storage, Inc., Grow Smart Labor, Inc., Pedro Arellano-Moya And Jorge Esteban Fuentes* (Case No. 1:24-cv-00028-JLT-SAB, ED Ca, Fresno Div.)

- *Irma Barbosa and Cecilia Mata et al v. Delta Packing Company of Lodi, Inc. aka "Delta Fresh"; Salinas Farm Labor Contractor, Inc.; Ernie Costamagna, an Individual, Annamarie Costamagna, an Individual.* (Case No. 2:20-cv-01096-TLN-CSK, ED, Ca., Sacramento Div.)

# EXHIBIT 3

Filed 12/11/17; Certified for Publication 1/10/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| ABM INDUSTRIES OVERTIME CASES | JCCP No. 4502 |
| | A132387, A133077 & A133695 |
| | (City & County of San Francisco Super. Ct. No. CJC-07-004502) |

Respondent ABM Industries, Inc. (collectively with related respondents, ABM) is a large facility services company with employees throughout the United States, including thousands of janitorial workers at hundreds of job sites in California.  Appellants (referred to herein as plaintiffs) are present or former ABM janitorial employees.  On behalf of themselves and similarly situated Californians, plaintiffs filed their complaint in this coordinated proceeding in September 2007, alleging that ABM violated California labor laws by, among other things, failing to properly record and compensate employees for meal breaks; requiring employees to work split shifts without appropriate compensation; and failing to ensure that employees were reimbursed for expenses incurred when traveling between work sites.  In June 2010, plaintiffs moved for class certification of a general class of ABM workers and various subclasses of such workers who had been subjected to particular wage and hour violations.  After briefing and argument, the trial court found plaintiffs' expert evidence inadmissible and indicated orally that it was denying the class certification motion.  In response, plaintiffs filed a

1

motion pursuant to Code of Civil Procedure section 473, subdivision (b) (the 473(b) motion), attempting to supplement the evidence previously provided with respect to the qualifications of their expert.  By order dated June 29, 2011, the trial court denied plaintiffs' 473(b) motion.  Thereafter, on September 1, 2011, the trial court issued its written order, formally denying plaintiffs' class certification motion.  We conclude that the trial court's wholesale exclusion of plaintiffs' expert evidence in this case was error.  We further determine that the trial court's refusal to grant class certification on these facts was an abuse of discretion, and therefore reverse.

## I.     BACKGROUND

### A.     *Facts Underlying the Consolidated Complaint*

ABM's numerous California janitorial employees work at customers' workplaces scattered throughout the state.  ABM's job sites in California are organized into two regions (Northern California and Southern California), various branches within a region, and dozens of distinct districts within a branch.  A district is a number of buildings within a geographic area.  Each branch is under the supervision of a different branch manager. Employees report to an individual site supervisor, who in turn reports to the branch manager.  According to ABM, the site supervisor is responsible for "the daily operations of the location, including assurance that employees are paid properly and provided with their meal and rest breaks . . . ."  However, it appears that ABM's wage and hour policies are controlled centrally and thus applied uniformly throughout all janitorial job sites.  In addition, ABM pays all of its employees through use of a single software application, the Labor Management System (LMS).

ABM provides janitorial services to clients under contracts obtained through competitive bidding.  According to ABM, "[t]he low cost of entry in the facility services business has led to strongly competitive markets comprised of a large number of mostly regional and local owner-operated companies, primarily located in major cities throughout the United States."  In order to compete, ABM provides various contracts at agreed-upon prices.  For instance, ABM provides a fixed price contract where "the client agrees to pay a fixed fee every month over a specified contract term."  Under the cost-

2

plus arrangement, "the clients reimburse [ABM] for the agreed-upon amount of wages and benefits, payroll taxes, insurance charges and other expenses associated with the contracted work."  Given the fixed-price nature of these contracts, it is ABM, not the customer, who is responsible for higher labor costs if their employees cannot finish their assigned work within budgeted timeframes.  As Faisal Algaheim, ABM's Regional Operations Manager for Northern California, testified:  "The customer paid the contracted amount; the contracted price.  And if it is a fixed job—which means the customer will only pay us a contracted amount—whether we work more or less, it is our problem to maintain the cleaning specifications, and pay the employees currently."

All of ABM's non-exempt janitorial employees, who provide the services under these contracts, are entitled to the benefits prescribed by California's labor laws and the related wage orders promulgated by the Industrial Welfare Commission (Wage Orders).  For instance, "[p]ertinent meal period provisions require that '[n]o employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes . . . .'  (Cal. Code Regs., tit. 8, § 11050, subd. 11(A).)  '[A]n employer's obligation is to provide a first meal period after no more than five hours of work and a second meal period after no more than 10 hours of work.'  (*Brinker* [*Restaurant Corp. v. Superior Court* (2012)] 53 Cal.4th [1004,] 1049 [*Brinker*].)  To qualify as a lawful meal break under California law, an employee must be relieved of all duties for an uninterrupted 30 minutes.  (*Id.* at p. 1040; Cal. Code Regs., tit. 8, § 11050, subd. 11(A).)  If an employer fails to comply with these requirements it must pay one hour of pay at the employee's regular rate 'for each workday that the meal period is not provided.'  (Cal. Code Regs., tit. 8, § 11050, subd. 11(B); see Lab. Code, § 226.7, subd. (c).)"  (*Alberts v. Aurora Behavioral Health Care* (2015) 241 Cal.App.4th 388, 400 (*Alberts*).)  We refer to any extra hours of wages potentially due to employees under the labor laws as premium pay.

Similarly, pursuant to Wage Order 5-2001(4)(C):  "When an employee works a split shift, one hour's pay at the minimum wage shall be paid in addition to the minimum wage for that workday . . . ."  (See Lab. Code, § 1197 ["The minimum wage for

3

employees fixed by the commission or by any applicable state or local law, is the minimum wage to be paid to employees, and the payment of a lower wage than the minimum so fixed is unlawful."]; see also *id.*, §§ 1194, subd. (a) & 1194.2 [allowing civil action for recovery of unpaid wages].)  For purposes of this requirement, "split shift" is defined to mean "a work schedule which is interrupted by non-paid non-working periods established by the employer, other than bona fide rest or meal periods."  (Wage Order 5-2001(2)(R).)  Although the Wage Order does not define "bona fide meal period," the Division of Labor Standards Enforcement (DLSE) has historically taken the position that a bona fide meal period "is one that does not exceed one hour (60 minutes) in length." (DLSE Of Counsel H. Thomas Cadell, Jr., letter to Paul K. Schrieffer, Dec. 11, 2002.)[1]

Finally, California law requires employers to fully reimburse employees for expenses actually and necessarily incurred in the discharge of their duties, including automobile expenses.  (Lab. Code, § 2802; *Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 569 (*Gattuso*).)  This right to reimbursement cannot be waived. (*Gattuso*, *supra*, 42 Cal.4th at p. 561.)  However, an employer can discharge its reimbursement obligation in a number of different ways, including through reimbursement for actual expenses or mileage, or through lump sum payments.  (*Id.* at pp. 567–571.)

On September 19, 2007, plaintiffs filed their consolidated class action complaint in this matter (Complaint).  The Complaint alleges numerous violations of California's labor laws and Wage Orders, including violations related to missed meal periods, failure to provide mandatory split shift premium pay, and failure to compensate ABM employees for travel expenses incurred when travelling between job sites.  The Complaint additionally alleges unfair competition under Business & Professions Code section 17200, based on the asserted labor law violations.  Finally, it contains a claim

---

[1] Although the DLSE is responsible for enforcing California's labor laws, including Wage Orders, its interpretations of Wage Orders—while entitled to consideration and respect—are not binding.  (*Aleman v. Airtouch Cellular* (2012) 209 Cal.App.4th 556, 573 (*Aleman*).)

4

under the Private Attorneys General Act of 2004, Labor Code section 2698 et seq. (PAGA), to collect penalties based on ABM's alleged systemic wrongdoing.

**B.**   *Class Certification Motion*

After a number of years of discovery and other preliminary matters, plaintiffs filed their motion for class certification on June 14, 2010.  The motion sought certification of a general class described as "[a]ll non-exempt janitorial employees and former non-exempt janitorial employees employed by ABM in the State of California at any time from April 6, 2002 to the present" (ABM Workers) (italics omitted).  This putative class was estimated as of 2007 to include approximately 35,000 ABM janitorial employees.  In addition, the motion proposed seven subclasses of ABM Workers, the following four of which are relevant here:  (A) "ABM Workers who . . . suffered an automatic deduction of a half-hour although the employee actually worked through the deducted meal period . . ." (Unpaid Time/Meal Period Subclass);  (B) "ABM Workers who were not paid premium meal period wages when they (1) worked shifts of at least five hours without an uninterrupted meal period of at least 30 minutes, (2) worked shifts of at least 10 hours without a second uninterrupted meal period of at least 30 minutes, or (3) were provided a first meal period *after* the fifth hour of work" (Unpaid Meal Premium Subclass);  (C) "ABM Workers who were scheduled or required in a workday to work two or more shifts separated by a period of time that was not a bona fide meal period, but were not paid an additional hour of wages for each split shift" (Unpaid Split-Shift Premium Subclass);  and (D) "ABM Workers who were not reimbursed for expenses that were necessary to carry out their duties, including (1) the use of their own vehicles to travel between jobsites, or transport ABM supplies or equipment" (Reimbursement Subclass).[2]

Plaintiffs argued that class certification was warranted because, among other reasons, common legal and factual issues predominated.  For instance, plaintiffs alleged

---

[2] Plaintiffs declined to appeal from the denial of class certification for their other three proposed subclasses—the Unpaid Rest Premium subclass, the Unpaid Reporting Time subclass, and the Paystub subclass.

that ABM applied a uniform payroll policy which compensated employees according to anticipated work *schedules* rather than for hours actually worked, leading to uncompensated time.  In particular, according to plaintiffs, the LMS, ABM's payroll system, automatically deducted 30 minutes of work time for a meal period whenever an employee was scheduled for a shift of five or more hours, without sufficient documentary evidence that those meals were actually taken.  In addition, plaintiffs averred that analysis of the LMS disclosed a company policy of never paying statutorily required premium wages for missed meal periods or split shifts, despite the fact that some employees were scheduled to work split shifts and, reportedly, many routinely missed meals if they otherwise had insufficient time for cleaning.  Finally, plaintiffs claimed that, although ABM scheduled route workers to provide janitorial services at different locations within the same workday—and required them to travel between sites—the LMS disclosed very few instances in which employees were reimbursed for expenses.

According to plaintiffs, the legality of these common practices could most appropriately be decided on a classwide basis, and ABM's computerized payroll records could be used both to identify violations and to establish common policies.  In support of their motion, plaintiffs submitted declarations from 50 ABM Workers, including four named plaintiffs, stating that the schedules under which employees were paid often bore little relationship to the hours actually worked.  For instance, they often worked through meal periods because there was too much work to do.  In addition, plaintiffs provided evidence of company practices from various ABM supervisors and officials.  Finally, plaintiffs also submitted expert declarations from Aaron Woolfson, a provider of database services who analyzed certain timekeeping and payroll data maintained by ABM with respect to its employees.  For example, Woolfson determined that, of the 1,141,903 shifts greater than five hours that failed to show any time-out/time-in entries during the scheduled workday, 1,070,517 of those shifts (94 percent) nevertheless showed an automatic 30-minute meal period deduction.  Further, there was no indication in the records that premium pay was ever provided for missed meal periods.  In addition, although Woolfson identified 6,331 employees for whom ABM reported at least one shift

containing shift segments separated by more than one hour, there was no indication in the payroll records that split shift premium pay was ever provided.  Finally, as stated above, analysis of the payroll records disclosed very few instances in which employees were reimbursed for travel expenses (12,834 checks to 826 employees out of the 6,396 employees who worked 155,485 shifts at more than one job site).

ABM opposed plaintiffs' class certification motion, claiming that plaintiffs had failed to offer any "common evidence of a pattern or practice of wrongdoing."  Rather, ABM asserted, it promulgated its written meal policy both in its employee handbook and, as of late 2006, on timecards used by some employees.[3]  ABM also had a policy for travel reimbursement, and stated that its practice was not to schedule split shifts.  With respect to payroll, ABM acknowledges that there is no data in the LMS that describes when a meal period is taken.  Rather, the LMS shows the hours scheduled for each employee, by listing the scheduled start and end time for each shift.  In addition, the LMS automatically deducts a 30-minute meal period when warranted due to the length of the scheduled shift.  According to ABM, when employees have worked their regularly scheduled shifts, they are paid according to their schedule as listed on the LMS.  In contrast, if an employee worked additional time, including through a meal break, the site supervisor was required to submit an exception report for input into the payroll system, showing that the employee worked different hours than scheduled.[4]  Under these

---

[3] Specifically, the employee handbook stated:  "If you are a non-exempt employee . . . you may receive at least one half hour time off as a meal period.  Your supervisor schedules meal . . . periods."  The timecards, as of late 2006, stated more directly:  "State law requires that you take a meal break of at least thirty (30) minutes whenever you work five consecutive hours or more in a day.  The meal period must begin before you exceed five hours of work and you must sign in and out for your meal period."  According to the plaintiffs, however, timecards that recorded meal breaks were used by less than 15 percent of ABM employees.

[4] According to Woolfson, however, despite ABM's "timesheet maintenance" policy, of the 1,836,083 time entries in the data he reviewed, only 5,625 (0.3 percent) contained any adjustments to pay.  Moreover, at least one ABM manager testified that exception reports did not list missed meal breaks and that, in fact, supervisors were not required to report missed meals.

circumstances, ABM argued that class treatment was inappropriate because resolution of plaintiffs' claims would turn on multiple individualized inquiries, such as whether and when each employee took lunch breaks, why an employee failed to take a lunch break, how many miles a particular employee drove between work sites, whether a split shift employee received total wages for that day less than the minimum wage that they would otherwise have been owed, and whether the employee requested a split shift.

In support of its opposition, ABM submitted declarations from 14 current employees as well as excerpts from the depositions of certain of plaintiffs' declarants. According to ABM, the deposition testimony of plaintiffs' declarants cast "serious doubts" on their credibility. With respect to expert testimony, ABM did not provide its own expert, but argued generally that Woolfson's expert declaration should not be considered. ABM also requested that the court take judicial notice of certain deposition testimony provided by Woolfson in another case.

After hearing on April 19, 2011, the trial court issued its oral ruling denying class certification. As a preliminary matter, the court opined that the evidence submitted by Woolfson was inadmissible because his declarations failed to qualify him as an expert on anything material to the class certification motion. Although the court did not strike the Woolfson material, it concluded that it was not admissible "because it doesn't prove anything." When asked about the validity of the many factual findings set forth in the Woolfson declarations, the trial court responded that the question at hand was "whether or not a class should be certified" and that, in this regard, it was "not sufficient to ferret out individualized common questions." With respect to Woolfson himself, the court found many of the statements regarding his expertise conclusory and thus believed that he had not "demonstrated that this court should accept him as a person with particular background, experience, skills, [or] expertise to differentiate him from the rest of the world so he should be accepted by this court as an expert."[5] Since the trial judge rejected

---

[5] Although there was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court, it was attached to an attorney declaration rather than incorporated into Woolfson's own declaration. Under these

Woolfson as an expert, he was not qualified "to present to me opinions that are not generally understood by the rest of the world and to allow him to present hearsay material to rely on and to give me opinions."

On the merits, the trial court found certification inappropriate due to issues with the subclass definitions. In particular, the court appeared concerned that the subclasses were defined in terms of individuals who had been harmed, making class members unascertainable until the conclusion of the case. In addition, it concluded that the plaintiffs had failed to meet their burden to show that common issues of fact and law predominated over individual questions, "given the employment structure and the variety of circumstances that each worker finds him or her under." The trial court further noted with regards to predominance that the number of declarations submitted by plaintiffs disclosing labor code violations was insufficient standing on its own to establish commonality. Rather, it believed "evidence besides declarations would have to be submitted to show a common practice." However, when asked about whether the existence of ABM's auto-deduct policy for meal periods was evidence showing a common issue sufficient to support certification, the trial court responded: "Your class definition is wrong. It's not up to me to ferret through what you present and to see if I can craft a class somehow from what you are arguing." In the end, the trial court opined: "[T]he concept is not whether we can find a common question here. There are plenty of common questions, but the question is whether the common questions predominate over individual questions so that it would be appropriate to utilize the class action mechanism. And it's just a procedural device for the convenience and efficiency of the court and for the efficiency and economic self-interests of the litigants . . . . [¶] . . . Just because you might have a common question in here somewhere doesn't mean it's appropriate to have this case proceed as a class action."

Plaintiffs filed notices of appeal with respect to this oral ruling in June 2011 (case No. A132387).

---

circumstances, the court found it to be hearsay and indicated, regardless: "I feel it's my job to figure out whether somebody is an expert."

9

**C.**    *Motion for Relief Under Section 473, Subdivision (b)*

In the meantime, on May 11, 2011, following the oral denial of their class certification motion, plaintiffs filed their 473(b) motion, asking to augment the record with further evidence of Woolfson's credentials and expertise.  Plaintiffs sought introduction of this additional evidence in hopes that the trial court would accept Woolfson as an expert, reassess its ruling that Woolfson's declarations were hearsay, and reconsider its class certification decision in light of Woolfson's expert findings and conclusions.[6]  In support of their motion, plaintiffs argued that it was excusable neglect not to have made a more thorough demonstration of Woolfson's qualifications prior to the hearing on the class certification motion because ABM had given no indication that it was raising a serious challenge to those qualifications.  Specifically, ABM had failed to lodge a formal objection to the evidence, move to strike the declaration, depose Woolfson on his credentials or conclusions, and/or provide their own contrary expert opinion.  Instead, ABM simply made a brief argument in its opposition papers that Woolfson was not qualified to analyze the data in question and that the opinions he offered were conclusory and based on common experience.[7]

The trial court denied plaintiffs' 473(b) motion after hearing on June 8, 2011.  According to the court, plaintiffs had not shown grounds for relief under that statute.  In particular, the trial court opined:  "Well, the problem with your certification motion was discussed in great detail at the hearing on the motion, and the problem was multifaceted.  It covered a full range of matters, none of which falls into the category of a technical

---

[6] Code of Civil Procedure section 473, subdivision (b), provides in relevant part: "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect."

[7] This was apparently in contrast to a previous case where counsel for ABM (representing a different party) had vigorously challenged the same Woolfson declaration by submitting written objections, filing rebuttal declarations by defense experts, and extensively cross-examining Woolfson at deposition.  According to plaintiffs' 473(b) motion, these efforts failed and Woolfson was nevertheless qualified as an expert in that case.

failing by the lawyer; in other words, the idea that the problem here is that the lawyers did something wrong and therefore I should relieve the parties from the lawyers' mistake is not what happened here."

According to the trial court, the real issue in the case was that ABM Workers were not a group of workers that were susceptible to being treated as a class, and thus there were no predominant questions of fact or law. The trial court also reiterated its problems with the plaintiffs' proposed class definitions. In the end, the court indicated that it had reviewed the supplemental evidence provided by plaintiffs and that—even if it agreed to consider it—it would not change the court's view on certification. As the court opined: "Whether or not this witness is qualified to give the opinions, the opinions are not material to this case . . . ." A written order memorializing the trial court's denial of the 473(b) motion was filed on June 29, 2011, and a timely notice of appeal with respect to that order was filed on August 29, 2011 (case No. A133077).

**D.     *Order Denying Class Certification***

The trial court's written order denying class certification was ultimately filed on September 1, 2011. The court first reiterated its conclusion that the Woolfson declarations submitted by plaintiffs in support of their class certification motion were inadmissible, stating "there is no evidence that Mr. Woolfson is an expert in any area that is material to this case." As discussed above, the record did contain two orders (from state and federal courts) certifying Woolfson as an expert. The trial court, however, found that the facts set forth in those orders were hearsay and concluded, regardless: "<u>Whether Mr. Woolfson was accepted as an expert in state and federal court is immaterial:  the Court does its own work regarding the admissibility of expert testimony</u>."

With respect to the merits, the trial court first concluded that plaintiffs' class definition was unworkable. It found plaintiffs' general class definition permissible:  "All non-exempt janitorial employees and former non-exempt janitorial employees employed by ABM in the State of California at any time from April 6, 2002 to the present." However, noting that courts have rejected class claims when the class definition is simply

11

shorthand for persons possibly wronged by the defendant, the trial court found fault with the plaintiffs' seven subclasses, opining that "defining the proposed class(es) by reference to the alleged injury or injuries sustained is a fatal defect, because the members of the class cannot be ascertained until the lawsuit is concluded."  According to the trial court, under such circumstances, "it is impossible to identify who is a member of the putative class, which makes it impossible to provide them with notice of the lawsuit, and which therefore also makes it impossible to determine who will be bound by the judgment."  The trial court also found fault with the fact that the sum of the seven subclasses did not add up to the entire general class.

In addition to these ascertainability issues, the trial court also concluded that class treatment of plaintiffs' claims was inappropriate because plaintiffs failed to demonstrate that common questions predominate over individual inquiries.  In particular, the court found that plaintiffs did not provide sufficient evidence of a common scheme with respect to the negotiation of contracts which, by their terms, led to ABM employees being underpaid.  In addition, the court determined that the declarations submitted by plaintiffs regarding claimed labor law violations were insufficient in number, "without additional evidence," to demonstrate a common practice.  In sum, the court opined that "consideration of all the factors relevant to class certification demonstrates that individual inquiries will predominate in determining all of the putative class members' claims, and therefore class certification is not a superior method of resolving the instant case."

Following entry of the trial court's written order denying class certification, appellants filed a third notice of appeal (case No. A133695).  By order dated January 26, 2012, the three cases were consolidated for all future proceedings in this court.  In addition, at the parties' request, we stayed the matter pending issuance by the Supreme Court of its decision in *Brinker*, *supra*, 53 Cal.4th 1004.  Once the Supreme Court's opinion in *Brinker* was final, a briefing schedule was set, and the matter is now before us for decision.

12

## II.      DISCUSSION

### A.      *Admissibility of Expert Evidence*

As a preliminary matter, we must address the trial court's decision to disregard the declarations of plaintiffs' expert, Woolfson, in making its class certification determination.  As both parties have accurately asserted, we review a trial court's ruling on the admissibility of expert evidence for abuse of discretion.  (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 187.)  " 'However, the discretion to admit or exclude evidence is not unlimited.  "The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown." ' "  (*Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 291–292 (*Kotla*).)  This is especially true when, as here, a trial court's exercise of discretion "implicates a party's ability to present its case."  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon Enterprises*); see *Brown v. Colm* (1974) 11 Cal.3d 639, 647 (*Brown*) ["the exclusion of the sole expert relied upon by a party because of an erroneous view of his qualifications is, in a case where expert testimony is essential, an abuse of discretion as a matter of law requiring reversal"].)  Indeed, in this context, courts must "be cautious in excluding expert testimony" as the trial court's gatekeeping goal "is simply to exclude 'clearly invalid and unreliable' expert opinion."  (*Sargon Enterprises*, at p. 772.)

Should we determine in this case that an abuse of discretion has occurred, that conclusion alone is not sufficient to support reversal of the trial court's certification decision.  Rather, the "judgment of the trial court may not be reversed on the basis of the erroneous admission of evidence, unless that error was prejudicial."  (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 799 (*Grail Semiconductor*); see Code Civ. Proc., § 475.)  Article VI, section 13, of the California Constitution further provides that "a judgment may not be set aside based on the erroneous admission of evidence 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error

complained of has resulted in a miscarriage of justice.' " (*Grail Semiconductor*, *supra*, 225 Cal.App.4th at p. 799; see Evid. Code, § 353.)  "In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Grail Semiconductor*, at p. 799.)  Thus, our task on appeal is to determine whether an abuse of discretion has occurred and, if so, whether it is reasonably probable that a result more favorable to plaintiffs would have been obtained absent the error.

As detailed above, the trial court in the present case based its decision to exclude Woolfson's expert declarations on two separate grounds—that Woolfson had not properly established himself as an expert and that, regardless, the information that he presented via expert declaration was not material to this case.  With respect to Woolfson's expert qualifications, although the trial court acknowledged in its order denying class certification that Woolfson indicated an expertise "in creating, managing and analyzing large databases," it rejected him as an expert, finding no evidence that he had "formal training or degrees that would qualify him as an expert to review the timekeeping and payroll data at issue."  The trial court also noted that "Mr. Woolfson's declaration does not set forth any evidence that he holds certificates, has obtained any kind of college or other professional degree, belongs to any professional organizations, has published any articles, taught or has ever testified as an expert witness at trial."  Further, at the April 2011 hearing denying class certification, the trial court indicated that it believed the qualification information supplied by Woolfson in his expert declaration was too general to establish him as an expert.  For example, the trial court stated: "[Woolfson] says he has extensive experience in creating, managing, and analyzing large databases, including, and then he lists a number of things.  I have no idea what the term 'extensive' means.  It looks to me like a conclusion that he hasn't explained in any way.  He doesn't say how many years, how many assignments, what the nature of the assignments were, what the nature of his tasks were or anything of the like."  Similarly, the trial court noted that "without any detail" Woolfson stated that he "has provided

14

payroll and timekeeping database analysis for attorneys in numerous wage-hour cases. That does not communicate any specific facts of the type that is usually relied upon to qualify an expert."

While the better course of action in this case clearly would have been to provide the trial court with a more extensive explanation of the specifics of Woolfson's expertise, we believe that, under the circumstances, the trial court erred by refusing to qualify Woolfson as an expert in database management and analysis based on the materials before it. "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, *or* education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a), italics added.) "Expertise, in other words, 'is relative to the subject,' and is not subject to rigid classification according to formal education or certification." (*People v. Ojeda* (1990) 225 Cal.App.3d 404, 408.) Rather, an expert's qualifications can be established in any number of different ways, including "a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion." (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115 (*Howard Entertainment*).) In sum, with respect to expert qualification, "[t]he determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth, and no hard and fast rule can be laid down which would be applicable in every circumstance." (*Brown*, *supra*, 11 Cal.3d at p. 645; see *Howard Entertainment*, at p. 1115.)

Once this threshold has been met, questions regarding *the degree* of an expert's knowledge go more to the weight of the evidence presented than to its admissibility. (See *People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1079–1080; see also *Jordan v. Allstate Insurance Co.* (2004) 116 Cal.App.4th 1206, 1217 [where expert declaration was sufficient to demonstrate " 'special' " knowledge of the subject matter, the "weight and value" of the expert opinion was a matter for the trier of fact].) Finally, the ability of an expert witness to testify as to either facts or opinions is limited to matters that are not

15

common knowledge.  Thus, for example, "[e]xpert testimony as to facts may be necessary where the facts from which conclusions are to be drawn are peculiarly within the expert's knowledge and are not a matter of common knowledge as to which an ordinary witness may competently testify."  (1 Witkin, Cal. Evid. (5th ed. 2012) Opinion Evidence, § 27, p. 638.)  Similarly, expert opinion should be excluded " ' "when 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness.' " ' "  (*Kotla*, *supra*, 115 Cal.App.4th at p. 291; see Evid. Code, § 801, subd. (a).)

Here, Woolfson provided a declaration indicating that he was a founder of TelSwitch, Inc., a company which "builds and develops telephonic database service for several major telecommunications companies to manage their billing, as well as calculating and maintaining extensive databases related to the accurate calculation of the rates and rounding mechanisms used on telecommunications services."  Woolfson further declared that he was a managing partner of Merkt-Woolfson, a company which "produces billing and database mechanisms for banks to keep track of the paperwork that banks require to maintain mortgage and loan origination" and also provides "extensive database management services to both government and private industries," including "the largest banks, military contractors, and publicly held telecommunications carriers where accuracy and accountability are a necessity."  Moreover, according to Woolfson, a "typical transaction load" for an "average database" maintained by his company was approximately one million records a day; he was "accustomed to, and comfortable with, working with a large amount of data across a variety of industries, including for litigation purposes"; and he had "extensive experience in creating, managing, and analyzing large databases," including specifically timekeeping databases.

Woolfson's expert declaration additionally indicated that he had provided "payroll and timekeeping database analysis for attorneys in Northern and Southern California involving numerous wage and hour class action cases."  He then described the timekeeping records he had received from ABM—including, for example, "1,836,083 Time Entries in Microsoft Excel$^{TM}$ files covering 27,183 employees who performed

16

1,500,175 shifts of work at 5380 Job Site locations from 12-08-02 through 07-18-07"—and walked through his step-by-step analysis of those records. Indeed, Woolfson went so far as to set forth the specific Structured Query Language (SQL) queries he used to extract relevant information from ABM's records.[8]

We reiterate that additional information regarding the specifics of Woolfson's expertise in matters relevant to this case would clearly have been preferable.[9] However,

_____

[8] As stated above, in addition to Woolfson's expert declarations, the plaintiffs submitted an attorney declaration that, among other things, attached two court orders from cases in which Woolfson had reportedly been qualified as an expert under similar circumstances. (See *Avalos v. La Salsa, Inc.* (Super. Ct. Santa Barbara County, 2010, JCCP No. 4488 (*Avalos*) [order dated May 17, 2010, granting in part and denying in part plaintiff's motion for class certification]; see also *Hines v. KFC U.S. Properties, Inc.* (S.D. Cal., Oct. 22, 2010, No. 09-cv-02422-JM (POR) (*Hines*) [order granting in part and denying in part motion for class certification, which states at page 6 that "Mr. Woolfson is an expert in the compilation and analysis of databases, based upon his declaration which sets forth his qualifications and the methods and procedures adopted to analyze the data."].) At the April 2011 hearing on class certification, the trial court initially indicated that it believed there was evidence in the record that Woolfson had *not* previously qualified as an expert. When plaintiffs' counsel mentioned the two cases cited above as instances where Woolfson had been qualified, the court opined that the referenced court orders were hearsay and that, regardless, it chose not to take judicial notice of them because it believed it was the court's job "to figure out whether somebody is an expert." The court's written order denying class certification reiterated this sentiment, stating that whether Woolfson was "accepted as an expert in state and federal court is immaterial; the Court does its own work regarding the admissibility of expert testimony." We agree with both the trial court and ABM that one court is not *required* to adopt another court's conclusion that an individual is an expert in a particular matter, although it may do so. (See *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 513–514.) However, that a proposed expert has been previously qualified seems, at the very least, relevant to another court's subsequent qualification analysis and we question the trial court's perhaps overly technical application of the hearsay rule when establishing prior expert qualification via judicially noticed court order. Nevertheless, we need not finally reach the issue, as we would find error here regardless of whether Woolfson's history as a qualified expert is considered.

[9] For instance, in a supplemental declaration filed in connection with plaintiffs' 473(b) motion, Woolfson clarified that he had *over 24 years* of experience developing highly accurate database applications for companies such as Japan Telecom America, Experian, Bank of America, and JP Morgan Chase; that his database techniques were

17

we conclude that the materials submitted in advance of the April 2011 hearing on class certification in this case were sufficient to qualify Woolfson as an expert in database management and analysis, and that the trial court's conclusion to the contrary was an abuse of discretion.  In particular, we find that the trial court's emphasis on formal education and membership in professional organizations was misplaced with respect to Woolfson's stated expertise, given his clear familiarity with numerous, highly complex transactions in that subject matter.  (See *Howard Entertainment*, *supra*, 208 Cal.App.4th at p. 1115.)  Indeed, while admittedly not detailed, Woolfson's declaration did indicate that he had "extensive experience" in database management and analysis, including statements that he held leadership positions in two database companies which serviced the "largest banks, military contractors, and publicly held telecommunications carriers"; that his company handled typical transaction loads of approximately one million records per day on "average" databases it maintained; and that he had previously provided payroll and timekeeping database analysis in numerous wage and hour class action cases in California.  Moreover, although ABM did argue briefly before the trial court that Woolfson was not qualified to analyze the data at issue and that certain of his conclusions were overly broad and lacked sufficient factual foundation, ABM did not challenge the veracity of any of Woolfson's qualifications as set forth in his declaration, nor did it contest *even a single one* of the myriad factual findings made by Woolfson during the course of his analysis.

---

used by the federal government, including by the Department of Justice and the Patriot Missile Defense Training System; that he had a number of relevant professional certifications; that his authored works included an analysis of the merger between Continental Airlines and United Airlines that was presented to the Senate Judiciary Committee in 2010; that he had qualified as an expert in *Avalos* and *Hines*, both wage and hour class actions in which the courts relied on his analysis in granting class certification; and that he had been retained as an expert in over 40 cases (90 percent class actions) by both plaintiffs and defendants to analyze "timekeeping, payroll records, telephone call records, credit card records, reimbursement records, and travel records (e.g., gps data and locations where employees worked)."

Under these circumstances, plaintiffs' evidence supporting Woolfson's expert qualifications showed that he had "sufficient skill or experience" in the field of database management and analysis such that his declarations should have been considered by the trial court.  (See *Brown*, *supra*, 11 Cal.3d at p. 645.)  Nevertheless, the trial court chose to reject all of the information provided by Woolfson, despite the fact that, as we discuss further below, Woolfson's analysis of the ABM database was central to plaintiffs' class certification motion, and thus the trial court's decision effectively foreclosed plaintiffs' ability to put on their case.  (See *Sargon Enterprises*, *supra*, 55 Cal.4th at p. 773; *Brown*, *supra*, 11 Cal.3d at p. 647.)  This was error.

While we do not here pass on the admissibility of *every* opinion reached by Woolfson based on his manipulation of ABM's database, we find the many facts generated by Woolfson's analysis clearly admissible as matters beyond the common knowledge or experience of an ordinary witness.[10]  (See *Business Objects, S.A. v. MicroStrategy, Inc.* (Fed. Cir. 2005) 393 F.3d 1366, 1368 [noting that SQL requires the user to "understand the structure and content of the relational database as well as the complex syntax of the specific query language" and that "[t]hese complexities generally prevent laypersons from drafting queries in query languages."].)  Moreover, as evidence of ABM's common wage and timekeeping practices, Woolfson's results would unquestionably aid a jury in its search for the truth regarding any alleged classwide wage or hour violations in this case.  (See *Brown*, *supra*, 11 Cal.3d at p. 645; *Howard Entertainment*, *supra*, 208 Cal.App.4th at p. 1115; see also *Brinker*, *supra*, 53 Cal.4th at p. 1033 ["Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment."].)

---

[10] As just one example, Woolfson identified ABM workers scheduled to work shift segments separated by more than one hour on the same day, without any indication of premium pay, through use of the following SQL queries:  "1.  *select count (\*) from workdata where SplitShiftViolation='YES' and isWork ='YES'*  [¶]  2. *select distinct reference from workdata where SplitShiftViolation ='YES' and iswork ='YES'.*"

Frankly, we are somewhat mystified by the trial court's wholesale exclusion of the entirety of Woolfson's evidence in this matter. Upon review, it appears that the trial court's conclusions regarding the admissibility of the Woolfson materials were impermissibly tainted by its strong views with respect to the underlying merits of plaintiffs' class certification motion—that is, that class certification was improper due to the individualized inquiries that would be required to establish which ABM employees, if any, had been harmed in this matter. This determination, moreover, appears to have been based, at least in part, on the mistaken notion that database analysis of timekeeping and payroll records cannot be used as a means to show common practices for purposes of class certification. Indeed, at the June 2011 hearing on plaintiffs' 473(b) motion, through which plaintiffs were attempting to bolster Woolfson's expert credentials, the trial court opined that ABM workers were "not susceptible to be treated as a class, period" and that the "basic problem" in the case was that "individualized analysis of working situations" would be needed "to understand why a worker may not have been given a lunch break." Thus, in the opinion of the trial court: "*Whether or not this witness is qualified* to give the opinions, the opinions are not material to this case." (Italics added.)

In sum, it was error for the trial court to completely disregard plaintiffs' proffered expert evidence of common practice, rather than accepting it for what it was and weighing it against the existence of any individualized inquiries that might properly have defeated plaintiffs' request for class certification. Moreover, as we discuss in detail below, the trial court's decision clearly prejudiced plaintiffs, as it left them without any evidence of systemic wrongdoing other than the information contained in the declarations and deposition testimony submitted in connection with their class certification motion, materials which the trial court found insufficient in number to demonstrate predominant common questions. Indeed, the trial court expressly stated: "The number of declarations [submitted by plaintiffs] compared to the number of employees by itself would not be sufficient [to demonstrate predominance]. . . . What I'm suggesting is that *evidence besides declarations would have to be submitted to show a common practice*." (Italics added.) Yet this was precisely the evidence that the trial court excluded. Since we find it

20

reasonably probable that a result more favorable to the plaintiffs would have been reached in the absence of this error, the trial court's order denying class certification cannot stand.  (See *Kotla*, *supra*, 115 Cal.App.4th at p. 294.)[11]

**B.**      ***Class Certification Issues***

1.      *Rules Governing Class Actions and Standard of Review*

The requirements for class certification are well established and were recently summarized by our high court in *Brinker*, *supra*, 53 Cal.4th 1004, 1021:  "Originally creatures of equity, class actions have been statutorily embraced by the Legislature whenever 'the question [in a case] is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . .'  [Citations.]  Drawing on the language of Code of Civil Procedure section 382 and federal precedent, we have articulated clear requirements for the certification of a class.  The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives.  [Citations.]  'In turn, the "community of interest requirement embodies three factors:  (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' "

" '[T]his state has a public policy which encourages the use of the class action device.' " (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 340 (*Sav-On*).)  Further, whether class certification should be granted is a procedural question, and not a question of whether the action is " 'legally or factually meritorious.' " (*Id.* at p. 326.)  As a general matter, " 'a class action is not inappropriate simply because

_____

[11] Because we conclude that the trial court erred in failing to consider Woolfson's expert declarations when making its class certification determination at the hearing in April 2011 (as memorialized by the court's order denying plaintiffs' motion for class certification filed on September 1, 2011), we need not reach the issue of whether the trial court also erred in refusing to grant plaintiffs' 473(b) motion so that additional evidence of Woolfson's expert qualifications could be brought before the court.

each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery or as to the amount of his or her damages.' " (*Id.* at p. 333.)

In addition, with respect to the superiority of the class action mechanism—and as is pertinent to our present inquiry—we have previously noted that "[c]ourts regularly certify class actions to resolve wage and hour claims. [Citations.] In this arena the class action mechanism allows claims of many individuals to be resolved at the same time, eliminates the possibility of repetitious litigation and affords small claimants with a method of obtaining redress for claims which otherwise would be too insignificant to warrant individual litigation. [Citation.] Moreover, the issues slated for contest are primarily common issues involving common evidence. It would not be efficient or fair to relegate these complaints to multiple trials." (*Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1208 (*Bufil*); see *Brinker*, *supra*, 53 Cal.4th at p. 1033.)

Indeed, as our high court elaborated in *Brinker*, a theory of liability that an employer "has a uniform policy, and that that policy, measured against wage order requirements, allegedly violates the law—is by its nature a common question eminently suited for class treatment." (*Brinker*, *supra*, 53 Cal.4th at p. 1033.) "[I]n the general case to prematurely resolve such disputes, conclude a uniform policy complies with the law, and thereafter reject class certification . . . places defendants in jeopardy of multiple class actions, with one after another dismissed until one trial court concludes there *is* some basis for liability and in that case approves class certification. [Citation.] It is far better from a fairness perspective to determine class certification independent of threshold questions disposing of the merits, and thus permit defendants who prevail on those merits, equally with those who lose on the merits, to obtain the preclusive benefits of such victories against an entire class and not just a named plaintiff." (*Id*. at p. 1034.)

"California courts consider 'pattern and practice evidence, statistical evidence, sampling evidence, expert testimony, and other indicators of a defendant's centralized practices in order to evaluate whether common behavior towards similarly situated plaintiffs makes class certification appropriate.' " (*Jaimez v. Daiohs USA, Inc.* (2010)

22

181 Cal.App.4th 1286, 1298 (*Jaimez*).)  Other relevant factors include " 'whether the class approach would actually serve to deter and redress alleged wrongdoing.' "  (*Ibid.*)  Moreover, in the wage and hour context, "[w]e have recognized that retaining one's employment while bringing formal legal action against one's employer is not 'a viable option for many employees,' " and thus a class action may be appropriate as "a current employee who individually sues his or her employer is at greater risk of retaliation." (*Gentry v. Superior Court* (2007) 42 Cal.4th 443, 459, abrogated on other grounds as stated in *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 359– 360; see also *Williams v. Superior Court* (2017) 3 Cal.5th 531, 558, citing *Gentry*.)  And, in *Gentry* our high court noted that class actions may be particularly useful for immigrant workers with limited English language skills, as illegal employer conduct might otherwise escape their attention.  (*Gentry*, at p. 461.)

A ruling on class certification is reviewed for abuse of discretion.  (*Brinker*, *supra*, 53 Cal.4th at p. 1022; *Sav-On*, *supra*, 34 Cal.4th at p. 326.)  Under this standard, " '[a] certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.' "  (*Brinker*, *supra*, 53 Cal.4th at p. 1022; see *Bufil*, *supra*, 162 Cal.App.4th at p. 1204 [noting that while "[t]rial courts enjoy wide discretion with regard to class certification," we will nevertheless reverse and order denying class certification "if the order is based on improper criteria or incorrect assumptions"].)  Moreover, "[a]n appeal from an order denying class certification presents an exception to customary appellate practice by which we review only the trial court's ruling, not its rationale.  If the trial court failed to conduct the correct legal analysis in deciding not to certify a class action, ' "an appellate court is required to reverse an order denying class certification . . . , 'even though there may be substantial evidence to support the court's order.' " '  [Citation.]  In short, we must ' "consider only the reasons cited by the trial court for the denial, and ignore other reasons that might support denial." ' "  (*Alberts*, *supra*, 241 Cal.App.4th at p. 399.)

23

On the issue of predominance, a trial court's finding is generally reviewed for substantial evidence.  (*Brinker*, *supra*, 53 Cal.4th at p. 1022.)  Thus, "[w]e must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' " (*Ibid.*)  However, since the focus of this type of certification dispute "is on what type of questions—common or individual—are likely to arise in the action, rather than on the merits of the case [citations], in determining whether there is substantial evidence to support a trial court's certification order, we consider whether the *theory of recovery* advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.  [Citations.]  'Reviewing courts consistently look to the allegations of the complaint and the declarations of attorneys representing the plaintiff class to resolve this question.' " (*Sav-On*, *supra*, 34 Cal.4th at p. 327, italics added.)

In the instant case, plaintiffs contend that the trial court abused its discretion, both in concluding that their proposed subclasses are not ascertainable and in determining that common issues do not predominate over individual inquiries.  We consider each claim in turn.

2.      *Ascertainability*

As stated above, the trial court refused to certify this matter as a class action because, among other reasons, it believed the subclasses proposed by appellants were not ascertainable.  In particular, the trial court opined that defining the proposed subclasses by reference to the alleged Labor Code violations sustained was a "fatal defect," because the putative subclass members could not be identified without a determination on the merits of each class member's case.  The court reasoned that, when the "class definition is simply shorthand for persons possibly wronged by the defendant," it is impossible to identify putative class members until the lawsuit is concluded, making it impossible both to provide appropriate notice and to determine who will be bound by the judgment.  The trial court also found fault with the fact that the sum of the seven subclasses did not add up to the entire general class of non-exempt janitorial employees, because some members of the general class may not have suffered any harm.  Unsurprisingly, ABM agrees with

24

the trial court on appeal, arguing that "the only means by which the many subclasses could be ascertained was by a trial on the merits, requiring the testimony of each and every putative class member on each and every claim, a concept that is antithetical to the very concept of class litigation." In our opinion, however, both the trial court and ABM have fundamentally misapprehended the concept of ascertainability as it applies to the circumstances of this case.

"Ascertainability is achieved 'by defining the class in terms of objective characteristics and common transactional facts making the ultimate identification of class members possible when that identification becomes necessary.' " (*Bomersheim v. Los Angeles Gay & Lesbian Center* (2010) 184 Cal.App.4th 1471, 1483; see *Nicodemus v. Saint Francis Memorial Hospital* (2016) 3 Cal.App.5th 1200, 1212 (*Nicodemus*); *Aguirre v. Amscan Holdings, Inc.* (2015) 234 Cal.App.4th 1290, 1300 (*Aguirre*).) "In determining whether a class is ascertainable, the trial court examines the class definition, the size of the class and *the means of identifying class members*." (*Bufil*, *supra*, 162 Cal.App.4th at p. 1207, italics added.) Thus, a plaintiff is not required to establish the identity of class members at the class certification stage of the proceedings. (*Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1274.)

Moreover, "[w]hile often it is said that '[c]lass members are "ascertainable" where they may be readily identified without unreasonable expense or time by reference to official records' [citations], that statement must be considered in light of the purpose of the ascertainability requirement." (*Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 101 (*Medrazo*).) " 'Ascertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata.' " (*Aguirre*, *supra*, 234 Cal.App.4th at p. 1300.) Therefore, "[t]he goal in defining an ascertainable class 'is to use terminology that will convey "sufficient meaning to enable persons hearing it to determine whether they are members of the class plaintiffs wish to represent." [Citation.] " . . . Otherwise, it is not possible to give adequate notice to class members or to determine after the litigation has concluded who is barred from relitigating." ' " (*Id.* at pp. 1300–1301; see also *Medrazo*, at p. 101

25

[ascertainability requirement is satisfied if "the potential class members may be identified without unreasonable expense or time and given notice of the litigation, and the proposed class definition offers an objective means of identifying those persons who will be bound by the results of the litigation"].)

In sum, a class is ascertainable if a plaintiff supplies a reasonable means of identifying potential class members and the class is defined in terms of objective characteristics and common transactional facts sufficient to allow a class member to identify himself or herself as having a right to recover based on that description.  So long as these requirements are met, a class is ascertainable "even if the definition pleads ultimate facts or conclusions of law."  (*Hicks v. Kaufman and Broad Home Corp.* (2001) 89 Cal.App.4th 908, 915–916 (*Hicks*); see *Faulkinbury v. Boyd & Associates, Inc.* (2013) 216 Cal.App.4th 220, 226, 240–241 (*Faulkinbury*) [directing certification of subclasses based on meal break, rest break, and overtime violations]; *Jaimez*, *supra*, 181 Cal.App.4th at pp. 1291–1292, 1295–1296 [directing certification of classes found ascertainable by the trial court, including a meal break class "based upon the failure to permit or authorize meal breaks and the failure to pay one hour of wages for each meal break violation" and an overtime class "based upon the failure to pay overtime to the class"]; *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1529, 1539 [directing certification of two subclasses based on failure to pay earned wages and overtime and failure to provide mandatory rest breaks].)  Under this established analytical framework—and when one considers the data supplied by Woolfson—the trial court's conclusion that the proposed subclasses in this case are unascertainable due to the need for individualized merit determinations is simply not defensible.

Indeed, we recently considered and rejected a similar argument in *Nicodemus*, *supra*, 3 Cal.App.5th 1200.  In that case, the plaintiff filed an action alleging that she was overcharged for copies of her patient medical records, which were sought in anticipation of litigation by her attorney pursuant to Evidence Code section 1158.  The named defendants were the plaintiff's hospital (Saint Francis) and HealthPort Technologies, LLC (HealthPort), a company that, during the relevant timeframe, provided Saint Francis

with patient medical record release of information services pursuant to a contract. (*Nicodemus*, at pp. 1205, 1207.)  The plaintiff moved for certification of a class comprised of all patients who requested medical records from a California medical provider through an attorney prior to litigation and who were charged by HealthPort more than the statutory maximum set forth in Evidence Code section 1158.  (*Id.* at pp. 1205–1206, 1208.)  The trial court concluded that the plaintiff's proposed class was unascertainable.  (*Id.* at p. 1210.)  Although HealthPort tracked all attorney requests using a separate billing code in its database, the trial court concluded that the data set was over-inclusive because the plaintiff "had not presented a mechanism for determining whether attorneys' requests were submitted ' "prior to litigation" . . . without individualized inquiry, for example, by asking' each attorney."  (*Ibid.*)

On appeal, we concluded that the trial court erred as a matter of law in finding that the proposed class was not ascertainable.  (*Nicodemus*, *supra*, 3 Cal.App.5th at pp. 1213–1217.)  Because it is highly relevant to the case at hand, we set out our reasoning in some detail:  "[E]ven assuming the attorney request data set does include some unknown number of requests that were submitted after litigation was commenced (or after defendants' first appearance) or for reasons unrelated to litigation, this fact would not defeat ascertainability.  HealthPort argued, and the trial court concluded, that a class is not ascertainable if the class members who are entitled to recover from the defendants cannot be identified without an individualized inquiry.  That is not, however, the standard for determining whether a class is *ascertainable*.  As noted, '[a]scertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata.  [Citations.]  . . . As long as the potential class members may be identified without unreasonable expense or time and given notice of the litigation, and the proposed class definition offers an objective means of identifying those persons who will be bound by the results of the litigation, the ascertainability requirement is met.'  (*Medrazo*, *supra*, 166 Cal.App.4th at p. 101.)  Plaintiff here has identified the class in terms of objective characteristics, tracking the provisions of section 1158; if it is determined later in the litigation that the '07' data set includes requests not made

27

pursuant to section 1158, 'those [persons] can be eliminated from the class at that time.' (*Aguiar v. Cintas Corp. No. 2*, *supra*, 144 Cal.App.4th at p. 136 (*Aguiar*); see also *Sav-On*, *supra*, 34 Cal.4th at p. 333 [' "a class action is not inappropriate simply because each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery" ']; *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 743 [class of all employees in certain job categories ascertainable even though some employees may not have worked overtime and thus may not be entitled to any recovery].)  Nor should a court 'decline to certify a class simply because it is afraid that insurmountable problems may later appear at the remedy stage.' " (*Nicodemus*, *supra*, 3 Cal.App.5th at p. 1214.)  Thus, contrary to the trial court's belief, possible over-inclusiveness in the method proposed for identifying potential class members does not defeat ascertainability.

In reaching our conclusion in *Nicodemus*, we distinguished *Hale v. Sharp Healthcare* (2014) 232 Cal.App.4th 50 (*Hale*)—a case relied on by ABM here—in which a class was decertified after nearly three years of litigation, discovery, and notice to potential class members.  (*Id.* at pp. 53–55; see *Nicodemus*, *supra*, 3 Cal.App.5th at pp. 1215–1216.)  *Hale* involved an allegation that a class of persons who self-paid for emergency room treatment were overcharged when compared to insured persons.  (*Hale*, at p. 53.)  In moving to decertify, the defendant argued that the class was not ascertainable because the defendant did not keep records in such a way "as to reasonably and readily identify those included in the class definition without individualized inquiries."  (*Id.* at p. 55.)  The trial court agreed with the defendant and the appellate court affirmed, opining with respect to ascertainability that "[i]t is the inability to reasonably distinguish those individuals [later determined to qualify for coverage] from individuals who were actually uninsured and then to identify any disparity in amounts paid that make it unreasonable to ascertain the defined class."  (*Ibid*.)  In *Nicodemus*, we distinguished *Hale*, both because of its "distinctive procedural posture" and because, under *Hale*'s facts, "it was indisputably demonstrated that there was simply no way to

28

avoid a complicated individualized inquiry to determine not just eligibility for damages but *to prove liability*." (*Nicodemus*, *supra*, 3 Cal.App.5th at p. 1216, italics added.)

In contrast, we found *Bufil*, *supra*, 162 Cal.App.4th 1193, instructive.  In *Bufil*, which involved meal and rest break claims, "[t]he proposed class was defined as employees for whom the defendant's records showed a meal period not taken because the employee was the only person in the store or was the only person present except for a trainee." (*Nicodemus*, *supra*, 3 Cal.App.5th at p. 1216.)  "Although employees who missed a meal period could be identified from the defendant's records, employees who missed a rest period could not." (*Ibid.*)  However, Bufil submitted evidence that the defendant had a policy that hourly employees who were working alone or only with a trainee were not allowed to go off duty for any type of break, and argued that the records identifying class members who missed meal periods for the reasons specified thus also identified those who missed rest breaks.  (*Bufil*, at pp. 1206, 1208.)  Under these circumstances, the appellate court reversed the trial court's denial of class certification, concluding that "the class was ascertainable from the defendant's records." (*Nicodemus*, at p. 1216.)  "In doing so, the court rejected the defendant's 'speculation' that an employee who missed a meal break nonetheless might have received a rest break, observing 'speculation that goes to the merits of ultimate recovery [was] an inappropriate focus for the ascertainability inquiry.' (*Ibid.*, citing *Medrazo*, *supra*, 166 Cal.App.4th at p. 101 [defendant's sales records offered an objective means of identifying potential class members, and plaintiff's inability at the class certification stage to identify precisely which buyers qualified as class members was "irrelevant"] and *Harper v. 24 Hour Fitness, Inc.* (2008) 167 Cal.App.4th 966, 976 ["the need to individually examine each member's contract to ultimately determine whether he or she qualifies for inclusion in the class does not . . . demonstrate a lack of ascertainability or manageability"].)

Adopting this analysis in *Nicodemus*, we concluded that potential class members could be readily identified by reference to HealthPort's attorney request data set, and the "speculation" that the data set might be over-inclusive went "to the merits of each class member's recovery" and thus "was an inappropriate focus of the ascertainability inquiry."

29

(*Nicodemus*, *supra*, 3 Cal.App.5th at p. 1216.)  Our analysis of ascertainability in the present case mirrors our conclusions in *Nicodemus*.  Here, as established by Woolfson, the potential subclass members are all readily identifiable by reference to ABM's own employment and payroll records.

For instance, the subclass of ABM Workers who "suffered an automatic deduction of a half-hour although the employee actually worked through the deducted meal period" can be identified through ABM's timekeeping and payroll records showing numerous instances where a meal deduction was made for a shift without any corresponding time entry indicating that a meal period was taken.  The subclass of ABM Workers who were not paid premium meal period wages when they worked shifts of a particular length without a recorded meal period can similarly be ascertained through reference to the same records, reviewed to determine whether any required premium wages were paid where no meal period was recorded.  The Unpaid Split-Shift Premium Subclass— "ABM Workers who were scheduled or required in a workday to work two or more shifts separated by a period of time that was not a bona fide meal but were not paid an additional hour of wages for each split shift"—can be identified by examining ABM's timekeeping and payroll records to determine which employees worked two or more shifts in the same day separated by more than an hour, but were not paid premium wages related to the split shift(s).[12]  Finally, members of the Reimbursement Subclass—ABM Workers who were not reimbursed for expenses related to the use of their own vehicles for travel between jobsites—can be identified by searching ABM payroll records to determine which employees worked at multiple jobsites separated by a certain baseline number of miles during the same workday, but did not receive reimbursement for travel.[13]

---

[12] As discussed above, the DLSE has historically taken the position that a bona fide meal period is one that does not exceed one hour in length.  (See *ante* at p. 4 & fn. 1.)

[13] Woolfson opined below that the ABM databases contained location information for each worker's shift and that from this information, along with the addresses of the

30

In addition, the subclasses are all defined using objective characteristics and common transactional facts sufficient to allow a potential class member to identify himself or herself as having a right to recover pursuant to that subclass.  For example, the nonexempt ABM workers who would receive notice as part of the general class would all be aware whether they worked though meal periods, failed to receive reimbursement for their travel expenses between worksites, or otherwise fell within the articulated subclasses.  Under these circumstances, ABM's speculation that some potential class members identified in the data may ultimately not be entitled to relief—because, perhaps, they actually took an otherwise unrecorded meal, or were not entitled to a split shift premium on a particular day, or did not drive themselves between job sites—goes to the merits of each class member's recovery and, as such, was an inappropriate focus of the trial court's ascertainability inquiry.  (See *Sav-On*, *supra*, 34 Cal.4th at p. 338 [class can be certified based on partial commonality, meaning not every single member of the proposed class needs to be exposed to the wrongful practice nor does the practice have to be unlawful  or lawful as to every class member].)[14]

3.      *Predominance.*

Having determined that the plaintiffs have proposed ascertainable classes, we must next address the trial court's conclusion that class certification was inappropriate in this matter because individual inquiries predominate over common questions.  As mentioned above, "[t]he 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would

---

work locations, it would be possible to calculate the mileage each worker traveled each day.

[14] In this regard, we note additionally that "if necessary to preserve the case as a class action, the court itself can and should redefine the class where the evidence before it shows such a redefined class would be ascertainable." (*Hicks*, *supra*, 89 Cal.App.4th at p. 916.)  Thus, as this action progresses, the trial court should be open to making modifications to the class definitions as necessary to avert developing certification problems or to otherwise enhance the efficiencies of the class certification model.

be advantageous to the judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Brinker*, *supra*, 53 Cal.4th at pp. 1021–1022, fn. omitted.) Indeed, "at the class certification stage, as long as the plaintiff's posited theory of liability is amenable to resolution on a classwide basis, the court should certify the action for class treatment even if the plaintiff's theory is ultimately incorrect at its substantive level, because such an approach relieves the defendant of the jeopardy of serial class actions and, once the defendant demonstrates the posited theory is substantively flawed, the defendant 'obtain[s] the preclusive benefits of such victories against an entire class and not just a named plaintiff.' " (*Hall v. Rite Aid Corp.* (2014) 226 Cal.App.4th 278, 293–294, italics omitted.)

In short, when analyzing the element of predominance for purposes of class certification "the focus must be on the policy the plaintiffs are challenging and whether the legality of that policy can be resolved on a classwide basis." (*Lubin v. The Wackenhut Corp.* (2016) 5 Cal.App.5th 926, 940.) Thus, for example, in *Morgan v. Wet Seal, Inc.* (2012) 210 Cal.App.4th 1341, the Court of Appeal affirmed the trial court's denial of class certification in a case alleging that the company required employees to purchase company clothing to wear to work but failed to reimburse such purchases. Because there were no clear companywide policies requiring employees to purchase company clothing as a condition of employment or describing what an employee was required to wear, the trial court determined there was no common method to prove the *fact of liability* on a classwide basis. Rather, individualized inquiries would need to be made regarding, among other things, what employees were told by store managers about

32

wardrobe, how employees interpreted any such discussion, and what each store manager actually required employees to purchase. (*Id.* at pp. 1356–1357.)

In contrast, numerous other cases have held that individualized issues regarding *proof of the amount of damages* class members may recover does not defeat a class action so long as there are *common questions of liability* amenable to class resolution. (See, e.g., *Faulkinbury*, *supra*, 216 Cal.App.4th 220, 232–240 [common issues of fact predominated for subclasses related to meal, rest, and overtime violations because liability could be determined classwide based on uniform policies, or lack thereof; individual issues, such as whether individuals took rest breaks, went to the issue of damages and did not preclude class certification]; *Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986, 997 [a uniform policy denying compensation for preshift work presented predominantly common issues of fact and law because liability depended on the existence of the uniform policy, rather than individual damages determinations]; *Benton v. Telecom Network Specialists, Inc*. (2013) 220 Cal.App.4th 701, 726 [theory that defendant violated wage and hour requirements by failing to adopt meal and rest break policies is amenable to class treatment; whether employee was able to take required breaks goes to damages].)

The common theme in these cases is that the plaintiff's theory of liability could be determined based on common uniform policies applicable to the class as a whole. (See also *Department of Fish & Game v. Superior Court* (2011) 197 Cal.App.4th 1323, 1356 ["Class treatment is not barred where a single wrongful act has different effects on different claimants such that some may have claims while others may not. ' "In such cases, the Courts will generally certify a class if the defendant's action can be found to be wrong in the abstract even if no individual person has been damaged. [Citations.] These situations are distinguishable from situations where the Court cannot determine the wrongfulness of an action without reference to individuals." ' "].)

In line with this precedent, and of particular relevance to the case at hand, is the Second District's opinion in *Jaimez*, *supra*, 181 Cal.App.4th 1286. In *Jaimez—*a case, like this one, involving claims of various wage and hour violations, including meal break

33

issues—the appellate court concluded that the "trial court misapplied the criteria [for determining whether a class should be certified], focusing on the potential conflicting issues of fact or law on an individual basis, rather than evaluating 'whether the *theory of recovery* advanced by the plaintiff is likely to prove amenable to class treatment.' " (*Id.* at p. 1294.) Since the plaintiff's theory of recovery focused on uniform policies and practices (such as the defendant's failure to compensate employees for missed meals, rest breaks, and earned overtime), it was "more amenable to class treatment than individual disposition." (*Id.* at p. 1300.) Indeed, in *Jaimez*, the defendant had a policy and practice of automatically deducting 30 minutes per shift for each employee's meal break regardless of whether that meal break was actually taken, and the appellate court expressly found that this policy raised common legal and factual issues. (*Id.* at pp. 1294, 1304.)

Further, in balancing these common issues against any individual inquiries necessary, the *Jaimez* court rejected the trial court's notion that common questions of fact and law did not predominate because the defendant had submitted declarations indicating that some employees did, in fact, get meal breaks, rest breaks, and proper pay stubs and thus there was a " 'strong indication that there could be conflicting testimony regarding whether these employees have common factual issues to be presented at trial.' " (*Jaimez*, *supra*, 181 Cal.App.4th at p. 1296.) Specifically, the appellate court declared that the trial court had improperly "focused on the *merits* of the declarations, evaluating the contradictions in the parties' responses to the company's uniform policies and practices, not the policies and practices themselves." (*Id.* at p. 1300.) Unfortunately, the trial court in this case fell prey to the same errors that infected the trial court's certification decision in *Jaimez*.

Specifically, instead of identifying the principal legal issues presented in this matter and determining whether those "operative legal principles, as applied to the facts of the case, render the claims susceptible of resolution on a common basis' " (*Alberts*, *supra*, 241 Cal.App.4th at p. 399), the trial court here improperly focused on the minutiae of each individual janitor's personal situation. This was a legal error and appears also to

34

have been the reason the trial court found Woolfson's evidence irrelevant to the class certification inquiry. However, when the merits of the ultimate damages issues are set aside and Woolfson's analysis of ABM's payroll practices is considered, along with the other evidence submitted by plaintiffs, it becomes clear that numerous common issues predominate in this matter, rendering class certification appropriate.

For instance, the legality of ABM's uniform payroll policy—which assumes each employee works his or her scheduled shift and takes any legally required meal breaks absent some type of exception report—is a legal question that can be determined by reference to facts common to all class members. Certainly, the evidence provided by Woolfson that a mere 5,625 of the 1,836,083 time entries for ABM Workers he investigated (0.3 percent) contained adjustments to pay calls into question the efficacy of ABM's asserted "timesheet maintenance" procedure, as does the evidence presented by plaintiffs that ABM does not generate exception reports for missed meals periods. Moreover, the legality of ABM's auto-deduct policy for meal breaks in light of the recordkeeping requirements for California employers is also an issue amenable to classwide resolution. (See Cal. Code Regs., tit. 8, § 11050, subd. (7)(A)(3).) In addition, ABM's apparent uniform practice of never providing premium pay to its employees, either for split shifts or missed meal breaks, is susceptible to classwide treatment. Moreover, ABM's defenses with respect to split shift premium pay—that voluntary split shifts are not compensable and that class members are paid more than the threshold under which premium pay is mandated—are also susceptible to common proof. (See *Saechao v. Landry's, Inc.* (N.D. Cal. Mar. 15, 2016, No. C 15-00815 WHA) 2016 U.S. Dist. LEXIS 33409 at pp. *22–23; *Kamar v. Radio Shack Corp.* (C.D. Cal. 2008) 254 F.R.D. 387, 405; see *Aleman*, *supra*, 209 Cal.App.4th at pp. 574–575 [interpreting split shift Wage Order as a legal matter].) Finally, whether ABM fails to properly reimburse its employees for work-related travel, despite its asserted policy to do so, is also subject to common proof. (See *Brewer v. General Nutrition Corp.* (N.D. Cal. Nov. 12, 2014, No. 11-CV-3587 YGR) 2014 U.S. Dist. LEXIS 159380 at pp. *27–30 [predominance of common questions on a travel reimbursement claim supported by evidence of

"exceedingly small percentage of employees who sought reimbursement"; evidence of mileage incurred could be determined on a class-wide basis where all relevant locations known].) Under these circumstances, fear that the determination of individual damages might prove overly complex should not have provided a basis for denial of class certification.

Indeed, although we do not reach the issue, the trial court's concern regarding the need for numerous individualized damage inquiries in this case may turn out to be over-exaggerated, given existing precedent indicating that the burden of proof shifts to employers "in the wage and hour context when an employer's compensation records are so incomplete or inaccurate that an employee cannot prove his or her damages." (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1189; see *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 961 (*Cicairos*) [" '[W]here the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee. In such a situation, imprecise evidence by the employee can provide a sufficient basis for damages.' "], overruled on another ground as stated in *York v. Starbucks Corp.* (C.D. Cal. Sept. 12, 2012, No. CV 08-07919 GAF (PJWx)) 2012 U.S. Dist. LEXIS 190086.) Thus, for example, since employers have a duty to record their employees' meal periods, "[i]f an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided." (*Brinker*, *supra*, 53 Cal.4th at p. 1053 [Werdegar, J., conc.]; see Cal. Code Regs., tit. 8, § 11050, subd. (7)(A)(3).) Under such circumstances, a court may award damages, even if they are only approximate and based on statistical sampling. (*Bell v. Farmers Ins. Exchange*, *supra*, 115 Cal.App.4th at pp. 746–751.)

In summary, given that the classes proposed by plaintiffs in this case were ascertainable and plaintiffs' allegations presented predominantly common questions, the trial court's determinations to the contrary cannot stand. Rather, we conclude that the trial court's denial of class certification—including its decision regarding the admissibility of the Woolfson materials—rested on improper criteria and erroneous legal

36

assumptions, amounting to an abuse of discretion.  Plaintiffs have made a showing sufficient to allow them to take the next step in attempting to prove the merits of their contentions on a classwide basis.[15]

### III.      DISPOSITION

The trial court's order denying class certification is reversed and the matter remanded for certification of classes as set forth in this opinion.  Plaintiffs are entitled to their costs on appeal.

---

[15] In making this determination, we are cognizant of the trial management concerns raised by counsel for ABM at oral argument in this case, issues which may make the ultimate resolution of all or parts of this matter on a classwide basis problematic.  However, as detailed above, our review following a denial of class certification is limited.  (See *Alberts*, *supra*, 241 Cal.App.4th at p. 399.)  Because the trial court's order was based on improper criteria and erroneous legal assumptions, we reverse.  Moreover, based on the record before us and as we have detailed at length above, it appears that plaintiffs have identified a number of common questions suitable for classwide resolution.  Should plaintiffs' trial plan subsequently prove unworkable, however, ABM may address any such issues to the trial court.

_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.

38

Filed 1/10/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ABM INDUSTRIES OVERTIME CASES | JCCP No. 4502 |
| | A132387, A133077 & A133695 |
| | (City & County of San Francisco Super. Ct. No. CJC-07-004502) |
| | ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION |
| | (NO CHANGE IN JUDGMENT) |

THE COURT:

It is ordered that the opinion filed December 11, 2017, be modified as follows:

The citation to *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949 located on page 36 of the opinion shall be modified to delete the reference to subsequent history such that the case citation shall read in full:  "see also *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 961 (*Cicairos*) [" 'Where the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee.  In such a situation, imprecise evidence by the employee can provide a sufficient basis for damages' "].)

There is no change in the judgment.

1

2

In addition, the opinion in the above matter was not certified for publication in the Official Reports when filed on December 11, 2017.  For good cause it now appears that the opinion, as modified herein, should be published in the Official Reports and it is so ordered.


Dated: _____          _____

RUVOLO, P. J.

2

| | |
|---|---|
| Trial Court: | City & County of San Francisco Superior Court |
| Trial Judge: | Hon. Richard A. Kramer |
| Counsel for Appellants: | Weinberg, Roger & Rosenfeld, David A. Rosenfeld, Christian L. Raisner, Emily P. Rich, Roberta D. Perkins; Mallison & Martinez, Stan S. Mallison, Marco A. Palau, Joseph D. Sutton; Rastegar & Matern, Matthew J. Matern |
| Counsel for Respondents: | Littler Mendelson, Keith A. Jacoby, Dominic J. Messiha, Lauren E. Robinson |

3

# EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEATRIZ ALDAPA and ELMER AVALOS, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> FOWLER PACKING COMPANY, INC., a California corporation; AG FORCE LLC, a California limited liability company; FOWLER MARKETING INTERNATIONAL LLC, a California limited liability company; and DOES 1–10, <br><br> Defendants. | No. 1:15-cv-00420-DAD-SAB <br><br> <u>ORDER GRANTING MOTION FOR CLASS CERTIFICATION IN PART AND DENYING MOTION FOR TRIAL PLAN</u> <br><br> (Doc. Nos. 145, 149) |

This wage-and-hour class action suit was initially filed by plaintiffs in this court on March 17, 2015 (Doc. No. 2), and currently proceeds on plaintiffs' first amended complaint ("FAC") filed on October 20, 2016 (Doc. No. 129). On February 3, 2017, plaintiffs filed a motion to certify one main class and thirteen subclasses. (Doc. No. 145.) A hearing on the motion was held May 17, 2017, following which the court ordered additional briefing, which the parties timely submitted. (Doc. Nos. 171, 178, 181, 183.) At the hearing, attorneys Mario Martinez, Ira Gottlieb, and Dexter Rappleye appeared on behalf of plaintiffs and the prospective class. Attorneys Howard Sagaser and Ian Wieland appeared on behalf of defendants. Following supplemental briefing by the parties, the matter was taken under submission for decision. For the

1

reasons set forth below, the court will grant the motion for class certification in part.

**BACKGROUND**

This lawsuit stems from a variety of alleged state and federal labor law violations by defendants, who employ seasonal workers for a variety of tasks necessary in commercial agricultural operations.  Some of the farms on which the agricultural workers are employed are owned by defendants, while others are owned by third-party growers who contract with defendants to provide a labor force.  Defendant Fowler Packing is a commercial grower, packer, and shipper of various fruits, while defendant Ag Force is a farm labor contractor.  Defendant Fowler Marketing International is responsible for marketing and selling the crops owned by Fowler Packing and harvested by the employees of Ag Force.  These three corporate entities are all owned by Grant Parnagian and members of the Parnagian family.

In their FAC, plaintiffs allege twelve separate claims:  (1) violations of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801, *et seq.* for failing to pay all wages due or provide necessary tools; (2) failure to compensate for rest breaks in accordance with California Labor Code § 226.7[1] and Wage Order 14; (3) failure to pay all wages due under the employment contract by requiring off-the-clock work and allowing the use of "ghost workers"; (4) failure to pay overtime, as required by state law; (5) failure to pay the minimum wage, in violation of Labor Code § 1194; (6) failure to pay waiting time penalties in violation of Labor Code § 203; (7) failure to provide necessary tools or reimburse for tools in violation of Labor Code § 2802; (8) violations of California Business and Professions Code § 17200 by underpaying workers, failing to provide rest periods, and retaining the benefits of the labor without reasonable compensation; (9) violations of Labor Code § 226 by failing to keep accurate records or provide accurate statements to the employees; (10) failure to record and/or pay for travel time and wait time, in violation of Labor Code § 1194 and 29 U.S.C. § 1801, *et seq.*; (11) failure to reimburse for vehicle expense, in violation of Labor Code § 2802; and (12) failure to provide meal periods

/////

---

[1]  All subsequent references to the "Labor Code" are to the California Labor Code.

and keep accurate records of meal periods, in violation of Wage Order 14 and 29 U.S.C. § 1801, *et seq.*

Plaintiffs seek certification of the following class[2] and thirteen subclasses:

**Main Class**

All individuals who have been employed, or are currently employed, by Defendants Ag Force, LLC, Fowler Packing, Co. and/or Fowler Marketing, Int'l. as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, excluding supervisors, "swampers," office, clerical, or other non-agricultural workers.

*Subclasses*

1. Piece Rate Rest Period Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, who worked on a piece rate basis at any time from March 17, 2011 up to the present, and were not separately compensated for rest periods during their piece rate shifts.

2. Ghost Worker Crew Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who worked on a crew piece rate basis and were not compensated properly due to the inclusion of payments to ghost workers in their crew(s).

3. Unpaid Travel Time Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who worked at two or more fields in one day but were not compensated for their time spent travelling between fields.

4. Waiting Time Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who spent time waiting before harvest work would commence and were not paid for that waiting time.

---

[2] The court will review each subclass individually to determine whether it meets the requirements of Rule 23. Further, the plaintiffs have not indicated that there are any members of the main class that do not fall within one of the subclasses. Therefore, the court will decline to certify the main class and will instead certify the subclasses individually as determined appropriate. *See, e.g.*, *Meyer v. Bebe Stores, Inc.*, No. 14-CV-00267-YGR, 2016 WL 8933624, at *11–12 (N.D. Cal. Aug. 22, 2016) (certifying subclasses but declining to certify main class); *Evans v. Linden Research, Inc.*, No. C 11-01078 DMR, 2012 WL 5877579, at *10, 19 (N.D. Cal. Nov. 20, 2012) (same); *Gomez v. Rossi Concrete, Inc.*, 270 F.R.D. 579, 596 (S.D. Cal. 2010) ("Because the Court certifies only the Plan 3 Subclass, it need not certify an overarching main class at this time.").

5. Pre-Shift Work Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who performed uncompensated and unrecorded work before the fixed start time of a daily shift.

6. Post-Shift Work Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who performed uncompensated and unrecorded work after the fixed end time of a daily shift.

7. Tools Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who incurred unreimbursed tool expenses while working for Defendants.

8. Meal Period Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who did not receive a meal period and/or for whom a meal period was not recorded.

9. Inaccurate Wage Statement Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who due to the violations claimed herein (other than the violations in subclasses 4 and 8), received an inaccurate itemized wage statement.

10. Vehicle Expense Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who worked at two or more fields in one day and drove their own cars between fields but were not reimbursed by Defendants for their vehicle expenses.

11. AWPA Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who, due to the violations claimed herein, were not provided employment consistent with the terms of the "working arrangements" made with them by Defendants.

12. Section 17200 Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who, due to the violations claimed herein, were employed under "unlawful, unfair, or fraudulent business acts or practices."

13. Final Paycheck Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March

4

17, 2011 up to the present, who were not paid all wages due when they were laid off each season, discharged, or quit, as required by the California Labor Code.

(Doc. No. 145 at 2–5.)

## LEGAL STANDARDS

### A.    Pertinent Class Action Law

The class action is a procedural mechanism whereby the "usual rule that litigation be conducted by and on behalf of the named parties only" is swept aside so that multiple parties— unwieldy in number but possessing similar or identical claims—may pursue common redress in an efficient and economical manner. *Comcast v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)); *see also Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 963–64 (9th Cir. 2013).  Federal Rule of Civil Procedure 23 controls class certification and imposes a two-step process designed to ensure not only that this system of representative adjudication nets expediencies for the litigants and the judiciary, but that it does not sacrifice procedural fairness or zealous advocacy in the process of doing so.

Rule 23(a) is the first hurdle that must be overcome for a case to proceed as a class action. It consists of four prerequisites, often described as:  (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy.  If—and only if—a putative class satisfies these four requirements may it then proceed to show it also satisfies one of the three subsections of Rule 23(b).  The party seeking class certification bears the burden of establishing conformity with these requirements, and must do so by producing facts "affirmatively demonstrat[ing]" that certification is warranted. *Comcast*, 569 U.S. at 33; *Dukes*, 564 U.S. at 350.  A court must review the merits of a party's substantive claim to the extent that they overlap with issues touching on class certification. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (citing *Dukes*, 564 U.S. at 350–51 and *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992)); *see also Blair v. The CBE Grp., Inc.*, 309 F.R.D. 621, 625 (S.D. Cal. 2015).  Only after it has conducted a "rigorous analysis" of these facts and determined they show "actual, [and] not presumed, conformance" with Rule 23(a) and (b), may a district court certify a class. *Ellis*, 657 F.3d at 981 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 161, (1982)); *see also Comcast*, 569 U.S. at 33–34

(extending the "rigorous analysis" requirement to Rule 23(b)); *Patel v. Nike Retail Servs., Inc.*, Case No. 14-cv-4781-RS, 2016 WL 1241777, at *3 (N.D. Cal. Mar. 29, 2016) ("This 'rigorous' analysis applies both to Rule 23(a) and Rule 23(b)."). If a court does decide to certify a class, it must define the class claims and issues and appoint class counsel. Fed. R. Civ. P. 23(c)(1), (g).

Individualized defenses may be relevant to a court's determination of whether to allow certification of certain class claims. *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1184 (9th Cir. 2015); *Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 531 (N.D. Ill. 2008) ("The existence of affirmative defenses which require individual resolution can be considered as part of the court's analysis to determine whether individual issues predominate under Rule 23(b)(3).") (footnote omitted); *Mulford v. Altria Grp., Inc.*, 242 F.R.D. 615, 629–30 (D.N.M. 2007) ("While the existence of affirmative defenses that may require individualized evidence does not compel a finding that individual issues predominate over common ones, it does weigh against class certification."). "When defendants opposing class certification raise a legal defense that may defeat commonality, the district court cannot assume its validity but should make a threshold determination on the legal merits." *Edwards*, 798 F.3d at 1184. While the court need not take evidence on any of the defenses, if the defense is invalid as a matter of law, it will not defeat certification. *Id.* Further, the need for individualized assessments of damages will not defeat class certification. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013); *see also Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("[D]amage calculations alone cannot defeat certification.").

"When appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5). If subclasses are required because of conflicts between the various class members and the inability of either class counsel or class representatives to adequately represent the subclass, "each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action." *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981). *See* 5 Newberg on Class Actions § 7.29 (differentiating between compulsory subclasses and permissive subclasses for management purposes). *But see Am. Timber & Trading Co. v. First Nat'l Bank of Oreg.*, 690 F.2d 781, 787 n.5 (9th Cir. 1982)

(concluding that because subclassing was permissive under Rule 23(d), it need not be evaluated separately for commonality, numerosity, typicality, and adequacy).

Subclasses may be used to more efficiently resolve common issues during the proceeding and at trial. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1123–24 (9th Cir. 2010) ("To the extent there may be any concern that the differing statutes . . . will render class adjudication of class members' claims impractical or undermine effective representation of the class, it may counsel the formation of subclasses."); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997) (subclasses allow courts to focus discovery, dismiss individual claims as necessary, and conduct trial in a more orderly manner). Absent conflicts of interest between subclasses, however, there is no rule that separate subclasses are required for each of cause of action in order for plaintiffs to satisfy their burden on class certification. *See, e.g.*, *In re VMS Sec. Litig.*, 136 F.R.D. 466, 477–78 (N.D. Ill. 1991) ("[T]he court will not require separate subclasses for the various federal securities fraud claims."); *cf. Unicorn Field, Inc. v. Cannon Grp., Inc.*, 60 F.R.D. 217, 226–27 (S.D.N.Y. 1973) (requiring separate subclasses for different causes of action when they proceed on distinct legal theories and requirements of proof). *See also Norwood v. Raytheon Co.*, 237 F.R.D. 581, 589 n.14 (W.D. Tex. 2006) (where subclasses are based on causes of action involving substantially similar claims, no separate analysis of subclasses is required).

**B.**    **Rule 23(a) Requirements**

In order for a class member to sue as a representative of all class members, the class member must establish the following prerequisites: (1) the class must be "so numerous that joinder of all members is impracticable"; (2) there must be "questions of law or fact common to the class"; (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These prerequisites are typically referred to as numerosity, commonality, typicality, and adequacy of representation.

1.    <u>Numerosity</u>

A proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity has no strict limit, but certainly class membership in the

hundreds is sufficient to meet it. *See Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 449 (E.D. Cal. 2013) (numerosity met with approximately 3,500 class members); *Orvis v. Spokane County*, 281 F.R.D. 469, 473 (E.D. Wash. 2012) (numerosity met with 260 class members); *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 594 (E.D. Cal. 2008) (approximately one thousand members satisfied numerosity).

### 2. Commonality

Rule 23 requires there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy Rule 23(a)'s commonality requirement, a class claim "must depend upon a common contention . . . of such a nature that it is capable of class[-]wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. As the Supreme Court further explained, this frequently necessitates an inquiry that "overlap[s] with the merits of plaintiff's underlying claim." *Id.* at 351.

### 3. Typicality

"[T]he claims or defenses of the representative parties [must be] typical of the claims and defenses of the class." Fed. R. Civ. P. 23(a)(3). They need not be clones; rather, all that is required is that the claims or defenses be "reasonably co-extensive." *Hanlon*, 150 F.3d at 1020 (noting that this standard is a "permissive" one and requires only that the claims of the class representatives be "reasonably co-extensive with those of absent class members; they need not be substantially identical"). Typicality is satisfied if the representative's claims arise from the same course of conduct as the class claims and are based on the same legal theory. *See, e.g., Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (claims are typical where named plaintiffs have the same claims as other members of the class and are not subject to unique defenses). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508.

/////

/////

8

#### 4.     Adequacy of Representation

Plaintiffs seeking class certification must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions:  '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis*, 657 F.3d at 985 (quoting *Hanlon*, 150 F.3d at 1020)); s*ee also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015).  "An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class." *Rodriguez v. W. Publ'g Co.*, 563 F.3d 948, 959 (9th Cir. 2009) (citing *Hanlon*, 150 F.3d at 1020).  Accordingly, "[c]lass certification will be inappropriate if fundamental conflicts of interest are determined to exist among the proposed class members." *Allied Orthopedic v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007).  Generally, the adequacy inquiry seeks to ensure that the class representative is "part of the class and [that he] possess[es] the same interest and injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997).

### C.     Rule 23(b) Requirements

Once the prerequisites of Rule 23(a) are met, the court must certify the class under one of the Rule 23(b) categories.  Certification under Rule 23(b)(3) is permitted when "the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is [deemed to be] superior to other available methods for fairly and efficiently adjudicating the controversy." *Dukes*, 564 U.S. at 362 (quoting Fed. R. Civ. P. 23(b)(3)); *see also Tyson Foods, Inc. v. Bouaphakeo*, ___U.S. ___, ____, 136 S. Ct. 1036, 1045 (2016) ("An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'") (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–97 (5th ed. 2012)).  "The Rule 23(b)(3) predominance inquiry tests whether proposed

9

classes are sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 622, whereas the superiority requirement demands courts "assess the relative advantages of alternative procedures for handling the total controversy" in order to determine that "a class action is the 'superior' method of resolution." Fed. R. Civ. P. 23(b)(3) advisory comm. note; *see also Pointer v. Bank of Am. Nat'l Ass'n*, No. 2:14-cv-0525-KJM-CKD, 2016 WL 696582, at \*8 (E.D. Cal. Feb. 22, 2016). While the predominance requirement is similar to the Rule 23(a)(2) commonality requirement, the standard is much higher at this stage of the analysis. *Dukes*, 564 U.S. at 359; *Amchem*, 521 U.S. at 624–25; *Hanlon*, 150 F.3d at 1022. Ultimately, "[t]he predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc.*, 136 S. Ct. at 1045 (quoting Newberg, § 4:49, at 195–96).

Rule 23 provides that, aside from predominance, a court must find that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The rule lists four metrics pertinent to superiority, including class members' interests in individually controlling litigation, whether any litigation has already been filed by putative class members, the desirability of concentrating the litigation in a class action, and the "likely difficulties in managing a class action." *Id.* The Ninth Circuit has recognized a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns," but rather should look to "manageability as one component of the superiority inquiry." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2015)).

## ANALYSIS

### A.   Standing to Seek Injunctive Relief

Based upon the parties' submissions, it is apparent that the named plaintiffs no longer work for defendants. Plaintiff Aldapa left the company in May 2015, shortly after this lawsuit was filed. (Doc. No. 145-6 at 94.) Plaintiff Avalos, left the defendants' employment in early 2014. (*Id.* at 106–07.) At the court's request, the parties provided supplemental briefing concerning the named plaintiffs' standing to seek injunctive relief and their ability to seek

10

certification under Rule 23(b)(2).

Plaintiffs concede that an employee typically does not have standing to seek injunctive relief against a former employer. *See Dukes*, 564 U.S. at 365 (noting that employees who left employment after the filing of a complaint have "no more need for prospective relief than those who left beforehand"); *Ellis*, 657 F.3d at 988; *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006). Nevertheless, plaintiffs advance two arguments in support of their claim of standing to seek injunctive relief here: (1) that at least one named plaintiff intends to seek reinstatement, should the alleged violations of labor law cease; and (2) that the federal statute under which plaintiff is suing—29 U.S.C. § 1854—has expanded the concept of standing in the particular case of seasonal agricultural employees to allow injunctive relief to be afforded to prior employees. The undersigned finds neither of these assertions to be persuasive.

### 1.  Potential for Reinstatement

As plaintiffs note, there is an exception from the standard rule that former employees lack standing to seek injunctive relief from their former employers. A former employee who is "in the process of seeking reinstatement to their former positions, or seeking work from that employer" may have standing to bring a claim for injunctive relief. *Walsh*, 471 F.3d at 1037 (citing *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006) and *Nanty v. Barrows Co.*, 660 F.2d 1327 (9th Cir. 1981)); *see also Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 865 (9th Cir. 2017). However, upon review none of these decisions support plaintiffs' standing to seek injunctive relief here. In *Freitag*, the plaintiff was actively pursuing reinstatement. 468 F.3d at 547 (noting that, when the injunction was issued, plaintiff "was still in the process of pursuing her state administrative appeal [of a termination decision] in which she maintains that she is entitled to retain her position as a correctional officer at Pelican Bay"). In *Nanty*, the court did state that "[w]hen a legitimate candidate for a job has demonstrated that he has been the subject of unlawful discrimination in the employment process, he is entitled to an injunction against future, or continued, discrimination." 660 F.2d at 1333, *overruled on other grounds by O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756 (9th Cir. 1996). However, the Ninth Circuit has subsequently explained that the injunction in *Nanty* was upheld "in part because the question whether the

11

plaintiff was entitled to the job he sought had not been finally resolved and, thus, he retained a personal interest in ensuring that the company's discriminatory activity be enjoined." *Freitag*, 468 F.3d at 548.

Here, plaintiff Avalos declares that, while he left his position with defendants due to the numerous employment law violations he observed, he would "consider seeking reinstatement with the company" if those violations were appropriately addressed.  (Doc. No. 145-6 at 106–07.)[3]  Nothing indicates plaintiff Avalos is actually seeking reinstatement by the defendants.  *See Jadwin v. County of Kern*, No. 1:07-cv-00026-OWW-DLB, 2009 WL 2424565, at *8 (E.D. Cal. Aug. 6, 2009) (injunctive relief was moot where plaintiff was not seeking reinstatement and there was no "reasonable likelihood" he would resume employment).  Nor does this case relate to plaintiff Avalos's unlawful discharge or a discriminatory failure to hire him.  Rather, he affirmatively resigned from his employment with defendants.  Finally, even the statement Avalos does make regarding resuming employment with defendants is equivocal:  he would merely "consider" seeking reinstatement if a variety of allegedly unlawful payment practices are remedied.  While it is unclear whether plaintiffs are required to seek reinstatement as a legal remedy of the suit in order to seek injunctive relief, merely considering reinstatement if certain remedial actions come to fruition is insufficient to fit within this exception.  Since plaintiff Avalos has not demonstrated a cognizable legal interest in defendants' future employment practices, he lacks standing to seek injunctive relief.

2.     <u>Expanded Standing Under 29 U.S.C. § 1854</u>

Plaintiffs also argue that "[p]articularly in the case of agricultural workers, there is a presumption that former employees may establish a real and immediate threat of continuing or future injury despite their fluctuation between employee and non-employee status during the course of litigation." (Doc. No. 178 at 10.)  According to plaintiffs, the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA") allows anyone "aggrieved" by the employer's failure to discharge its lawful responsibilities to bring suit, even non-employees.  (*Id.*)  Therefore,

---

[3]  Plaintiff Aldapa has not indicated she would consider returning to work for defendants.

12

they assert, as the named plaintiffs in this action they "are entitled to a presumption that as seasonal, agricultural employees they and similarly-situated class members are likely to return to work as employees of Defendants in the future." (*Id.* at 11–12.)

The Supreme Court has held a plaintiff suffers an "injury-in-fact" for the purposes of standing when Congress provides a statutory cause of action. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 521–23 (2007) (finding the State of Massachusetts had standing based on the Clean Air Act); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–85 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) (finding injury in fact under the Clean Water Act)); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21–25 (1998) (finding standing when plaintiff was deprived of the statutory right to obtain information). *But see Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing."); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 973 (9th Cir. 2015) (noting Congress may enact statutes creating a private cause of action, absent which no injury would exist, but may not "create injury in fact by legislative fiat"). However, a plaintiff must also establish standing for each type of relief sought. *Summers*, 555 U.S. at 493; *Friends of the Earth, Inc.*, 528 U.S. at 185.

The AWPA permits "[a]ny person aggrieved by a violation of this chapter" to bring suit in a district court. 29 U.S.C. § 1854(a). Plaintiffs point to several court decisions in which certification of a class seeking injunctive relief under Rule 23(b)(2) has been permitted, despite the fact that violation was not presently occurring. *See Siquic v. Star Forestry, LLC*, No. 3:13cv00043, 2016 WL 1117627, at *6 (W.D. Va. Mar. 17, 2016); *Roman v. Korson*, 152 F.R.D. 101, 109 (W.D. Mich. 1993) (allowing injunctive relief where evidence showed migrant workers would return to the same housing in future years, because there was "a reasonable likelihood that violations will occur in the future"); *Saintida v. Tyre*, 783 F. Supp. 1368, 1376 n.7 (S.D. Fla. 1992); *Fields v. Luther*, No. JH-84-1875, 1988 WL 59963, at *21–22 (D. Md. May 4, 1988). Of these decisions, only one—*Roman*—concerned a motion for class certification; the others that were class actions involved cases in which a class had already been certified. Moreover, because

13

it was decided in 1993, the court in *Roman* could not have considered more recent precedent finding injunctive relief unavailable for classes of prior employees. *See Dukes*, 564 U.S. at 365 (noting with approval the Ninth Circuit's recognition that "plaintiffs no longer employed by Wal–Mart lack standing to seek injunctive or declaratory relief against its employment practices"); *Munoz v. Giumarra Vineyards Corp.*, No. 1:09-cv-00703-AWI-JLT, 2012 WL 2617553, at *35 (E.D. Cal. July 5, 2012), *findings and recommendations adopted*, 2013 WL 2421599 (declining to certify a class under Rule 23(b)(2) where the class contained employees who no longer worked for defendant).

This court is not unsympathetic to the unique and myriad difficulties facing seasonal agricultural workers who attempt to vindicate their rights under applicable labor law.  However, the named plaintiffs' absence from employment here is not apparently based on the seasonal ebb-and-flow of the work which might warrant an expanded application of standing principles in this case.  Instead, neither named plaintiff has worked for defendants in multiple years, nor do they show any sign of returning to defendants' employment.  Nor is this a case where plaintiffs have shown that some malfeasance or retaliatory interest on the part of their employer was what caused their termination or prevented them from being rehired, or that they seek to be rehired as part of the relief afforded by this lawsuit.  Rather, the named plaintiffs have not indicated they are seeking reinstatement or are actively pursuing employment with the defendants.   In short, plaintiffs have presented no persuasive argument that the AWPA expands standing sufficiently to afford them the opportunity to seek injunctive relief here.  Since the plaintiffs lack standing to

*/////*

14

pursue their claims for injunctive relief,[4] the court will deny plaintiffs' request to certify any of the subclasses under Rule 23(b)(2) for the purposes of seeking injunctive relief.[5]

## B.      Adequacy of Class Representatives and Class Counsel

As noted above, adequacy of the class representatives and class counsel must be determined for each of the classes and subclasses to be certified.  Unlike factors such as commonality, typicality, and predominance, however, adequacy of representation can be addressed collectively, as the class representatives and class counsel remain the same for each subclass.

Defendants have attacked, at length, the adequacy of one of the anticipated class counsel and of both the named plaintiffs to represent the class.  (Doc. No. 147 at 24–32.)  Defendants' arguments in this regard are addressed in turn below.

### a.      Plaintiff Avalos

Both plaintiffs declare they wish to serve as a class representative in this action.  (Doc. No. 145-6 at 93, 106.)  Both represent to the court that they have participated in numerous meetings with their attorneys, have communicated with other workers about this action, and have reviewed documents and policies with their attorneys.  (*Id.* at 93, 106.)  Plaintiffs Aldapa and

---

[4]  The same standing concerns do not impact the named plaintiffs' ability to seek damage for a class period beyond the time in which they were employed by defendants.  A plaintiff must establish standing for each type of relief sought.  *Summers*, 555 U.S. at 493; *Friends of the Earth, Inc.*, 528 U.S. at 185.  Plaintiffs clearly have standing to seek monetary redress.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (holding the "irreducible constitutional minimum of standing" requires injury in fact, a causal connection to the conduct complained of, and the likelihood of redressability by a favorable decision).  Plaintiffs here have identified various injuries they suffered due to labor law violations by the defendants, which are likely to be remedied by an award of damages.  The named plaintiffs need not be identically situated to bring the claims of other class members, but need only have claims that are "reasonably co-extensive." *See Hanlon*, 150 F.3d at 1020; *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990).  Therefore, plaintiffs may represent a class seeking damages, even if the class period extends beyond the period of their employment with defendants.

[5]  In the event the court rejected their arguments with respect to standing to seek injunctive relief, plaintiffs have requested leave to amend the complaint to add named plaintiffs that do have standing to seek such injunctive relief.  (Doc. No. 178 at 12.)  Defendants indicate they would oppose any such request.  (Doc. No. 181 at 12–14.)  Motions for leave to amend the complaint and any motion to amend this class certification order may be filed and noticed on the court's calendar pursuant to Local Rule 230.

15

Avalos have already been deposed by defense counsel, and attended a mediation in San Francisco concerning the case. (*Id.*)  Additionally, both state that they are aware of no conflicts preventing them from serving as class representatives, have neither business nor personal relationships with class counsel, and intend to continue prosecuting this action until its resolution. (*Id.*)

The court struggles to understand what genuine objections defendants have to plaintiff Avalos serving as a class representative.  Defendants in large part[6] appear to argue that, because Mr. Avalos made changes to his deposition transcript which were significant enough to warrant the reopening of his deposition, this demonstrates "the lack of credibility of Mr. Avalos." (Doc. No. 147 at 29.)  According to defendants, "based on that fact [the reopening of the deposition] alone, Mr. Avalos should not be allowed to serve as a class representative." (*Id.*)

Defendants cite one case for the proposition that a court may find a plaintiff to be an inadequate class representative if it finds his testimony lacks "credibility." (Doc. No. 147 at 24–25) (citing *CE Design Ltd. v. King Arch. Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011).  Even within the decision in the cited case—which involved potential affirmative, systematic misrepresentations being made by the sole named plaintiff, who had filed at least 150 class actions under the same federal law—the Seventh Circuit cautioned against an over-reading of its decision when it remanded the case for a further credibility evaluation:

> We don't want to be misunderstood, however, as extending an invitation to defendants to try to derail legitimate class actions by conjuring up trivial credibility problems or insubstantial defenses unique to the class representative.  Serious challenges to typicality and adequacy must be distinguished from petty issues manufactured by defendants to distract the judge from his or her proper focus under Rule 23(a)(3) and (4) on the interests of the class.

*Id.* at 728.

/////

---

[6] Defendants also assert various facts about plaintiff Avalos—that he worked for Ag Force from 2012 to March 22, 2014 under foreperson Elpidio Torres, that he pruned and thinned peach and nectarine trees, that he picked mandarins, and that he did not harvest grapes or tree fruit—but present neither argument nor explanation as to why these allegations are relevant to this inquiry. (Doc. No. 147 at 29–30.)  Because it is not apparent to the court why these facts should disqualify plaintiff Avalos from serving as a class representative, the court delves no further into defendants' assertions.

16

Defendants point to various aspects of the deposition testimony given by plaintiff Avalos in arguing that he lacks "standing"[7] to pursue class claims. (Doc. No. 147 at 29–30.)  In this regard, plaintiff Avalos testified at deposition that, while he was supposed to be paid on a piece-rate basis for the mandarin harvesting, he was in fact paid hourly. (Doc. No. 147-2 at 5–9.)  He also testified that he believed the crew boss was "doing something illegal," but only testified about the practices on his crew. (*Id.*)  He later testified that his understanding of the way the ghost workers affected him was that he had to perform more work in order to compensate for these workers, as opposed to being deprived of wages. (*Id.* at 11.)  According to plaintiff Avalos, he was paid for all of the hours he worked. (*Id.* at 11–13.)  Additionally, he testified he never worked overtime, and "sometimes" got rest breaks, seemingly once a day. (*Id.* at 13, 15.)  After noting his testimony on these points defendants then baldly assert, without explanation, "[c]learly, based on Plaintiff Avalos [sic] own testimony, he lacks standing." (Doc. No. 147 at 30.)

This appears to be the type of manufactured trivial credibility issue which the Seventh Circuit warned that courts should not be distracted by.  Most of the changes to plaintiff Avalos's deposition testimony reflect his desire to correct his testimony about not being paid on a piece rate basis to accurately reflect that he was not paid *properly* on a piece rate basis. (Doc. No. 54-1.)  Plaintiff Avalos explained that he misunderstood these questions when put to him at his deposition and had assumed that because the crew bosses did not accurately account for his piece rate wages, he was being paid on an hourly basis. (*Id.*)  Defendants do not argue that these are "sham corrections," *i.e.*, corrections designed to create a material dispute of fact where there otherwise is none. *See Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 901 (N.D. Cal. 2016).  Plaintiffs' counsel notes these corrections by Avalos to his deposition testimony were

---

[7]  The invocation of standing in this context makes little sense.  Standing is an Article III concern that exists in class actions similar to regular actions. *See, e.g.*, *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 230–31 (C.D. Cal. 2003).  It is analyzed separately from the adequacy of a named plaintiff to represent the class. *See id.* at 230–31, 235–36 (treating standing and adequacy as separate inquiries).  Plaintiff Avalos both alleged in the complaint and declares in his affidavit that he was subject to numerous illegal employment practices.  He clearly has standing to pursue his claims against defendants.  Whether he is an adequate class representative is a separate matter.

17

made necessary by "defense counsel's use of ambiguous, vague questions that contained legal terminology or sought legal conclusions from Plaintiff [Avalos], a farmworker with no legal training and little formal education." (Doc. No. 150 at 13, n.4.)  Further, according to plaintiffs' counsel, plaintiff Avalos does not speak English, "and the interpreter strained to translate defense counsel's legal terms of art into Spanish." (*Id.*)  It is not surprising that a layman in these circumstances might have an imperfect understanding of the accurate answers to such questions.  These corrections to his deposition testimony do nothing to undermine plaintiff Avalos's credibility as a class representative, which primarily requires that he not have a conflict of interest and is willing to vigorously prosecute the action on behalf of the class.  *Ellis*, 657 F.3d at 985.[8]  If anything, they bolster his credibility, since providing corrections to deposition testimony is the appropriate course of action with respect to any misstatements.  *See* Fed. R. Civ. P. 30(e)(1).  Plaintiff Avalos will be confirmed as a class representative for each of the subclasses certified below.

> b.      Plaintiff Aldapa

Defendants' arguments against plaintiff Aldapa's ability to serve as an adequate class plaintiff are likewise unpersuasive.  Defendants argue that plaintiff Aldapa too met with class counsel and other potential class plaintiffs.  As already stated herein, the court finds that the act of meeting with one's attorney and co-plaintiffs is in no way salacious and does not impugn Aldapa's credibility or call into question her adequacy as a class representative.  As with respect to plaintiff Avalos, the court is unclear what defendants intended to imply by listing numerous facts about plaintiff Aldapa without explaining their relevance.  (Doc. No. 147 at 30–31) (noting plaintiff Aldapa only worked on one crew; that crew had at least three different forepersons; that

---

[8]  Defendants also attack plaintiff Avalos's credibility on two other grounds, which deserve only the briefest of mentions.  First, according to defendants, Avalos should be barred from serving as class representative because he provided different estimated prices for tools at his deposition than he did in his declaration supporting class certification.  (Doc. No. 147 at 24–25.)  This contention is of no consequence here, and is summarily rejected.  Second, defendants repeat their frequent refrain that Avalos's role is suspect because of his participation in group meetings with counsel at the UFW facilities.  (Doc. No. 147 at 30; *see also* Doc. Nos. 98, 116.)  The act of meeting with other potential class action plaintiffs and the attorney who was seeking to serve as class counsel in no way impugns Avalos's credibility.

18

the only time she knew of a foreperson using ghost workers was under Ramon Murillo; that Aldapa was paid piece rate at times and hourly at other times; Aldapa "admitted" during her deposition that she did not like the company-issued scissors and purchased her own, and knew her foreman was charging for gloves without defendants' knowledge but did not report it).

Defendants present no salient reason why plaintiff Aldapa is unqualified to serve as a class representative.[9]  Ms. Aldapa avers in her declaration that she has no conflicts of interest and will vigorously prosecute the action.  (Doc. No. 145-6 at 93.)  These representations are sufficient to meet the general criteria for serving as a class plaintiff.  *Ellis*, 657 F.3d at 985.  Therefore, plaintiff Aldapa will be confirmed as a class representative for each of the subclasses certified below, with the exception of the Vehicle Expense Subclass.

c.      Class Counsel

Plaintiffs seek appointment of both Martinez, Aguilasocho, & Lynch APLC ("MAL") and Bush Gottlieb as class counsel, and provide detailed information concerning the qualifications of various attorneys working for each law firm.  Mario Martinez, one of the putative class's proposed attorneys, declares he graduated from the University of California at Berkeley's School of Law and has been licensed to practice law since 1999.  (Doc. No. 145-1 at ¶ 7.)  He worked with Camacho Law from 1998 to March 2015, at which point he formed the firm Martinez, Aguilasocho, & Lynch APLC ("MAL").  (*Id.*)  Attorney Martinez is fluent in Spanish and grew up working in the grape fields as a child, giving him a unique appreciation for the work performed by his clients.  (*Id.*)  During his more than fifteen years of work at Camacho Law, he represented farm workers and other low-income workers in complex class actions in both the state and federal courts in California.  (*Id.* at ¶ 8.)  Camacho Law has represented low-income agricultural workers who worked with many different crops in California, Florida, Washington, Oregon, and other states, and primarily worked in labor and employment law to assist in

_____

[9] Defendants' argument that plaintiff Aldapa cannot be a representative for the Vehicle Expense Subclass (Doc. No. 147 at 31) is superfluous.  It is true that a named plaintiff can only function as a representative for absent class members bringing claims she herself has standing to bring. *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001).  However, plaintiffs acknowledged as much in their moving papers and never sought to have plaintiff Aldapa represent that subclass.  (*See* Doc. No. 145 at 34, n. 41.)

19

enforcing the rights of Spanish-speaking farm workers, which is the same practice area upon which MAL now focuses.  (*Id.* at ¶¶ 7–9.)  According to attorney Martinez, he is also the general counsel for the United Farm Workers ("UFW").  (*Id.* at ¶ 8.)  Attorney Martinez has also provided the qualifications for the other partners at his firm, Thomas Lynch and Edgar Aguilasocho, as well as an associate who is working on the case, Margaret Serrano.  (*Id.* at ¶¶ 10–11.)  Attorney Martinez lists thirteen class actions which the attorneys for his firm have worked on.  (*Id.* at ¶ 12.)

Attorney Ira Gottlieb declares he has been licensed in California since 1982, and in New York since 1981, having received a J.D. in 1980 from Rutgers University.  (Doc. No. 145-2 at ¶ 2.)  He has worked as a labor attorney for more than 35 years, and previously served as counsel to the UFW.  (*Id.* at ¶ 3.)  Attorney Gottlieb notes he has worked on numerous labor law class actions as lead counsel, and lists many of them.  (*Id.* at ¶¶ 4–6.)  He also notes the qualifications of the other attorneys from Bush Gottlieb working on this case, Erica Deutsch and Dexter Rappleye.  (*Id.* at ¶¶ 7–8.)

Defendants' sole argument about the adequacy of class counsel consists of contesting attorney Mario Martinez's ability to serve in that role.  No other arguments are raised concerning other attorneys from MAL or Bush Gottlieb.  Defendants assert attorney Martinez and MAL are prohibited from representing the class because of the "apparent conflict of interest" between Martinez's role in this case and as general counsel for the UFW.  (Doc. No. 147 at 25.)  Defendants state that they "are informed and believe the UFW threatened to oppose AB 1513 [the safe harbor bill] because Mr. Martinez stands to earn substantial attorneys' fees should this case be certified as a class action and the class plaintiffs ultimately prevail."  (*Id.*)  According to defendants, requiring the putative class to "recover those wages they believe to be due and owing through litigation—rather than the AB 1513 safe harbor—was profoundly not in the class members' best interest."  (*Id.* at 25–26.)  Allegedly, this "jeopardized the ability of employees to recover at all," "significantly delayed" recovery, and allowed any ultimate recovery to be reduced by class counsel's attorneys' fees.  (*Id.*)  Defendants allege that these circumstances establish that attorney Martinez and the UFW "put their own monetary interests ahead of the same class

20

members they now seek to represent." (*Id.* at 26.)

The undersigned finds defendants' arguments in this regard to be unpersuasive. Plaintiffs note they agreed to a protective order barring them from sharing confidential information with the UFW. (Doc. No. 150 at 15.) Defendants have presented no evidence in connection with the pending motion that shows the interests of the UFW, attorney Martinez, and the class members are at odds. This court has already rejected the same argument made by defense counsel here against attorney Martinez in another case. *See Amaro v. Gerawan Farming, Inc.*, No. 1:14-cv-00147-DAD-SAB, 2016 WL 3924400, at *17 (E.D. Cal. May 20, 2016). Additionally, the court remains unconvinced that, even if there was evidence that attorney Martinez was involved in the defendants' exclusion from AB 1513's safe harbor provisions, it would be evidence of an interest on his part that conflicts with the class. The safe harbor provision at issue allowed offending companies to pay only for the actual rest period time owed and to avoid paying a premium penalty. *See* Labor Code § 226.2(b) (providing an affirmative defense in certain situations to statutory penalties and damage claims where employers paid the amount due by December 15, 2016). Plaintiffs do not concede that attorney Martinez was involved in having defendants excluded from the safe harbor provision. However, they do point out that the safe harbor would have allowed defendants to escape paying significant amounts in damages, thereby reducing class recovery in this case by millions of dollars. (Doc. No. 150 at 15, n.7.) Actions by counsel that might well serve to increase a recovery by the class would not appear to pose any obvious conflict with class counsel's general duties to the class. In any event, the court concludes that no conflict of interest on the part of attorney Martinez has been established by defendants.[10]

Absent any demonstrated conflicts of interest, and given the qualifications of class counsel, the court is satisfied they will vigorously and adequately pursue representation of the class. *Ellis*, 657 F.3d at 985. The court will therefore deem Martinez Aguilasocho & Lynch

---

[10]  Defendants also believe there is a conflict of interest because the UFW unsuccessfully attempted to unionize defendants' employees after the filing of the class action. (Doc. No. 147 at 26.) Defendants contend in summary fashion that attorney Martinez's dual role as general counsel for the UFW and class counsel in this case "creates an obvious and unresolvable conflict of interest." (*Id.*) Absent any explanation for this contention, no conflict is apparent to the court.

21

APLC and Bush Gottlieb to be appropriate class counsel.

**C.      Numerosity and Typicality**

Defendants do not dispute that numerosity and typicality are met for each of the subclasses.  Plaintiffs indicate that even the smallest potential subclass—the Ghost Worker Subclass—contains hundreds of employees.  (Doc. No. 145 at 31, n.39.)  Most of the other subclasses are made up of at least 14,000 employees, and potentially more.  (*Id.*)  This is well beyond the size needed to satisfy numerosity requirements.  *See, e.g.*, *Orvis*, 281 F.R.D. at 473 (numerosity met with 260 class members); *Collins v. Cargill Meat Sols. Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011) ("Courts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members.").

Further, plaintiffs' claims mirror those of each of the subclasses that they intend to represent.  Plaintiffs have provided declarations indicating they would fit within the subclass definitions below and are bringing the same substantive legal claims.  (*See* Doc. No. 145-6 at 91–113.)  Plaintiffs Aldapa and Avalos's claims are "reasonably co-extensive with those of absent class members."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  The court finds plaintiffs' claims to be typical here.  Therefore, the numerosity and typicality requirements of Rule 23(a) will be deemed to have been satisfied for each of the subclasses discussed below.

**D.      Certification of the Subclasses**

The court will now examine the propriety of certifying each subclass, and will address both the remaining Rule 23(a) and 23(b)(3) factors for each.

1.      Piece Rate Rest Period Subclass

Plaintiffs seek to establish a subclass for violations of Labor Code § 226.7 and Wage Order No. 14-2001.  (Doc. No. 145 at 43–47.)  As with a number of the subclasses below, defendants contest commonality, predominance, and superiority in various respects.

a.      *Commonality*

As mentioned above, an appropriately certified class requires "a common contention . . . of such a nature that it is capable of class[-]wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in

22

one stroke." *Dukes*, 564 U.S. at 350.

Labor Code § 226.7 and IWC Wage Order No. 14-2001 (codified at 8 Cal. Code Regs. § 11140) work together to control the provision of rest breaks by employers to non-exempt agricultural employees, whether paid on a piece rate or hourly basis. Labor Code § 226.7 serves as an enabling statute, mandating that employers provide breaks in a manner consistent with the wage orders, as well as other authorities. The wage order states the specific requirements to which an employer of agricultural workers must adhere:

> Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

8 Cal. Code Regs. § 11140(12). California courts have held that this provision means that one 10-minute rest period is required for shifts between three and one-half and six hours in length, two 10-minute rest periods are required for shifts between six and ten hours, and three 10-minute rest periods for shifts between ten and fourteen hours. *See Alberts v. Aurora Behavioral Health Care*, 241 Cal. App. 4th 388, 400 (2015) (citing *Brinker Rest. Corp. v. San Diego Cty. Superior Court*, 53 Cal. 4th 1004 (2012)). Labor Code § 226.7 reiterates that rest breaks are to be counted as hours worked, and that rest breaks cannot result in a deduction of wages.

California law also requires piece-rate employees to be separately compensated for rest-break periods at an amount not less than the minimum wage. Lab. Code § 226.2; *Gonzalez v. Downtown LA Motors, LP*, 215 Cal. App. 4th 36, 44–45 (2013); *Bluford v. Safeway Stores, Inc.*, 216 Cal. App. 4th 864, 872 (2013). "[C]ompliance [with this requirement] cannot be determined by averaging hourly compensation." *Bluford*, 216 Cal. App. 4th at 872. Rather, "employees [must] be compensated at the minimum wage for each hour worked." *Gonzalez*, 215 Cal. App.

/////

/////

/////

23

4th at 45 (citing *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 323 (2005)).[11]  While the law compels employers to "authorize and permit" rest breaks, it does not mandate that employees take these breaks.  8 Cal. Code Regs. § 11140(12); Cal. Dep't of Indus. Rel., Division of Lab. Standards Enforcement, Opinion Letter (Jan. 28, 2002).  In addition, employers are not required to track rest periods.  8 Cal. Code Regs. § 11140(7)(A)(3); *see also Munoz v. Giumarra Vineyard Corp.*, No. 1:09-CV-0703 AWI JLT, 2015 WL 5350563, at *6 (E.D. Cal. Sept. 11, 2015); *In re Taco Bell Wage &Hour Actions*, No. 1:07-cv-1314 LJO DLB, 2012 WL 5932833, at *11 (E.D. Cal. Nov. 27, 2012) ("While meal beaks are required to be recorded on time cards and therefore provide a reliable record, California law does not require employers to record rest periods.").

Plaintiffs argue that here the Piece Rate Rest Period Subclass should be certified because defendants maintained a universal rest period policy, and piece rate workers took rest breaks during their shifts. (Doc. No. 145 at 45.)  Similarly, plaintiffs contend that defendants utilized a universal compensation system, which compensated all field workers on either an hourly or a piece-rate basis. (*Id.*)  Because of this, plaintiffs assert, the payroll records reflect whether defendants provided separate hourly compensation for the rest periods of their piece rate employees. (*Id.* at 46.)  Plaintiffs maintain that from March 17, 2011 (the beginning of the proposed class period) until at least October 2013, defendants provided no separate compensation for rest periods, and that, between November 2013 and February/March 2014, defendants provided separate compensation for rest periods for less than the minimum amount of time required by law. (*Id.*)  Finally, plaintiffs claim that following March 2014, while some rest breaks were provided to piece rate employees, not all of defendants' workers received them. (*Id.* at 46–47.)

Plaintiffs have presented evidence of the following.  It was defendants' company policy to provide rest periods for all field workers, regardless of whether they work on an hourly or piece-

---

[11]  Hours paid as a result of Labor Code § 226.7 are treated as wages under California law. *Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094, 1114 (2007).  Further, the employee is entitled to payment "immediately upon being forced to miss a rest or meal period."  *Id.* at 1108. Thus failure to compensate appropriately for rest breaks would also violate 29 U.S.C. § 1832(a) (requiring payment of "wages owed to [seasonal agricultural] worker[s] when due").

24

rate basis, consisting of one 10-minute break for three hours or more of work, and a second break for seven[12] or more hours of work.  (Doc. No. 145-1 at 130) (Deposition of Christopher Rodriquez, defendants' Person Most Knowledgeable ("PMK")).  This policy was eventually reduced to writing.  (Doc. No. 145-1 at 500 (Notice of Rest and Meal Period Policy).)  Similarly, defendants have universal pay policies for certain types of employees:  all pruning work is compensated hourly at the minimum wage, while harvesting of mandarins and grapes was paid on a piece rate basis (though the piece rate could either be a group piece rate or an individual piece rate).  (Doc. No. 145-1 at 108–12 (PMK Deposition).)

It is also clear that whether an employee was separately compensated for rest periods can be readily determined by reviewing payroll records for that employee.  (*See id.* at 185–91.)  Plaintiffs' retained statistical expert, Jeffrey Petersen, declares that he received and analyzed payroll data[13] from defendants.  (Doc. No. 145-3) (Declaration of Jeffrey Petersen).  According to Dr. Petersen, there were a total of 9,427 subclass members who worked 620,348 individual work days during the class period.  (*Id.* at ¶ 10.)  He concluded a rest break was not paid on a piece rate employee workday if either (a) a shift was between 3.5 and 6.0 hours, and there was no record of a payment for at least 0.1667 hours in the "regular pay" column[14]; or (b) there was a recorded

_____

[12]  As stated above, California law requires a second rest break at six hours of work, not seven. *See Alberts*, 241 Cal. App. 4th at 400.  Defendants' Person Most Knowledgeable ("PMK") testified in the same deposition that documents which suggested a second rest period was available at seven hours of work reflected a "misprint," and that they should reflect a second rest period at six, not seven, hours of work.  (Doc. No. 145-1 at 138.)  While there is a factual dispute about what defendants' rest policy actually was, plaintiffs maintain this is immaterial because defendants failed to provide legally sufficient rest breaks regardless.  (Doc. No. 145 at 45 n.58.)

[13]  It is unclear whether Dr. Petersen has analyzed all of defendants' payroll data.  Plaintiffs' brief notes that defendants may only have disclosed payroll records for 25 percent of the total class, pursuant to an earlier discovery dispute.  (Doc. No. 145 at 22.)

[14]  Dr. Petersen states that, when defendants made rest period payments for piece rate employees, they were categorized as non-productive time and paid as "regular pay," thus appearing distinctly in the payroll record.  (Doc. No. 145-3 at ¶ 11, n.5.)  The figure found significant for rest period purposes corresponds to a ten minute period of work time, as ten minutes is 0.1667 hours.  (*Id.*)  Each was purportedly paid at the minimum wage.  Some entries reflected a 0.16 hour payment, which Dr. Petersen counted as no rest period payment being received, because 0.16 hours equates to only 9.6 minutes.  (*Id.*)  Because each of these rest periods was paid at the minimum wage, a payment for 9.6 minutes reflects a payment below the state minimum wage.  (*Id.*)

25

shift of more than 6.0 hours, but no payment for at least 0.3333 recorded.  (*Id.* at ¶ 11.)

This subclass is premised on the central claim that defendants failed to make legally sufficient payments to their workers for all rest periods.  Defendants' rest period policy changed throughout the proposed class period.  It is undisputed rest periods for piece rate employees were not separately compensated at an hourly rate—allegedly in violation of California labor law— between March 2011 and November 2013.  (*See* Doc. No. 145 at 46; Doc. No. 147 at 40.)  From November 2013 to March 2014, plaintiffs contend that while rest breaks were separately compensated, the compensation was legally insufficient, because they were compensated at the minimum wage for only 9.6 minutes, rather than 10 minutes.  (*See* Doc. No. 145-1 at 187–88 (PMK Depo.)) (noting that, in March 2014, defendants began separately compensating for 0.17 hours of rest break time per rest break, rather than 0.16 hours).  Finally, while the policy following March 2014 was facially valid, defendants in fact failed to compensate all subclass members separately for each rest period.  (Doc. No. 145-1 at 188–91 (PMK Depo.).)  Despite the fact that defendants' rest period policy changed throughout the period in question, it is apparent that whether a rest period was separately compensated and the amount of compensation provided for rest breaks are determinable simply from reviewing defendants' payroll records.  (*See, e.g.*, *id.* at 185–91.)  The common issue of whether defendants maintained a lawful rest period policy and appropriately made rest period payments under California law is common to this subclass. Commonality is therefore satisfied here.

b.      *Predominance*

Common issues also predominate over individual ones within this subclass.  As explained above, defendants maintained universal payroll policies concerning compensation for rest periods applicable to all piece rate employees.  Furthermore, plaintiffs' claims will succeed or fail based on the ultimate determination of whether defendants' policies were lawful under California law and whether class members were actually paid in accordance with those policies.  Both issues are capable of determination on a subclass-wide basis:  whether defendants' policies were lawful affects all similarly situated employees, while whether class members were paid in accordance with those policies can be determined by looking to a single body of evidence—defendants'

26

payroll records.

Defendants argue that they anticipate raising as a defense that their piece rate workers regularly skipped rest breaks, and that this defense will result in individual issues predominating over common ones.  (Doc. No. 147 at 41–46.)  In support of this position, defendants do offer at least some evidence that their workers occasionally skipped rest breaks.  (*See, e.g.*, Doc. No. 147-8 at 15 (Amador) ("Sometimes I prefer to work through my break in order to catch up if I am running behind of the crew.  I estimate this happens very few times and when it does, I only do it for about five (5) minutes of my break."); Doc. No. 147-8 at 108 (Diaz) ("Although extremely rare, Saturday's [sic] the crew would work through our morning break and instead would combine it with our lunch in order to take a forty (40) minute lunch."); Doc. No. 147-10 at 95–96 (Mendoza) ("From the time I started with the company until about 2014, our crew would agree and get permission from our foreman to skip over our rest break and lunch break on Saturdays when we worked shorter days, in order to get out earlier.").)  Nonetheless, defendants' argument in this regard does not defeat predominance.

For the period from March 2011 to November 2013, any individualized defenses on the grounds identified by defendants would appear to be irrelevant to consideration of this aspect of plaintiffs' motion for class certification.  Plaintiffs' claim is based on Labor Code § 226.7 which states that "[i]f an employer fails to provide . . . [a] rest or recovery period in accordance with a state law, . . . the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that . . . [the] rest or recovery period is not provided."  As set forth above in addressing the issue of commonality with respect to this subclass, plaintiffs' claim here is that state law required the class members to be separately compensated for rest breaks during this period.  Thus, this claim is focused on the manner in which the rest breaks were compensated by defendants, not whether the rest breaks were in fact taken by their workers.[15]  It appears to be undisputed that none of the rest breaks for defendants'

---

[15]  Specifically, plaintiffs' contend that defendants' piece rate employees were not being separately compensated on an hourly basis for rest breaks as required by state law.   Whether plaintiffs' claim in this regard is supported by state law is a question going to the merits of their claim rather than to whether class certification as to it is appropriate.

piece rate employees during the specified period of time were compensated separately on an hourly basis.  Therefore, if plaintiffs are correct in contending that defendants' policy in this regard was in violation of the requirements of California law, it would also be undisputed that defendants failed to provide *any* "rest or recovery period[s] in accordance with a state law" from March 2011 to November 2013, because class members were unable to take a separately compensated rest period even if they sought to do so.  *Brinker*, 53 Cal. 4th at 1033 ("No issue of waiver ever arises for a rest break that was required by law but never authorized; if a [legally-compliant] break is not authorized, an employee has no opportunity to decline to take it."); Labor Code § 226.7.  Therefore, the court concludes that the common issues here "are more prevalent or important than" the individual issues.  *See Tyson Foods, Inc.*, 136 S. Ct. at 1045 (quoting Newberg on Class Actions § 4:50, pp. 196–97).

Defendants also indicate that, for the period from November 2013 to March 2014, they will raise both a *de minimis* defense as well as a merits defense, because the alleged violation is that rest periods were undercompensated, not uncompensated.  (*See* Doc. No. 147 at 46) ("[E]ven if the court agrees with Plaintiffs' argument that compensation for such rest periods in the amount of 0.16 of an hour, or 9.6 minutes, constitutes an unpaid rest period as opposed to *de minimis* violation . . .").  Defendants cite no authority establishing that a *de minimis* defense is cognizable under state law, although the Ninth Circuit has held such a defense exists to unpaid overtime claims under the Fair Labor Standards Act ("FLSA").  *See Lindow v. United States*, 738 F.2d 1057, 1062–63 (9th Cir. 1984) (noting courts should look to factors such as practical administrative difficulty of reflecting the time, the aggregate size of the claim, and the regularity of the excess work in the context of that case).[16]  Moreover, district courts have held that this defense does not preclude class certification in other circumstances.  *See Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 618 (C.D. Cal. 2015).  In any event, the court concludes that here both *de minimis* and merits-based defenses tend to support, rather than

---

[16]  A question of a similar nature—whether California recognizes a *de minimis* defense to claims for unpaid wages under Labor Code §§ 510, 1194, and 1197—has been certified to the California Supreme Court.  *See Troester v. Starbucks Corp.*, 680 Fed. App'x 511, 2016 WL 8347245 (9th Cir. June 2, 2016).  It appears that the question remains pending before that court.

28

undermine, class certification, as they too will be issues suitable for resolution across the entire subclass.  Defendants have not explained how the assertion of these defenses must be applied individually.

Finally, from March 2014 onward, plaintiffs concede that defendants' policies were lawful.  Rather, plaintiffs maintain that class members were not always paid in accordance with those policies.  Defendants argue that their payroll records will not provide a common method of proof with respect to this claim because they will only show whether an individual was compensated for a rest period, but cannot show whether an employee freely chose to waive any given rest period.

Regardless of whether a waiver defense to these claims is cognizable,[17] defendants have failed to establish that assertion of such a defense would cause individual issues to overwhelm class questions.  Defendants bear the burden of pleading and proving any affirmative defenses they seek to raise.  *See Brinker*, 53 Cal. 4th at 1053 (noting that waiver "is an affirmative defense, and thus the burden is on the employer, as the party asserting waiver, to plead and prove it"); *see also Sliger v. Prospect Mortg., LLC*, 89 F. Supp. 2d 1212, 1217 (E.D. Cal. 2011).  Of the 100 employee declarations provided by defendants, only in seven do employees recall ever skipping a rest break; of those seven, the declarations state that this practice was very infrequent.  (Doc. No. 147-8 at 15 (Amador) (estimating she skipped a rest break "very few times"); *id.* at 108 (Diaz) (describing skipping a rest break as "extremely rare"); Doc. No. 147-10 at 95–96 (Mendoza) (describing skipping rest breaks on Saturdays only); Doc. No. 147-11 at 58 (Perez) (describing skipping rest breaks "occasionally" on Saturdays, and noting this stopped occurring when the individual piece rate system was put in place); *id.* at 78–79 (Ramos) (stating that skipping rest

_____

[17] It is unclear whether employees may waive rest periods under California law.  *Compare* Cal. Dep't of Indus. Rel., Division of Lab. Standards Enforcement ("DLSE"), Opinion Letter (Jan. 28, 2002) (noting that no rest break is required for any employee who "freely chooses without any coercion or encouragement to forego or waive a rest period") *with Bufil v. Dollar Fin. Grp., Inc.*, 162 Cal. App. 4th 1193, 1205 (2008) (citing 8 Cal. Code Regs. § 11040(11)(A), (12)(A)) ("[T]he purported meal period waivers had nothing to do with the rest period claims because an employee cannot waive such claims.  The permitted waiver of the meal requirement applies only to meal periods, not to rest breaks.").

breaks had "occurred less than about ten (10) times"); Doc. No. 147-12 at 48 (Toledo) (noting that, some years ago, his crew would skip rest breaks on Saturdays if everyone, including the foreman, agreed); *id.* at 85 (Vargas) (noting that sometimes his crews would skip rest breaks on Saturdays but it "didn't happen all the time back then and it does not happen at all anymore"). None of the employees suggested they skipped all, most, or even a sizable number of their rest breaks. Defendants have presented no evidence suggesting any waiver defense permeates this subclass to the point a liability determination would require individualized attention. Moreover, the Ninth Circuit has approved of the use of statistical sampling and representative testimony as a method to determine liability in wage-and-hour class actions. *See Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014) ("Since *Dukes* and *Comcast* were issued, circuit courts including this one have consistently held that statistical sampling and representative testimony are acceptable ways to determine liability."). To the extent defendants wish to prove that individual class members waived rest breaks, they may do so at the damages phase of the case. *See id.* at 1168 (noting with approval the district court's decision to preserve defendant's "opportunity to raise any individualized defense it might have at the damages phase of the proceedings"); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013) ("[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3).").

In short, defendants' liability under this subclass can be determined based on legal disputes common to all subclass members, including whether defendants' varying rest period policies were lawful and whether they are subject to a *de minimis* defense. These issues will predominately be resolved based on one body of evidence—defendants' payroll records—also supporting subclass-wide resolution. Finally, defendants have presented very little evidence supporting an affirmative waiver defense. To the extent they have shown that any waiver occurred, it appears to the court that such evidence is more properly categorized as relevant only to the damages inquiry, rather than one pertaining to plaintiffs' central theory of liability. Therefore, the court concludes that subclass-wide issues predominate with respect to this subclass.

/////

30

c.      *Superiority*

For many of the same reasons that this court concludes subclass-wide issues predominate, it likewise concludes that class treatment of the piece rate rest period subclass claims is superior to individual treatment.  In determining superiority, the court is to look to issues such as class members' interests in individual control of the litigation, the extent of any litigation already begun by class members, the desirability of concentrating the litigation in a particular forum, and the likely difficulties in managing a class action.  *See* Fed. R. Civ. P. 23(b)(3)(A)–(D).  There has been no showing here that any of the class members have a separate interest in individual control of the litigation, or that suits by class members are already pending on these same issues. Moreover, the types of claims at issue here likely involve smaller amounts of damages, for which the only practical means of seeking redress is class treatment.  *See Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1190 (9th Cir. 2001) ("Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action.").

Finally, while defendants do raise some issues that they believe will result in difficulties managing the class action at a later stage in this litigation, this does not defeat class certification. The Ninth Circuit has emphasized that administrative feasibility is not a stand-alone prerequisite to class certification, and that there is a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017).  Indeed, here, the only real manageability concern defendants have presented is their potential waiver defense and, as noted above, there is scant evidence suggesting that this will be a genuine issue running throughout the subclass.

For all of these reasons, the court concludes a class action is superior to individual resolution of these claims against defendants, and therefore will certify the Piece Rate Rest Period Subclass as follows:

/////

/////

/////

/////

31

<u>Piece Rate Rest Period Subclass</u>

All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, and were compensated on a piece rate basis.[18]

2.      <u>Unpaid Travel Time Subclass</u>

Plaintiffs seek certification of a subclass to litigate the issue of whether defendants were required to compensate them for unpaid travel time between various work sites.

a.      *Commonality*

Plaintiffs assert, and defendants do not dispute, that class members were required to be compensated for any time spent traveling between different fields during their shifts. (Doc. No. 145 at 47; Doc. No. 147 at 50.) Indeed, any compulsory travel time is generally compensable as "hours worked" for agricultural employees in California. *See Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 595 (2000).[19]

Supporting commonality are twenty-five declarations from putative class members generally recalling that they were required to travel between thirty minutes and one hour between fields during mandarin harvest season numerous times per week. (*See* Doc. No. 145-4 at 5 (Magdaleno); *id.* at 12 (Hinojosa); *id.* at 17–18 (Torres); *id.* at 26 (Estrella); *id.* at 40–41 (Vega); *id.* at 47 (Gonzalez); *id.* at 55–56 (Vargas); *id.* at 65 (de Estrella); *id.* at 72 (Rojas); *id.* at 80 (Hinojosa); *id.* at 86 (Carranza); *id.* at 96 (Orozco); Doc. No. 145-5 at 6 (Reyna); *id.* at 31

---

[18]  This subclass definition differs somewhat from that originally proposed by plaintiffs. The court has reformulated this and other subclasses below to address concerns attached to so-called "fail-safe" classes. *See, e.g.*, *Ruiz v. Citibank, N.A.*, Nos. 10 Civ. 5950 (KPF)(RLE), 10 Civ. 7304 (KPF)(RLE), 2015 WL 4629444, at *7 (S.D.N.Y. Aug. 4, 2015) ("Such 'fail-safe classes' present myriad problems, including the risk that plaintiffs might effectively litigate their claims without the risk of an adverse judgment:  either they 'win' and are in the class, which by definition cannot lose its claim, or they 'lose' and are outside the class, and thus are not bound by an adverse decision."); *see also Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 n.7 (9th Cir. 2016) (noting the Ninth Circuit requires only a "reasonably close fit between the class definition and the chosen theory of liability" so as to avoid the problems of fail-safe classes); *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1072 (N.D. Cal. 2005) ("A court may divide a class into subclasses on motion of either party, or *sua sponte*.") (citing *Burka v. N.Y.C. Transit Auth.*, 110 F.R.D. 595, 603–04 (S.D.N.Y. 1986)).

[19]  Again, since this time is compensable as hours worked, it counts as wages that must be paid under 29 U.S.C. § 1832(a).

32

(Patron); *id.* at 39 (Carrera); *id.* at 50 (Melendres); *id.* at 58 (De Leon); *id.* at 64 (Alvarez); *id.* at 70 (Gutierrez); *id.* at 77–78 (Esquivel); *id.* at 86–87 (Reyes); Doc. No. 145-6 at 4 (Sanchez); *id.* at 74–75 (Cabrales); *id.* at 81 (Hernandez); *id.* at 85 (Monzon).)  All of these declarations state that the employees were not compensated for this travel time.  Defendants' PMK testified at his deposition that, in the early part of the class period, workers would travel between fields in their own vehicles during mandarin season, alternately doing pruning and harvesting work.  (Doc. No. 145-1 at 119–20.)  Further, the PMK testified that defendants' payroll records did not reflect any separate travel time compensation for those employees.  (*Id.* at 163, 171–72, 174–77, 180, 184.)  It is clear there are common questions of fact and law that run throughout the proposed subclass, and that there is a common method of proof—defendants' payroll records—which will further facilitate subclass-wide resolution.  Commonality is therefore satisfied with respect to this subclass.

                         b.      *Predominance*

        Defendants do not contest predominance as such here.  Rather, defendants complain the class is not ascertainable.  (Doc. No. 137 at 48–51.)  As noted above, there is not a stand-alone prerequisite of administrative feasibility which the plaintiffs must meet in order to certify a class; rather, administrative concerns are simply a part of the analysis of whether a class action is a superior method of resolving a dispute.  *See Briseno*, 844 F.3d at 1128.  Defendants' arguments in this regard will therefore be addressed in connection with the consideration of superiority, below.

        Meanwhile, the central issue concerning this subclass is whether defendants were required to compensate their employees for travel time between job sites, and whether they did so.  This subclass is readily subject to not only common legal issues, but common proof.  Defendants' PMK acknowledged at his deposition that defendants' payroll records reflect unique codes identifying what specific fields various workers were working in on a particular day, along with identifying information about that grower, allowing a determination as to when workers travelled to two different fields in one day.  (Doc. No. 145-1 at 150–55.)  Plaintiffs also supplied a ranch map index and list of growers which they purport allow for the determination of the driving time between any two fields reflected in the payroll records.  (*See* Doc. No. 145 at 48; Doc. No. 184.)

                                    33

Plaintiffs' expert Dr. Petersen explains how he will calculate the unpaid travel time in his declaration.  First, he notes that, within the data he received, 14.3 percent of the workdays during the class period reflect work performed at more than one location.  (Doc. No. 145-3 at ¶ 18.)  To calculate the payments due, he would "randomly draw a number of days when class members traveled that is representative of the entire class."  (*Id.* at ¶ 19.)  Dr. Petersen states he understands the coded job sites depicted in the payroll records are attached to addresses, which he would then input into Google Maps to determine the length of time it would take to drive between job sites.  (*Id.*)  He notes that, if there are not addresses readily available, plaintiffs would need to seek further data production from defendants to confirm the location of the job sites in question.  (*Id.*)  According to Dr. Petersen, the data from each of the sample drive times selected will be aggregated to determine the average travel time per work days, within an acceptable margin of error.  (*Id.*)  This average number will then be combined with the number of days where travel time payments were due and the associated hourly wage rate to determine the damages for the class for unpaid travel time.  (*Id.*)

Defendants concede that the claims raised by this subclass are susceptible of common proof.  Defendants argue that either no travel time was incurred or all payments were appropriately made, because their payroll records reflect some travel periods were separately compensated and recorded.  (*See* Doc. No. 147-5 at ¶ 15) (giving an example of 0.41 hours of travel time paid separately to plaintiff Avalos on November 27, 2013).)  The evidence referred to by defendants may be relied upon to support a merits-phase argument and is not appropriately addressed at this stage of the proceeding.  However, the court notes that defendants' PMK declares he was able to determine that there was separate compensation provided for travel time by examining payroll records, the grower list, and the ranch map index.  (*Id.*)  This statement makes clear that defendants can discern from the payroll records whether an employee was appropriately compensated for travel time.  This, in turn, demonstrates the viability of this claim being addressed on a subclass-wide basis:  both parties can determine solely from defendants'

/////

/////

34

records whether the employees were separately compensated for travel time.[20]

Because this claim is susceptible of common proof and will involve common legal questions that clearly outweigh any individual issues, predominance is satisfied.

c.    <em>Superiority</em>

The court also concludes that class treatment of this claim is superior to individual treatment. No showing has been made that any other individual litigation of the putative subclass members has begun, or that any individual subclass members are interested in seeking separate recourse. The cumbersome nature of attempting to pursue many small-value claims individually further supports concentrating all of them within one forum.

Defendants challenge the ascertainability of this subclass, which the court again takes to be a challenge to the administrative feasibility or manageability of the subclass. *See Briseno*, 844 F.3d at 1124, n.3 (refraining from using the term "ascertainability" because of the varied meanings given to it by courts). Defendants assert numerous individual determinations that would have to be made in order to identify the members of the class. (Doc. No. 147 at 50–51.) However, the class definition need not be so exact as to only cover individuals who in fact suffered the injury alleged. *See Torres*, 835 F.3d at 1138, n.7 (noting the Ninth Circuit requires only a "reasonably close fit between the class definition and the chosen theory of liability," because requiring a class definition that is too precise leads to problems associated with fail-safe classes). All that is required for class definition is that it set forth "common characteristics sufficient to allow a member of that group to identify himself or herself as having a [potential] right to recover based on the description." *Krueger v. Wyeth, Inc.*, No. 03CV2496 JAH(AJB),

---

[20] Defendants also argue that, if the two fields at which a given class member worked are contiguous, there would be no compensable travel time between them and therefore no violation of the law. This argument is not well taken. Even to the extent this could theoretically be true, defendants make no showing that any of their fields are in such close proximity to one another that there would be no travel time between them, let alone that any putative class members actually worked at two such contiguous fields on the same day during any part of the class period. Indeed, the evidence before the court suggests that the fields in question range over a wide area. (*See* Doc. No. 145-1 at 85–87) (noting that, according to the PMK, the fields on which the putative class members work range as far north as Madera and as far south as Goshen (approximately 65 miles apart) and as far east as Sanger and as far west as Kerman (approximately 35 miles apart)).

35

2011 WL 8984448, at *1 (S.D. Cal. July 13, 2011).

As such, having found all the criteria met for certification, the court certifies the following subclass, which will allow potential class members to know whether they are a member of that group and have a potential right to recover:

<u>Unpaid Travel Time Subclass</u>

All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, and worked at two or more fields in one day.

3.    <u>Vehicle Expense Subclass</u>

Plaintiffs seek to certify a subclass for unreimbursed vehicle expenses incurred by class members when they drove their cars between various worksites. Defendants essentially renew their objections to certification under the unpaid travel time subclass in opposition to certification of this subclass. (Doc. No. 147 at 54–55.)

a.    *Commonality*

Under California law, an employer "shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." Cal. Labor Code § 2802(a). This is generally understood to include vehicle expenses. *See Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 567–68 (2007) (noting the parties agreed § 2802 required "an employer to indemnify its employees for expenses they necessarily incur in the discharge of their duties," and finding employer could do so by enhancing the base salary under certain circumstances). Defendants' PMK testified at his deposition that defendants' employees are not compensated for mileage reimbursements for driving their own cars between worksites. (Doc. No. 145-1 at 249.) It is clear that this subclass contains common legal issues and company policies.

b.    *Predominance*

Plaintiffs submit that, for many of the same reasons that the Unpaid Travel Time Subclass is appropriate for certification, so is this subclass. In addition to the facts stated above showing that travel between different worksites can be determined by defendants' own records, defendants' PMK testified that employees are never provided mileage reimbursements or

36

automobile allowances for their vehicle expenses when traveling between fields because "they're paid for that time." (Doc. No. 145-1 at 249.)  Plaintiffs have come forward with declarations from individual class members reflecting that they drove their own car between fields and were not reimbursed for it.  (Doc. No. 145-4 at 26 (Estrella); *id.* at 48 (Gonzalez); *id.* at 57 (Vargas); *id.* at 65 (de Estrella); *id.* at 80 (Hinojosa); Doc. No. 145-5 at 7 (Reyna); *id.* at 32 (Patron); *id.* at 39 (Carrera); *id.* at 64 (Alvarez); *id.* at 70 (Gutierrez); *id.* at 78 (Esquivel); *id.* at 87 (Reyes); *id.* at 96 (Machuca); Doc. No. 145-6 at 4–5 (Sanchez); *id.* at 56 (Gonzalez); *id.* at 75 (Cabrales); *id.* at 81 (Hernandez); *id.* at 85–86 (Monzon).)

Defendants believe predominance is not met here because the identity of the individuals who drove vehicles between worksites cannot be determined solely from defendants' payroll records, which is undisputed.  Indeed, there is evidence that some employees carpooled to work and presumably between job sites while at work.  (*See* Doc. No. 147-5 at 4 (PMK Depo.) ("[O]ver the class period, while performing my duties as Director of Human Resources for Ag Force and FPC, I have observed that it is more common than not for agricultural employees to carpool to work."); Doc. No. 147-8 at 37 (Ayala) ("I arrive this early because the ladies I carpool with pick me up early."); *id.* at 92 (Cruz) (carpool driver); *id.* at 96 (Cruz) (carpool driver); *id.* at 101 (de Jesus) (sometimes carpools); Doc. No. 147-9 at 13 (Dung); *id.* at 6 (Garcia); Doc. No. 147-12 at 9 (Sanchez); *id.* at 68 (Valencia).)  However, the number of individual employees whom actually drove vehicles between fields goes to the question of damages with respect to this subclass, not to liability with respect to the claim.  The liability question will be resolved by looking to whether defendants were required to compensate employees for mileage for driving their own vehicles between job sites, and whether they did so.  Once again the court notes, individualized damages inquiries do not defeat class certification.  *Leyva*, 716 F.3d at 513–14; *Yokoyama*, 594 F.3d at 1094.

Here, the parties do not contest that the question of liability with respect to this claim is readily determinable across the subclass.  Accordingly, the court finds that common issues predominate over individual ones.

/////

37

c.      *Superiority*

Defendants' main objection to this subclass is, as with the Unpaid Travel Time Subclass, based upon defendants' contention that it is not manageable.  (Doc. No. 147 at 54–55.)  At its core, this is a challenge to the superiority of pursuing this cause of action on a subclass-wide basis.  According to defendants, because it is not apparent from their records whether an employee drove a car from one worksite to another, thereby incurring reimbursable expenses, this will necessitate a series of individual inquiries as to damages.  (*Id.*)  However, plaintiffs' expert Dr. Petersen suggests a damages determination for this subclass would be reached by combining his analysis of the damages attributable to the unpaid travel time subclass with an aggregated average travel distance, multiplied by the IRS mileage reimbursement rate.  (Doc. No. 145-3 at ¶ 20.)  In a footnote in his declaration, Dr. Petersen represents that he will determine how many individuals drove their own vehicles between worksites by employing surveying techniques, essentially asking class members whether they did so and how many co-workers typically rode with them.  (*Id.* at ¶ 20, n.9.)  This information would then "be used in the projection of class wide damages."  (*Id.*)  Alternately, plaintiff indicates that the number of individuals who drove their vehicles and are entitled to reimbursement can be identified through "self-certification," i.e. the submission of affidavits at the claims administration stage.  (Doc. No. 150 at 25–26.)  Other district courts in California have permitted just this type of procedure.  *See Melgar v. CSk Auto, Inc.*, No. 13-cv-03769-EMC, 2015 WL 9303977, at *8 (N.D. Cal. Dec. 22, 2015); *Krueger v. Wyeth, Inc.*, 310 F.R.D. 468, 475–76 (S.D. Cal. 2015) (noting approval of classes "even when the only way to determine class membership is with self-identification through affidavits").

The court understands and appreciates defendants' concerns regarding the proposed statistical analysis.  However, the court is likewise mindful that under binding Ninth Circuit precedent individualized damage assessments, standing alone, cannot serve to defeat class certification.  *Leyva*, 716 F.3d at 513–14; *Yokoyama*, 594 F.3d at 1094.  Further, it is clear here that plaintiffs' anticipated damages models are not inconsistent with their alleged liability case.  *See Comcast*, 569 U.S. at 34–35.  Whatever method of determining damages may ultimately be employed here, the fact that plaintiffs have proposed statistical modeling at this stage does not

38

defeat class certification. *See Jimenez v. Allstate Ins. Co.*, No. LA CV10-08486 JAK (FFMx), 2012 WL 1366052, at \*15 (C.D. Cal. Apr. 18, 2012) (noting that although plaintiff had not met its burden of demonstrating that statistical sampling was proper for calculating damages, "this shortcoming is not sufficient to preclude class certification"); *In re Estate of Marcos Human Rights Litig.*, 910 F. Supp. 1460, 1464 (D. Haw. 1995) ("The use of aggregate procedures, with the help of an expert in the field of inferential statistics, for the purpose of determining class compensatory damages is proper."). There are no issues with class manageability that render this subclass unsuitable for class treatment at this time. Therefore, the following subclass is certified by the court:

Vehicle Expense Subclass

> All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, worked at two or more fields in one day, and drove their own cars between fields.

4. Meal Period Subclass

Plaintiffs wish to certify a subclass of employees who were denied required meal periods or whose required meal periods were not recorded. (Doc. No. 145 at 50–52.) Defendants again argue that individual issues predominate as to this subclass, thereby making class certification inappropriate. (Doc. No. 147 at 55–56.)

a. *Commonality*

Defendants do not directly contest commonality with respect to this subclass. California law requires employers to "authorize and permit all employees after a work period of not more than five (5) hours to take a meal period of not less than thirty (30) minutes." 8 Cal. Code Regs. § 11140(11). If an employee is working no more than six hours during a day, they may validly waive a meal period by mutual consent of both employee and employer. *Id.* During the meal period, the employee shall not be required to work, unless the parties have executed a written agreement to an "on duty" meal period, which is required by the nature of the work. *See* Cal. Labor Code § 226.7; 8 Cal. Code Regs. § 11140(11). Generally, the employer's duty to provide a meal period to an employee is discharged "if it relieves its employees of all duty, relinquishes

control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." *Brinker*, 53 Cal. 4th at 1004. Further, employers are required by law to record meal periods. *See* Cal. Code Regs. § 11140(7)(A)(3) ("Meal periods, split shift intervals and total daily hours worked shall also be recorded.").

Additionally, defendants apparently maintained a practice requiring forepersons to ensure each crew took a lunch break and took it at the same time, and that each lunch period was recorded. (Policies and Procedures for Crew Foreman – Lodged Doc.) Defendants' PMK testified at deposition that company policy requires the forepersons to record the start and stop time of the lunch break. (Doc. No. 145-1 at 137–38.) Nevertheless, there are numerous instances in defendants' records, confirmed by the PMK, where no lunch break was recorded for work periods of longer than five hours. (*See* Doc. No. 145-1 at 167–68; *id.* at 175–76; *id.* at 180; *id.* at 211–14.) The PMK testified he did not know why the company forepersons were not recording meal periods. (*Id.* at 214.)

Plaintiffs have submitted declarations from numerous class members in which those employees state that lunch breaks were frequently not given, and hence were not recorded. Those declarants have recounted that either they were told they would not get a lunch break because the crew had to change job sites during the day and the travel time was their lunch break, or simply because the foreperson failed to call for a lunch break. (Doc. No. 145-4 at 5 (Magdaleno) ("Only the foreman can tell the crew to take a lunch. If the foreman doesn't call lunch, we don't take it."); *id.* at 18 (Torres); *id.* at 26 (Estrella); *id.* at 48 (Gonzalez); *id.* at 57 (Vargas); *id.* at 65 (de Estrella); *id.* at 81 (Hinojosa); Doc. No. 145-5 at 7 (Reyna); *id.* at 12 (Hernandez); *id.* at 34 (Patron); *id.* at 39–40 (Carrera); *id.* at 50 (Melendres); *id.* at 58 (De Leon); *id.* at 64 (Alvarez); *id.* at 69–70 (Gutierrez); *id.* at 78 (Esquivel); *id.* at 87 (Reyes); Doc. No. 145-6 at 5 (Sanchez); *id.* at 66–67 (Garcia); *id.* at 75 (Cabrales); *id.* at 81 (Hernandez).)

Additionally, Dr. Petersen has declared that he received 24,271 pages of records consisting predominantly of daily time sheets compiled by crew forepersons from January 2011 to December 2015. (Doc. No. 145-3 at ¶ 13.) These time sheets, which are filled out by the crew

40

forepersons each day, have a specific section denoting start and stop times for a meal break. (*See, e.g.*, Doc. No. 145-1 at 362, 374, 379.) Dr. Petersen noted that, while examining these forms, if a half hour period was recorded, he assumed the crew had received a meal period, whereas if it was empty, he assumed no meal period was received. (Doc. No. 145-3 at ¶ 13.) Indeed, at deposition defendants' own PMK confirmed that crew forepersons record the meal period taken on these sheets. (Doc. No. 145-1 at 126–27.) The crew sheet records obtained by plaintiffs thus far depict approximately 12,135 crew work days (measured per crew, rather than per employee). (Doc. No. 145-3 at ¶ 14.) Dr. Petersen randomly selected 275 crew sheets to estimate a percentage of work days when class members did not receive the required meal break, which yielded 6,469 individual employee records for that sample. (*Id.* at ¶ 15.) He determined that there were 981 instances of individual employees not being provided meal breaks out of the sample, suggesting there was approximately a 15.2 percent rate of employees not being provided meal breaks. (*Id.*) Dr. Petersen clarified in a supplemental declaration that putative class members were not provided with a meal period on 15.2 percent of the days worked, not that 15.2 percent of the employees had suffered this injury at some point. (Doc. No. 178-1 at ¶ 3.)

As demonstrated by the above discussion, there are common legal questions that pervade defendants' liability to this subclass, and common proof—defendants' records and the parties' respective expert opinions concerning their interpretation—which will be used in determining liability. Commonality is therefore satisfied as to this subclass.

b. *Predominance*

Defendants present three separate arguments concerning why common issues do not predominate over individual issues with respect to this subclass. First, they argue that the 15.2 percent rate of missed meal payments calculated by Dr. Petersen is "exceptionally low under the assumption that Defendants made it a practice to deny workers a meal period." (Doc. No. 147 at 55.) Defendants represent that "a determination of liability and calculation of damages based on a rate this low will not achieve a reasonable method for allocating liability or damages across the class as the Compliance Rate varies from person to person, crew to crew, and crop to crop." (*Id.* at 55–56.) However, defendants do not explain why a low violation rate would affect the liability

41

determination here. Nor do defendants provide any authority for the proposition that an employer must commit labor law violations at a particular rate to make those violations subject to class wide determination. To the extent defendants' argument in this regard relates to how damages will ultimately be demonstrated and determined, the court notes defendants' concerns. However, as explained above, such concerns are premature and cannot defeat class certification. *Leyva*, 716 F.3d at 513–14; *Yokoyama*, 594 F.3d at 1094; *Jimenez*, 2012 WL 1366052, at \*15; *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 539 (N.D. Cal. 2012) ("[T]he need for individualized hearings does not, on its own, defeat class certification."); *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 680 (N.D. Cal. 2011) ("[I]ndividual damages issues typically do not bar class certification where common questions predominate over individual questions as to liability.").

Defendants next argue that there are numerous potential reasons why their payroll records would have omitted a meal period, "including clerical errors, meal periods taken between assignments, errors in a crew boss's understanding of the law, or unforeseen circumstances which keep the crew working past five hours." (Doc. No. 147 at 56.) Defendants provide neither authority nor evidence to support either: (1) that evidence exists supporting these possible explanations; or (2) that even if such evidence exists, it would support a legal defense from liability. Without such support, defendants' argument that their suggested defenses are genuine and cognizable and therefore require individualized liability treatment is unpersuasive . *Edwards*, 798 F.3d at 1184 ("When defendants opposing class certification raise a legal defense that may defeat commonality, the district court cannot assume its validity . . ."); *Anda v. Roosen Varchetti & Olivier, PLLC*, No. 1:14-CV-295, 2016 WL 7157414, at \*4 n.1 (W.D. Mich. Oct. 31, 2016) ("[T]he mere possibility that Defendants could raise individualized defenses against Plaintiffs' claims is insufficient reason for this Court to depart from the well-settled rule that potential individualized defenses do not preclude class certification.").

Finally, defendants argue:

> The primary shortcoming of the use of sampling methodologies in class litigation is that a statistical (or any other) methodology does not exist that allows for the assignment of a proportional result to the non-sampled population.

42

(Doc. No. 147 at 56.)  In this vein, defendants present the declaration of their expert, Dr. Joseph Krock, who opines that the sample on which plaintiffs' expert relied "identified 981 days out of 6,469 days on which workers purportedly did not receive a meal period.  According to the proposed methodology, at least 269,188 days are going to be assigned as missed meal period days without actually determining whether a missed meal period exists." (Doc. No. 147-7 at ¶¶ 39–41.)  As mentioned at oral argument on the pending motion, the court has struggled to understand this argument advanced by defendants.  To the extent this argument suggests that statistical conclusions are inherently flawed or invalid, the court cannot adopt that proposition. *See, e.g.*, *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, No. CV 13-2747-DMG (AGRx), 2014 WL 5797541, at *3–4 (C.D. Cal. Oct. 7, 2014) (allowing introduction of statistical expert); *Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1266 (N.D. Cal. 1997) (same).  Defendants may be suggesting that a foreperson's failure to note whether a meal break was taken on crew sheets does not mean the crew actually missed a meal break.  However, they have provided no evidence that this is the case, nor have they provided any authority suggesting it would be a defense to liability even if such evidence were to exist.

Again, the court understands defendants' concerns about the methodology to be employed in any ultimate calculation of damages with respect to this claim.  Nevertheless, such concerns do not bar class certification here. *Leyva*, 716 F.3d at 513–14; *Yokoyama*, 594 F.3d at 1094; *Jimenez*, 2012 WL 1366052, at *15; *Ellis*, 285 F.R.D. at 539; *Herrera*, 274 F.R.D. at 680.  Instead, it is largely undisputed that liability can be determined on a subclass-wide basis by determining whether defendants were required to and did compensate the class members for the meal periods, along with whether they recorded the meal periods, as required by California law.  Therefore, predominance is satisfied as to this subclass

c.      *Superiority*

Similar to the above subclasses, there is no indication that members of this subclass wish to pursue these claims individually or have filed suits to that end.  To the extent defendants recast their qualms with this class under the guise of administrative feasibility or manageability, those arguments are rejected since they do not overcome the "well-settled presumption that courts

43

should not refuse to certify a class merely on the basis of manageability concerns." *Briseno*, 844 F.3d at 1128. For these reasons the following subclass is certified by the court:

Meal Period Subclass

All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, for whom no meal period was recorded on at least one day in which the employee worked more than five hours.

5.      Ghost Worker Crew Subclass

Plaintiffs seek certification for a subclass of individuals subjected to the practice of using so-called "ghost workers" or "muertitos." (Doc. No. 145 at 53–56.) Between the 2011 and 2014 mandarin harvest seasons, defendants compensated their employees who picked mandarins on a group piece rate basis: their compensation was based on a per-bin rate for all of the bins harvested by a given crew, divided in equal shares among the crew members. (*Id.* at 53.) Plaintiffs allege that various forepersons put fictitious employees—the ghost workers or muertitos—on their crew list, allowing the foreperson to claim the pay for these fictitious employees for themselves while also depriving each of the rest of the crew members of some portion of their wages. (*Id.* at 54.) As of the 2015 mandarin harvest season, defendants began paying their employees on an individual piece rate basis, eliminating the incentive and potential for this practice to continue.

At the court's request, plaintiffs provided supplemental briefing detailing their theories of the defendants' liability based on their forepersons' use of ghost workers. According to plaintiffs, there are six separate theories of liability with respect to this claim: (1) the basic nature of the employment relationship; (2) Labor Code § 221 and the AWPA; (3) California Business and Professions Code § 17200; (4) apparent authority liability for the torts of defendants' agents; (5) ratification of the tortious actions of its employees; and (6) negligent hiring of forepersons. (Doc.

/////

/////

/////

/////

44

No. 178 at 17–23.)  Several of these—namely, the last four—are summarily rejected by the court.[21]

Concerning their other two theories of liability, plaintiffs maintain defendants are liable pursuant to Labor Code §§ 221 and 1194, as well as the AWPA.  It remains unclear to the court in what way Labor Code § 221 could be applicable here.  California law prohibits "any employer" from "collect[ing] or receiv[ing] from an employee any part of wages theretofore paid by said employer to said employee."  Labor Code § 221.  Generally speaking, § 221 "was enacted in order to prevent employers from utilizing secret deductions or kickbacks to pay employees less than their stated wages."  *Finnegan v. Schrader*, 91 Cal. App. 4th 572, 584 (2001).  Plaintiff has not alleged that the defendant employers here collected or received any of the wages which should have gone to class members.

One California court has held that an underpayment of wages may, in certain circumstances, be considered a violation of § 221.  *Gonzalez*, 215 Cal. App. 4th at 50.  However, the California Court of Appeals' holding in *Gonzalez* was premised on a violation of Labor Code § 223, which prohibits "secretly pay[ing] a lower wage while purporting to pay the wage designated by statute or by contract."  *See Gonzalez*, 215 Cal. App. 4th at 50.  The employer in *Gonzalez* had utilized a payment system under which automotive service technicians were compensated at a flat, per-hour rate.  215 Cal. App. 4th at 41.  However, the hours were based on "flag hours," rather than actual hours worked.  *Id*.  The employer assigned each specific repair task a certain number of "flag hours," approximating the amount of time it believed a repair

---

[21]  To the extent plaintiffs now suggest their ghost worker claims against defendants rely on tort causes of action—whether established directly through negligent hiring, or through an agency theory such as apparent authority or ratification—their contention must be rejected.  (Doc. No. 178 at 21–23.)  The operative pleading in this case set forth only causes of action based in statutory labor law.  (*See* Doc. No. 129.)  No tort causes of action have been alleged in the operative complaint, and plaintiffs cannot hope to certify a subclass on the basis of claims they have not alleged.  Further, Business and Professions Code § 17200 cannot provide an independent basis to warrant certification of this subclass, since this provision merely "'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200 *et seq.* and subject to the distinct remedies provided thereunder."  *Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 383 (1992).

45

should take. *Id*. A technician who completed a repair earned the amount of "flag hours" attributed to it, regardless of how long the repair actually took to complete. *Id*. No compensation was provided for down time, except that at the end of a pay period, the amount of compensation for "flag hours" was averaged across the total scheduled time for that pay period. *Id*. If the rate fell below the minimum wage, the employer would supplement the employees' pay accordingly. *Id*. In holding that this averaging was unlawful, the court in *Gonzalez* explained that such a scheme could be a violation of § 221, employing the following example:

> [A] technician who works four piece-rate hours in a day at a rate of $20 per hour and who leaves the job site when that work is finished has earned $80 for four hours of work. A second technician who works the same piece-rate hours at the same rate but who remains at the job site for an additional four hours waiting for customers also earns $80 for the day; however, averaging his piece-rate wages over the eight-hour work day results in an average pay rate of $10 per hour, a 50 percent discount from his promised $20 per hour piece-rate. The second technician forfeits to the employer the pay promised "by statute" under Labor section 223 because if his piece-rate pay is allocated only to piece-rate hours, he is not paid at all for his nonproductive hours.

*Id*. at 50. In *Gonzalez*, therefore, the state appellate court reasoned that Labor Code §§ 221 and 223 were violated because the employees forfeited this amount *directly* to the employer by virtue of the employer not paying them in accordance with statutory labor law. In contrast, the plaintiffs' allegation here is that the money was essentially stolen by their forepersons, who presumably kept it and did not return it to the employer, the defendants in this action. Accordingly, the court concludes that plaintiffs' argument that this claim could be premised on an alleged violation of Labor Code § 223 is simply not persuasive.

More importantly, however, all of these alleged violations of the law appear to require the employer to have knowledge of the unlawful payment scheme at issue. The AWPA requires that employers of seasonal agricultural workers provide employees written information concerning, among other things, the wages to be paid. 29 U.S.C. § 1821(a). Further, employers are prohibited from "*knowingly* provid[ing] false or misleading information" to the same employees. *Id.* § 1821(f) (emphasis added). Meanwhile, Labor Code § 1194 authorizes private civil suits by employees receiving less than the legal minimum wage or overtime compensation. As the

46

California Supreme Court has noted, "[a] proprietor who *knows* that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so." *Martinez v. Combs*, 49 Cal. 4th 35, 69–70 (2010) (emphasis added).

Plaintiffs have come forward with no evidence indicating that defendants here had a company policy permitting, allowing, or encouraging the use of ghost workers by forepersons. Nor have they provided evidence that the majority of forepersons were engaged in this practice, from which it could perhaps be inferred the defendants had at least constructive knowledge of the activities of their forepersons. At most, plaintiffs have provided evidence that this practice occurred on the crews of thirteen different forepersons: Ramon Murillo, Eloy Molina, Elpidio Torres, Vicky Vargas, Porfidio Vargas, "La Chata," Guadalupe Cruz, Jilberto (LNU), "El Sapo," Juan Miramontes, Bartolo (LNU), Alejandro LNU, and Joaquin Murillo.[22] (Doc. No. 151 at ¶ 19(a).)[23] The parties do not dispute that defendants employed at least 109 different crews during the proposed class period which utilized this group piece rate system, suggesting there were at least 109 different forepersons active during the class period. Based on this, the court finds that there the evidence before it is insufficient to show that the alleged behavior affected

---

[22] Plaintiffs' evidence does not support a finding that this practice occurred on the crews of forepersons Enrique Garcia, Baltazar Ramirez, Bertha (LNU), or Reyna Ibanez. Gerardo Reyna declared that he worked for foreperson Garcia, but implicates only foreperson Vicky Vargas in any wrongdoing. (Doc. No. 145-5 at 6–7.) The same is true of the declaration of Ines Garcia in regards to foreperson Ibanez. (Doc. No. 145-6 at 65.) Similarly, the declarations provided by plaintiffs recount only that class members began working for forepersons Ramirez and Bertha (LNU) in 2015 and 2016. (Doc. No. 145-4 at 102; Doc. No. 145-6 at 65.) Plaintiffs have alleged that the payment structure for these crews changed from a group to an individual piece rate system starting in 2015, thereby preventing forepersons from using ghost workers.

[23] Plaintiffs note that while they do not believe every foreperson committed wage theft in this manner, they are unwilling to stipulate to a specific number of forepersons who committed such wage theft, because they have been provided with only limited contact information for class members. (Doc. No. 178 at 23–24.) The assigned magistrate judge in this action previously limited discovery relevant to these claims to 25 percent of the putative class members, unless plaintiffs uncovered from that sampling "evidence of company-wide violations." (Doc. No. 33 at 7.) Plaintiffs have not sought further discovery on this issue or brought a motion to compel for hearing by the magistrate judge, despite the prior order limiting discovery stating that this issue could be revisited if further evidence of class-wide violations was developed. (*Id.*)

most or even a substantial portion of defendants' crews.  Absent that showing, the court is not persuaded that an inference can be drawn that defendants should have been aware that the ghost worker practice was widespread or occurring across all of its forepersons.

Given the above, any question of defendants' liability here would first require proof that each foreperson was engaged in the practice.  Defendants do not agree that the above thirteen forepersons were engaged in this practice of wage theft via ghost workers, and instead assert only one foreperson—Ramon Murillo—ever engaged in it.  (Doc. No. 181 at 20.)  Indeed, defendants have provided declarations from crew members specifically stating that forepersons Bartolo (LNU), Vicky Vargas, Porfidio Vargas, and Eloy Molina did not engage in the use of ghost workers.  (*See* Doc. No. 147-8 at 25–26 (Foreperson Bartolo (LNU); never saw or suspected ghost workers and believed she was paid correctly); *id.* at 107 (Foreperson Vicky Vargas); Doc. No. 147-9 at 25 (Fernandez) (Foreperson Porfidio Vargas); Doc. No. 147-11 at 70, 72–73 (Foreperson Eloy Molina).)  These are factual disputes that would need to be resolved on a foreperson-by-foreperson basis.

Second, as suggested above plaintiffs would be required to prove that defendants knew their forepersons were engaged in this practice in order for defendants to be held liable.  *See* 29 U.S.C. § 1821(f); *Martinez*, 49 Cal. 4th at 69–70.  Some of plaintiffs' declarants indicate that putative class members generally complained about the ghost worker practices.  (*See, e.g.*, Doc. No. 145-4 at 26 ("We began to complain to the company supervisors, but no one listened to us."); *id.* at 34.)  Others do not.  (*See, e.g.*, Doc. No. 145-6 at 5, 19–20, 58–59.)  None of the declarations presented indicate how frequently, when, or the type of worker complaints that were lodged, nor who within the defendants' organizations they were lodged with.  There is simply not sufficient evidence before the court to establish that these complaints were of such a nature that the defendants should have been on notice that *all* of its forepersons were potentially engaged in the practice of using ghost workers thereby causing actual employees to suffer injury.

Plaintiffs have also failed to identify any method of common proof that could be used to demonstrate the liability of the defendants across this subclass.  Defendants are only potentially liable under the theories plaintiffs have alleged if their forepersons actually engaged in this

48

practice and if the company knew it. Plaintiffs have not demonstrated to the court's satisfaction that this can be accomplished in any way other than taking individualized testimony and engaging in a foreperson-by-foreperson determination of that supervisor's practices and defendants' knowledge of those practices. This would, in essence, require up to 109 separate proceedings to establish defendants' liability, if any, with respect to each of their forepersons. Common issues therefore do not predominate over individual ones here. Thus, certification is not warranted for this subclass. *See Zinser*, 253 F.3d at 1189 (upholding denial of certification where it was "inescapable that many triable individualized issues may be presented"); *Pena v. Taylor Farms Pac., Inc.*, 305 F.R.D. 197, 219–20 (E.D. Cal. 2015) (finding common issues predominate where factual issues are "individualized, but subject to common determination by resort to the timekeeping records"); *Kurihara v. Best Buy Co., Inc.*, No. C 06-01884 MHP, 2007 WL 2501698, at *9 (N.D. Cal. Aug. 30, 2007) (noting that courts are frequently unwilling "to certify classes where individualized inquiries are necessary to determine liability," and collecting cases).

### 6.    Tools Subclass

Plaintiffs seek certification of a subclass to correspond with their claim that defendants failed to provide all necessary tools for their employees to perform their jobs. (Doc. No. 145 at 56–60.) Defendants respond that they complied with the law in this respect because most of the tools plaintiffs identify are not necessary for the work to be performed and that commonality is lacking because of variances in tool practices among different work crews. (Doc. No. 147 at 57–59.)

### a.    Commonality

Defendants phrase their objection to this subclass in terms of commonality, but in the court's view defendants' argument is better understood as an objection to predominance. Defendants do not dispute that there are common questions amongst this subclass, but rather argue that individual variances overwhelm them. (*See id.* at 59) ("Membership in this proposed subclass may only be ascertained after making the following individualized determinations . . ."). Therefore, the court will treat commonality as uncontested here. *See Dukes*, 564 U.S. at 359 (noting that "for purposes of Rule 23(a)(2) even a single common question will do") (internal

quotations and brackets omitted); *Hanlon*, 150 F.3d at 1022 (noting "commonality alone is not sufficient to fulfill" the predominance requirement, which requires that "common questions present a significant aspect of the case[,which] can be resolved for all members of the class in a single adjudication").

### b.        Predominance

Under California law, "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." Cal. Labor Code § 2802(a). Moreover, "[w]hen tools or equipment . . . are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer," absent certain circumstances where the employee earns more than twice the minimum wage. 8 Cal. Code Regs. § 11140(9)(B). This requirement cannot be waived by the employee. *See Gattuso*, 42 Cal. 4th at 561 (citing Cal. Labor Code § 2804).

In support of their motion for certification of this subclass, plaintiffs' counsel has submitted a declaration stating that an inventory of the tools purchased shows that defendants bought the following tools in the relevant years: in 2011, four tree pruning shears and 1,093 grape clippers; in 2012, seven tree pruning shears and 1,200 grape clippers; in 2013, 112 tree pruning shears and 1,500 grape clippers; in 2014, zero tree pruning shears, 504 citrus clippers, and 1,300 grape clippers; and, in 2015, 252 tree pruning shears, 652 citrus clippers, and 4,274 grape clippers. (Doc. No. 145-1 at 14.) According to plaintiffs, defendants made "no significant purchases for repair or replacement parts for tools during the 2011 – 2015 period." (*Id.*) Further, defendants purchased 93 grape pruning shears in 2011, and never again purchased grape pruners during the four-year period involved. (*Id.*) Plaintiffs represent there was no record of defendants purchasing any cloth gloves, holsters, or files to sharpen tools. (*See* Doc. No. 145 at 56.) Additionally, plaintiffs state that there were many more employees who needed various tools than there were tools purchased. For instance, plaintiffs state defendants employ 1,200 to 1,600 citrus harvesters a year and yet bought no citrus clippers until 2014, and even then purchased only a total of 1,156 citrus clippers throughout both 2014 and 2015. (Doc. No. 145 at 57.) Defendants' PMK estimated at deposition that there were between 2,500 and 3,000 grape harvesters employed

50

by defendants during the 2015 season. (Doc. No. 145-1 at 102.) Plaintiffs point out that it was only in 2015 that the company first purchased enough grape clippers for every employee.[24]

Plaintiffs have also submitted declarations stating that numerous tools beyond those provided by defendants were required to perform the assigned work, including leather gloves, cloth gloves, files, oil, safety glasses, heavy-duty pruning shears, long pruning shears, picking shears, citrus clippers, harvesting scissors, sheaths, and various replacement parts. (Doc. No. 145-4 at 6 (Magdaleno); *id.* at 27 (Estrella); *id.* at 34 (Zepeda); *id.* at 41 (Vega); *id.* at 48 (Gonzalez); *id.* at 56–57 (Vargas); *id.* at 64 (de Estrella); *id.* at 70 (Rojas); *id.* at 80 (Hinojosa); *id.* at 87–88 (Carranza); *id.* at 96–97 (Orozco); *id.* at 104–05 (Villafuerte); *id.* at 111–12 (Garcia); Doc. No. 145-5 at 6 (Reyna); *id.* at 32 (Patron); *id.* at 41–42 (Carrera); *id.* at 47 (Melendres); *id.* at 56 (De Leon); *id.* at 65 (Alvarez); *id.* at 71 (Gutierrez); *id.* at 79 (Esquivel); *id.* at 87 (Reyes); *id.* at 94 (Machuca); *id.* at 107 (Sanchez); *id.* at 116 (de Sanchez); Doc. No. 145-6 at 6 (Sanchez); *id.* at 12–13 (Arteaga); *id.* at 18–19 (Orosco); *id.* at 25 (Orozco); *id.* at 31 (Saldana); *id.* at 37 (Cisneros); *id.* at 42 (Saldana); *id.* at 50 (Saldana); *id.* at 57–58 (Gonzalez); *id.* at 65–66 (Garcia); *id.* at 74 (Cabrales); *id.* at 79–80 (Hernandez); *id.* at 87–88 (Monzon).) These declarations also recount that the employees were forced to purchase each of these on their own, and were never reimbursed for them. Moreover, in the declarations it is reported that some of these items were actually sold to the putative class members by their forepersons. (Doc. No. 145-4 at 27 (Estrella); *id.* at 34 (Zepeda); *id.* at 64 (de Estrella); *id.* at 70 (Rojas); *id.* at 80 (Hinojosa); *id.* at 87–88 (Carranza); *id.* at 96–97 (Orozco); *id.* at 104–05 (Villafuerte); *id.* at 111–12 (Garcia); Doc. No. 145-5 at 41–42 (Carrera); *id.* at 47 (Melendres); *id.* at 56 (De Leon); *id.* at 65 (Alvarez); *id.* at 94 (Machuca); Doc. No. 145-6 at 57–58 (Gonzalez); *id.* at 79–80 (Hernandez); *id.* at 87–88 (Monzon).)

In 2015, defendants' policy concerning provision of tools changed. (*See* Doc. No. 145-1 at 482–85.) The policies adopted by defendants in 2015 contained forms that forepersons were to

---

[24] Defendants argue that they provided a sufficient number of tools for the class members to perform their jobs and therefore were in compliance with California law. (Doc. No. 147 at 58.) This is an argument going to the merits of plaintiffs' claim, rather than one relevant to whether certification of the subclass is appropriate.

51

have employees complete indicating whether they chose to use the employers' tools or declined to do so, which tools they were using, and when they took them.  (*Id.*)

Defendants concede that some tools are necessary for certain jobs class members perform. (*See* Doc. No. 145 at 58) (conceding hand clippers are necessary for mandarin and grape harvesting).  However, defendants dispute whether other tools identified by plaintiffs are necessary.  (*See id.*) (disputing whether cloth gloves, files, and holsters are necessary tools). These two sets of tools—those of conceded necessity and those of disputed necessity—pose different issues, though it is clear that common issues nevertheless predominate.  For the first set, it is clear the only liability determination that will need to be made is whether defendants purchased a sufficient number of concededly necessary tools.  For the second set, it is apparently undisputed defendants bought none of these tools.  Instead defendants assert only that these tools are not necessary to perform the work in question.  The sole liability issues to be determined with respect to this subclass, therefore, are whether a given tool is necessary to perform a particular job and whether a sufficient number of those tools were purchased by defendants.  Both of these questions are suitable for determination across a wide number of employees, and will predominate over any individual questions that may be present among this subclass.

> *c.*     *Superiority*

Further, a class action is clearly a superior vehicle for addressing this dispute.  There is no demonstrated interest that class members have in controlling the litigation individually.  No showing has been made that other cases concerning this subject matter are pending.  Because of the predominance of common issues and the small amounts of damages in question, it is desirable to concentrate the litigation in a class action.  Finally, there has been no showing of the presence of difficulties that persuade the court that it will struggle to manage this subclass.  Therefore, the following subclass is certified by the court:

Tools Subclass

> All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present who purchased gloves, files, oil, safety glasses, shears, clippers, scissors, sheaths, or replacement parts for their work for Defendants.

7.       Unpaid Work Subclass

Plaintiffs seek certification of three separate subclasses posing primarily allegations that class members were not compensated for all of their work time:  the waiting time, pre-shift work, and post-shift work subclasses.  (Doc. No. 145 at 3.)  As referenced at the hearing on the pending motion for certification, the court believes these subclasses can be formulated into one subclass, rather than three separate ones, since they all involve allegations of the same legal injury, i.e., that employees were not compensated for time they spent working.  Accordingly, these subclasses will be addressed jointly below.

Plaintiffs allege that employees were required to spend time on work-related duties both before and after their shifts, and were regularly required to wait for trees to dry during their shifts before they could begin picking.  According to plaintiffs, the pre- and post-shift work included attending training sessions conducted by the defendants' forepersons, performing safety inspections, unloading and setting up equipment, and breaking down and stowing equipment. None of this time was recorded.  Defendants oppose certification of this subclass because employees are not required to work off the clock, and any instances of individuals doing so are the exception not the rule.  (Doc. No. 147 at 59–61.)  The court finds that defendants' opposition, in essence, goes to the merits of plaintiffs' claims and fails to provide a rationale for why the subclass should not be certified.  Accordingly, the court will treat certification of this subclass as unopposed.  Nevertheless, because the court has an independent duty to ensure that the requirements of Rule 23 are met, *see In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 660 (S.D. Cal. 2010), it examines those requirements with respect to this subclass below.

a.       *Commonality*

The applicable wage order states that employers shall maintain records showing when employees begin and end each work period, as well as total hours worked and what the rate of pay was for each.  8 Cal. Code Regs. § 11140(7)(A); *see also* Cal. Labor Code §§ 1174(d) (requiring maintenance of records) and 226(a) (requiring employer to furnish employee a statement of total hours worked with each paycheck).  In California, employees must be compensated for each hour worked at least at the legal minimum wage, which cannot be arrived

53

at by averaging.  *Bluford*, 216 Cal. App. 4th at 872; *Armenta*, 135 Cal. App. 4th at 324.  The wage order defines "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."  8 Cal. Code Regs. § 11140(2)(G).  Additionally, federal law requires employers to pay seasonal agricultural workers all wages owed when due.  29 U.S.C. § 1832(a).

Plaintiffs have submitted numerous declarations supporting their claims that this uncompensated work time was routine, with the declarants noting that they frequently worked fifteen to twenty-five minutes before a shift, ten to thirty minutes after a shift, and spent thirty minutes to two hours waiting for trees to dry, with each type of uncompensated work time occurring several times a week.  (*See, e.g.*, Doc. No. 145-4 at 4–5 (Magdaleno); *id.* at 11–12 (Hinojosa); *id.* at 18 (Torres); *id.* at 24–26 (Estrella); *id.* at 32–33 (Zepeda); *id.* at 39–41 (Vega); *id.* at 46–48 (Gonzalez); *id.* at 54–56 (Vargas); *id.* at 62–63, 65 (de Estrella); *id.* at 71–72 (Rojas).)  Thus, common legal questions such as whether defendants must compensate class members for the time at issue and common factual questions such as whether subclass members were required to arrive early or stay late or wait for trees to dry before working run throughout the subclass.

> b.    *Predominance*

Additionally, the court must determine that common issues predominate over individual ones.  As noted, common legal or factual questions run throughout this subclass.  As indicated, defendants' primary objection to this subclass is based upon the contention that their employees were not required to work off the clock.  To that end, defendants have provided numerous declarations from employees or former employees in which they state they were always compensated for time setting up and tearing down ladders, that they were called the day before and told to report to work late if the fruit was wet, that any training sessions always happened after they clocked in for work, and that on any occasions they might have arrived early to work they did so voluntarily and did not expect to be paid.  (*See, e.g.*, Doc. No. 147-8 at 5 (Guzman); *id.* at 9–10 (Alvarez); *id.* at 14–15 (Amador); *id.* at 19–20 (Andrade); *id.* at 31–32 (Arteaga); *id.*

at 78–79 (Corona); *id.* at 85–86 (Cotino).) These arguments advanced by defendants, however, go to the *extent* of liability—i.e., the damages subclass members have suffered—not whether the subclass can establish liability on the part of defendants. As often stated herein, issues with respect to damages cannot prevent certification of this subclass. *Leyva*, 716 F.3d at 513–14 (holding individualized damages calculations do not defeat class certification); *Yokoyama*, 594 F.3d at 1094 (same).[25]

Additionally, there are numerous issues that are common to this subclass that will predominate during a merits determination. Aside from the general question of whether defendants were required to compensate class members for the time spent in training, setting up and tearing down work equipment, and waiting for fruit to dry prior to harvesting, at least one of the defenses defendants anticipate raising—whether individuals volunteered to come to work early—is one for which a subclass-wide determination is likely suitable. *See Alberts*, 241 Cal. App. 4th at 419 (noting a "nonexempt employee . . . may not lawfully volunteer to work off-the-clock without compensation"); s*ee also* Cal. Labor Code § 1194 (employee may file suit to collect minimum wage "[n]otwithstanding any agreement to work for a lesser wage"); *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740–41 (1981) (noting minimum wage and overtime are non-waivable under the FLSA); *Gentry v. Superior Court of L.A. Cty.*, 42 Cal. 4th 443, 455 (2007) ("By its terms, the rights to the legal minimum wage and legal overtime compensation conferred by the [California] statute are unwaivable."). Moreover, employers are generally not liable for off-duty work being performed by their employees about which they have no knowledge. *Brinker*, 53 Cal. 4th at 1051; *Morillion* at 585. Thus, another crucial issue at the liability phase of this case is whether defendants had constructive knowledge of the activities of their agents, who were directing any unpaid work. *See, e.g.*, Restatement (Third) of Agency, § 5.03 (imputing notice of facts that an agent knows to principal). Finally, the liability

---

[25] Plaintiffs' expert Dr. Petersen notes that he will employ a surveying method for determining liability for the unpaid work time subclass. He anticipates, from reviewing a selection of the relevant declarations, class members would be able to both identify and quantify the amounts of unpaid time they worked in response to such a survey. (Doc. No. 145-3 at ¶¶ 29–30.) Since no surveying has yet been conducted, the question of whether this will be a sufficient measure of class-wide damages is not yet before the court.

determination for all shifts that were worked on a piece rate basis will undoubtedly be subject to common proof:  if defendants were required to pay employees separately for this non-productive time and no non-productive time is noted in the payroll records, it would appear likely that liability will be established across the subclass.[26]  For all these reasons, the court finds that common issues will predominate over individual ones with respect to this subclass.

### c.   *Superiority*

The court also concludes that a class action will be a superior vehicle for the resolution of this dispute.  As with the other subclasses, there has been no showing of any other individual suits being filed or any interest among class members of proceeding individually on these claims.  Again, the size and number of the claims make it highly desirable to concentrate them into a single proceeding.  Therefore, the following subclass is certified by the court:

> Unpaid Work Subclass
>
> All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present who were required to arrive before their shift or perform duties after their shift, or wait for fruit to dry before beginning work.

### 8.   Inaccurate Wage Statement Subclass

Plaintiffs seek certification of a subclass to contest violations of law due to the failure to provide itemized wage statements.  California law requires employers to furnish to employees "an accurate itemized statement" which must be in writing and show the following:

> (1) gross wages earned, (2) total hours worked by the employee . . . (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and only the last four digits of his or her social security number or an employee identification number other than a social security number, (8) the name and address of the legal entity that is the employer and, if the employer is a farm labor contractor, as defined in subdivision (b) of Section

---

[26]  While the court is somewhat less certain whether shifts paid on an hourly basis will be subject to common proof, it does appear that some payroll records reflect hourly wage payments for non-productive time.  (*See, e.g.*, Doc. No. 145-1 at 406.)  Therefore, the court declines to differentiate this subclass between shifts paid on hourly and piece rate bases in ruling on the pending motion.

> 1682, the name and address of the legal entity that secured the services of the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee . . .

Labor Code § 226(a).  In addition, the statute provides that "a copy of the statement and the record of the deductions shall be kept on file by the employer for at least three years." *Id.* Employees who can demonstrate a knowing and intentional failure by the employers to provide the above or to maintain records appropriately are entitled to statutory damages. *Id.* § 226(e)(1).

Plaintiffs maintain that two different theories warrant certification of this subclass.  First, they argue that the violations detailed in the piece rate rest period, unpaid travel time, meal period, ghost worker, and off-the-clock work subclasses also reflect violations of the § 226 recordkeeping requirement as derivative claims.  (Doc. No. 145 at 65.)  To the extent that plaintiffs assert claims of § 226 violations as strictly derivative claims, the court sees no need to certify a separate subclass to address them.

Second, plaintiffs indicated at the hearing on the pending motion that their claims include allegations of independent, non-derivative violations of § 226:  namely, plaintiffs assert that defendants failed to maintain *any* records of itemized wage statements with respect to the putative class, and therefore did not retain the records for the three years required by state law.  (Doc. No. 145 at 64–65.)  At his deposition defendants' PMK appears to have conceded as much.  (*See* Doc. No. 145-1 at 59 (Rodriquez) ("We don't have the itemized wage statements or pay stubs.  We don't have copies of those pay stubs."); *see also id.* at 15 (noting that they keep payroll records, but that these do not have identical information as that which is included on a wage stub, which reflects more information).)  Further, defendants' counsel represented to plaintiff's counsel that their clients do not create paystubs themselves, and that the third-party service that does so maintains no copies of these records.  (*Id.* at 513) ("[W]e can only produce reports from Datatech that do not contain all of the itemized totals that appear on the paystubs.").

Defendants presented no argument in their briefing concerning why this subclass should not be certified.  At oral argument, defense counsel asserted that defendants were not required to maintain these records as a matter of law, and that defendants were only legally required to

provide such records to the employees.  Defendants' contention in this regard is a merits-phase argument that would apply to the entire subclass, and thus bolsters this court's conclusion that certification of this subclass is appropriate.

In short, there are common questions of fact and law that run throughout this subclass, those issues predominate, and a class action provides a superior vehicle by which to decide the disputes related to this subclass.  Accordingly, the following subclass is certified by the court concerning liability under § 226:

<u>Inaccurate Wage Statement Subclass</u>

All individuals who were employed at any of the Defendants between March 17, 2012 and present as non-exempt field or agricultural workers for the Defendants.

9.      <u>Other Derivative Subclasses</u>

Plaintiffs also sought certification of several additional subclasses in order to bring claims that are purely derivative of other claims alleged here.  (Doc. No. 145 at 65–66.)  Defendants did not oppose certification of these derivative claims separately from the subclasses with respect to which they are derivative.  Class counsel explained at the hearing on the pending motion that such subclasses were unnecessary, and that the request was only included by plaintiffs out of an abundance of caution to ensure defendants did not later object.  The court sees no need to certify a separate subclass for claims that are purely derivative of claims relating to subclasses that have already been certified.  Any derivative claims may be brought on behalf of the appropriate subclass.  Therefore, certification of the derivative subclasses is denied.

**D.      Motion for a Trial Plan**

Finally, defendants filed a motion seeking an order requiring plaintiffs to submit a trial plan.  (Doc. No. 149.)  This motion essentially renews arguments previously decided when the court rejected the last such motion.  (*See* Doc. No. 77.)  For many of the same reasons previously expressed, the court once again denies defendants' motion for a trial plan.

As previously recognized by the court, a trial plan request is "properly raised after significant merits-phase discovery has taken place." (*Id.* at 3.)  Plaintiffs are only required at the present stage of this litigation, to make the showing necessary to warrant class certification.  They

have sought to do so and the court has agreed with some of their arguments and rejected others, as set forth in detail above. There is no requirement under the Federal Rules of Civil Procedure that plaintiffs submit a trial plan listing the items defendants have requested in their motion for a trial plan, and the court declines to read one into those rules. *See Briseno*, 844 F.3d at 1126 ("Supreme Court precedent also counsels in favor of hewing closely to the text of Rule 23.").

Additionally, plaintiffs have moved for the award of sanctions under 28 U.S.C. § 1927 to require defense counsel to pay their fees and costs incurred in opposing the motion for a trial plan. (*See* Doc. No. 165 at 9–10.) According to the statute relied upon by plaintiffs in this regard, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The Ninth Circuit has held that sanctions under this provision may be imposed for reckless conduct, while sanctions imposed under the district court's inherent authority require a bad faith finding. *Lahiri v. Universal Music & Video Dist. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010). The Ninth Circuit has reversed the imposition of sanctions under § 1927 where the supposedly groundless issues raised were quickly dismissed, and "so . . . did not vexatiously multiply the proceedings," but in doing so has suggested that sanctions might be warranted if the offending attorney "file[d] repetitive motions or generate an extraordinary volume of paperwork." *Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1189 (9th Cir. 2012).

As indicated at the hearing on these motions, the court is not inclined to impose sanctions at this time. It is not quite accurate to say, as plaintiffs assert, that the court's prior order contained an "express instruction" to defendants not to file another motion for a trial plan until later in the case. (*See* Doc. No. 165 at 9–10; Doc. No. 167 at 9–10.) Instead, the court noted in its prior order that "normally" such requests are "properly raised after significant merits-phase discovery has taken place." (Doc. No. 77 at 3.) Notwithstanding whether the court's statement in its prior order was an "express instruction," defendants' motion appears to pay little regard to the spirit or the clear import of the court's prior order, as no merits-phase discovery has yet taken place in this action. Nonetheless, the court declines to impose monetary sanctions at this time.

59

However, defendants are warned that future motions for such a trial plan prior to the close of merits-phase discovery will likely result in the award of sanctions, absent a showing that the requested trial plan is required by law.  Simply put, plaintiffs are entitled to full discovery on their claims before being required to demonstrate how they will present their evidence at trial.

## CONCLUSION

For all of the reasons set forth above:

1.  The court grants plaintiffs' motion for class certification (Doc. No. 145) in part, and the following subclasses are certified:

    a.  Piece Rate Rest Period Subclass

        All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, and were compensated on a piece rate basis.

    b.  Unpaid Travel Time Subclass

        All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, and worked at two or more fields in one day.

    c.  Vehicle Expense Subclass

        All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, worked at two or more fields in one day, and drove their own cars between fields.

    d.  Meal Period Subclass

        All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, for whom no meal period was recorded on at least one day in which the employee worked more than five hours.

    e.  Tools Subclass

        All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present who purchased gloves, files, oil, safety glasses, shears, clippers, scissors, sheaths, or replacement parts for their work for Defendants.

    f.  Unpaid Work Subclass

        All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present who were required to arrive before their shift or perform

duties after their shift, or wait for fruit to dry before beginning work.

   g.  Inaccurate Wage Statement Subclass

All individuals who were employed at any of the Defendants between March 17, 2012 and present as non-exempt field or agricultural workers for the Defendants.

2.  Because the court separately certifies each of the above subclasses under Rule 23, the court denies certification of an overarching main class.  Additionally, pursuant to Rule 23(b)(3), the court denies certification as to all other subclasses not specifically addressed in clause 1, paragraphs a through g above, particularly the Ghost Worker Crew Subclass and each of the subclasses proposed solely for the purpose of bringing a derivative claim;

3.  The court denies plaintiffs' motion to certify any of the subclasses under Rule 23(b)(2) for the purpose of seeking injunctive relief based upon its conclusion that the named plaintiffs lack standing to seek injunctive relief;

4.  The court finds plaintiffs Avalos and Aldapa to be adequate class representatives, and confirms them as class representatives for each of the certified subclasses, except for the Vehicle Expense Subclass, for which only plaintiff Avalos is a class representative;

5.  The court finds plaintiffs' counsel to be adequate to represent the class in this proceeding, and the firms of Martinez, Aguilasocho, & Lynch APLC ("MAL") and Bush Gottlieb ALC are hereby confirmed as class counsel;

6.  Defendants' motion for a trial plan (Doc. No. 149) is denied without prejudice to being re-raised following the conclusion of merits-phase discovery;

7.  Plaintiffs' request for the imposition of sanctions under 28 U.S.C. § 1927 (Doc. No. 165) is denied;

8.  The parties are directed to meet and confer promptly upon service of this order concerning the submission of a joint stipulated class notice and distribution plan, based on the subclasses as certified in this order.  The parties shall file either a stipulated class notice and distribution plan or a notice that no stipulation can be reached within twenty-one (21) days of service of this order.  If the parties cannot agree to a class notice or distribution

plan, plaintiffs shall submit a proposed class notice and distribution plan within thirty-five (35) days of service of this order.  Defendants will have fourteen (14) days following plaintiffs' submission of a proposed class notice and distribution plan to file any objections thereto.  Plaintiffs will have seven (7) days thereafter to submit a reply; and

9.  This matter is referred back to the assigned magistrate judge for further scheduling and other proceedings consistent with this order.

IT IS SO ORDERED.

Dated:  **January 24, 2018**

_____

UNITED STATES DISTRICT JUDGE

62

# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN LOFTON,

        Plaintiff,

      v.

VERIZON WIRELESS (VAW) LLC,

        Defendant.

Case No. 13-cv-05665-YGR   (JSC)

**ORDER GRANTING IN PART MOTIONS TO COMPEL AND FOR SANCTIONS**

Re: Dkt. Nos. 119, 129

Plaintiff John Lofton ("Plaintiff") brings this putative class action challenging Defendant Verizon Wireless (VAW) LLC's debt collection practices. Plaintiff alleges that Verizon engaged a third party, Collecto, Inc., to collect Verizon's past due accounts as Verizon's agent, and that in doing so Collecto violated state and federal law. In particular, Plaintiff alleges that he was not a current or former Verizon customer, but that Collecto nonetheless telephoned him on his cell phone on numerous occasions in violation of the California Invasion of Privacy Act ("IPA"), Cal. Penal Code § 630-38, and the federal Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A). Plaintiff alleges Verizon, through Collecto, violated the IPA by recording telephone calls with persons, such as Plaintiff, without the recipient's permission, and violated the TCPA by using an automatic telephone dialing system to make the calls. The action has been referred to the undersigned magistrate judge for resolution of discovery disputes.

Now pending before the Court is Plaintiff's motion to compel Verizon to respond to a number of outstanding discovery requests and Plaintiff's motion seeking sanctions against Verizon and Collecto. Having considered the parties' submissions, and having had the benefit of oral argument on June 4, 2015, the Court GRANTS IN PART Plaintiff's motion to compel and GRANTS IN PART his motion for sanctions.

United States District Court
Northern District of California

relevant to what sanction, if any, is imposed." *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 523 (N.D. Cal. 2009).

However, courts often decline to impose sanctions for spoliation where the documents withheld are unlikely to material affect the outcome of the case, insofar as other evidence exists to provide the same information. *See Ahcom, Ltd. v. Smeding*, No. 07-1139 SC, 2011 WL 3443499, at *8-9 (N.D. Cal. Aug. 8, 2011) (declining to impose sanctions for destruction of a computer that contained the defendant's financial information where the plaintiff had other documents that provided "extensive information" about the defendant's finances); *see also Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.*, 306 F.3d 806, 825 (9th Cir. 2002) (affirming district court's denial of sanctions where loss of original evidence was remedied by sufficient substitute).

Here, Collecto and Verizon concede that the call detail records are relevant to Plaintiff's claims and that Collecto deleted the call detail records for two years while this case was pending. And the Court concludes that Collecto was on notice of its duty to preserve the documents based on the filing of Plaintiff's complaint and even the *Powell* litigation before it, *see Montoya v. Orange Cnty. Sheriff's Dep't*, No. 11-1922, 2013 WL 6706992, at *7-9 (C.D. Cal. Dec. 18, 2013) (noting that the duty to preserve documents can arise from similar prior litigation). That Collecto nevertheless allowed the documents to be destroyed is spoliation—whether or not Collecto did so with a culpable mind. *See Glover*, 6 F.3d at 1329.

But this case does not involve spoliation of an entire swath of evidence with no possible substitution. Rather, Collecto still maintained archives for all of its dialers and has provided these records in discovery. On the other hand, Plaintiff has proffered sufficient evidence why that evidence is lacking. For one, it is more expensive and time-consuming to digest. Moreover, Plaintiff's review indicated that it was missing wrong number codes for a substantial portion of calls. On the other hand, Collecto's expert consultant has submitted a declaration explaining that the archived data provided contains the data that Plaintiff seeks. The Court therefore ORDERS Collecto and Verizon to bear the cost of having their own expert, Aaron Woolfson, reconstruct the archived data for the time period lacking call logs according to the categories Plaintiff identifies.

United States District Court
Northern District of California

16

# EXHIBIT 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Michael Anthony, individually, and on behalf
of all others similarly situated,

      Plaintiff,

v.

The Federal Savings Bank, National Bancorp
Holdings, Inc., and FDE Marketing Group
LLC,

      Defendants.

Case No. 21 C 2509

Hon. LaShonda A. Hunt

## AMENDED MEMORANDUM OPINION AND ORDER

Michael Anthony ("Plaintiff") filed this putative class action against The Federal Savings

Bank ("FSB"), National Bancorp Holdings, Inc. ("NBH"), and FDE Marketing Group, LLC

("FDE") (collectively, "Defendants")[1], asserting violations of the Telephone Consumer Protection

Act ("TCPA"), 47 U.S.C. § 227(c). Currently before the Court are Plaintiff's combined motion for

class certification and to bar defense expert Jan Kostyun (Dkt. 128) and Defendants' cross-motion

to bar plaintiff's expert Aaron Woolfson (Dkt. 134). Upon consideration of the legal arguments

presented in the submissions as well as during oral argument, the Court grants the motion for class

certification and denies each motion to bar for the reasons discussed below.

## BACKGROUND

In the age of the digital world, many have been on the receiving end of a phone call, text

message, email, or fax that they have found annoying. Recognizing the disturbance caused by these

---

[1] On May 16, 2023, counsel for FDE was allowed to withdraw. In light of the FDE representative's statement that new counsel would not be retained to defend the case, Plaintiff was granted leave to seek entry of default against FDE at any appropriate time. (*See* Dkt. 139). FDE has never opposed the relief sought by Plaintiff here. As such, the Court uses the term "Defendants" for simplicity sake even though arguments were submitted on behalf of FSB and NBH only.

1

unwanted communications, in 1991, Congress enacted the TCPA which provides a private right of action for "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection . . . ." 47 U.S.C. § 227(c)(5). And since 2003, individuals have been able to register their residential and/or cell phone numbers on the National Do Not Call registry ("Registry") to further avoid telemarketers.

In May 2004, Plaintiff added his residential phone number to the Registry. Nevertheless, from about January 2020 to January 2022, he received "numerous unsolicited calls to his phone asking for someone named 'Needle Dee,'" a name he does not and has never used. (Compl. ¶¶ 32, 33). After receiving three such unsolicited calls in April 2021, Plaintiff "feigned interest" in an effort to identify the caller. (*Id.* ¶¶ 33-38). He subsequently learned that the caller was an FSB representative. FSB, which is owned by NBH, provides traditional banking services and sells residential mortgages. Defendants hired third-party companies, including FDE, to place these telemarketing calls to consumers. Upon a successful pitch with a potential customer, FDE would transfer the live call to one of Defendants' representatives to complete the sale. (*Id.*).

Plaintiff says that despite instructing FSB not to contact him again, he received four more unwanted calls from that same number. Plaintiff contends that he never provided consent to receive such communications and had no prior relationship with Defendants to justify the calls. He therefore brought this action on behalf of himself and other individuals who had registered on the Registry but were contacted by Defendants without having provided prior consent to receive such communications. Following fact and expert discovery, he now moves to certify the following class and subclass:

(1) **"National DNC Class"** defined as "All persons within the United States whose phone numbers () are included in the Ytel call detail records of FDE Marketing Group, LLC ("FDE") produced in this matter, and (ii) received more than one call from FDE in any twelve-month period while their phone numbers were registered on the National Do Not Call Registry for at least 30 days."; and

(2) **"Transfer Subclass"** defined as "All members of the National DNC Class whose call resulted in a transfer to The Federal Savings Bank ("FSB") or National Bancorp Holdings, Inc. ("NBH")." (*Id.*).

(Pl.'s Mot. at 1, Dkt. 128). In conjunction with that motion, Plaintiff also moves to bar Defendants' rebuttal expert, Jan Kostyun. In turn, Defendants oppose class certification and cross-move to bar plaintiff's expert Aaron Woolfson.[2]

## LEGAL STANDARDS

Class actions are an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). To be certified, a class must meet all prerequisites identified in Rule 23(a) and one of the three subsections of Rule 23(b). *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). Rule 23(a) requires: (1) a class that is "so numerous that joinder of all members is impracticable," ("numerosity"), (2) "questions of law or fact common to the class," ("commonality"), (3) "claims or defenses of the representative parties [that] are typical of the claims or defenses of the class," ("typicality"), and (4) that "the representative parties will fairly and adequately protect the interests of the class" ("fairly and adequately"). Fed. R. Civ. P. 23 (a)(1)-(4).

If those prerequisites are met, a class may be certified if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

---

[2] This case was reassigned to Judge Hunt's calendar on June 2, 2023 (Dkt. 146). Prior to the reassignment, District Judge Edmond Chang ordered consolidated briefing on Plaintiff's motion for class certification and any motions to bar expert testimony after the parties represented that expert challenges were "directly connected to the class-certification motion." (Dkt. 125).

3

corresponding declaratory relief is appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2), or Rule 23(b)(3)'s requirements of predominance and superiority are met. Specifically, Rule 23(b)(3) requires courts to find that:

> [T]he questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> >
> > (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> >
> > (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Furthermore, a class may be divided into subclasses when appropriate to protect divergent interests. Fed. R. Civ. P. 23(c)(5); *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 940 (7th Cir. 2016). To be certified, a subclass must meet the same requirements as a regular class. *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 599 (7th Cir. 1993).

In addition to satisfying the requirements in Rule 23(a) and (b), "a class must be sufficiently definite that its members are ascertainable." *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 577 (N.D. Ill. 2018)**.** Finally, Plaintiff bears the burden of proving by a preponderance of the evidence that class certification is proper. *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843 (7th Cir. 2022).

The admissibility of expert testimony is governed by Rule 702 and the Supreme Court's landmark decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Specifically, "expert testimony is admissible only if (1) the expert testifies to valid, technical, scientific, or other

4

specialized knowledge; and (2) that testimony will assist the trier of fact." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012). Stated another way, experts must be qualified and their testimony both relevant and reliable. *Daubert*, 509 U.S. at 589. This inquiry is flexible, and "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95. "When an expert's report or testimony is critical to class certification . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *Am Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010).

## DISCUSSION

### I. Ascertainability

In determining whether class certification is appropriate, ascertainability is a threshold question. *Toney*, 323 F.R.D. at 577. Like other courts, the Seventh Circuit has "long recognized an implicit requirement under Rule 23 that a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind." *Mullins*, 795 F.3d at 657. At issue is the "adequacy of the class definition," not "the potential difficulty of identifying particular members of the class and evaluating the validity of claims they might eventually submit." *Id.*

Plaintiff relies on testimony from his expert, Aaron Woolfson, in proposing the National DNC Class and the Transfer Subclass. Defendants offer the opinion of their rebuttal expert, Jan Kostyun, in seeking to bar Woolfson's testimony. And Plaintiff counters that Kostyun's methodology is unreliable. Because Defendants repeatedly contend that ascertainability hinges on the admissibility of expert testimony, the Court begins by analyzing each of the parties' motions to exclude. *See Am. Honda Motor Co.*, 600 F.3d at 816 (requiring courts to "resolve any challenge

5

to the reliability of information provided by an expert if that information is relevant to establishing any of the Rule 23 requirements for class certification"). Even where the significance of the testimony is doubtful, courts are required to make an explicit *Daubert* ruling. *Messner*, 669 F.3d at 812.

### A.  Daubert Motions

#### 1.  Aaron Woolfson's Expert Report

Woolfson reached three conclusions after reviewing call detail records ("CDRs") obtained from Ytel, FDE's carrier: (1) that "there is a reliable method to identify which calls in the call records were made to telephone numbers (a) to which two or more times were called in a twelve month period by [FDE], and (b) that were registered with the [Registry] for more than thirty days before each of the calls"; (2) that "using the CDRs and Defendants' call transfer logs, there is a reliable method to identify the calls in the CDRs that were to phone numbers that also appear in the call transfer log ("Live Transfers"); and (3) that he is "able to identify contact information, including names and mailing addresses, related to the individuals to whom the calls were placed, based upon the records that are maintained by phone carriers in their ordinary course of business." (Woolfson Decl. at ¶3, Dkt. 128-2).

Woolfson has "over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls." (*Id.* at ¶7). And it is through this "hands-on work experience" that he has "become very familiar with the [relevant] technology . . through which calls are processed, received and transmitted" as well as "how dialing systems work, and how telephone systems handle inbound and outbound calls." (*Id.* at ¶12). He has been qualified as an expert in other TCPA cases requiring

him to analyze call records and compare them against records of leads. (*Id.* at ¶¶15-16). Plaintiffs thus rely upon Woolfson's opinion in proposing the National DNC Class and the Transfer Subclass.

Defendants do not take issue with Woolfson's qualifications, which appear to be more than adequate for him to opine about the subject matter here. Instead, relying upon the rebuttal report of Kostyun, Defendants contend that Woolfson's methodology used to identify potential class members is faulty and therefore Plaintiff cannot establish that the proposed classes are ascertainable. In particular, Defendants maintain that the Ytel CDRs are unreliable because, among other things, they fail to include disposition information specifying the outcome of the call (connected, disconnected, busy signal, picked up by an answering machine, etc.); round up every call of more than zero seconds to a six-second duration, making it unclear if such a call was successfully connected; and include six-second calls placed to numbers there were not in service or were otherwise unavailable for assignment. (Dfts.' Resp. at 13, Dkt. 134). Second, they complain that Woolfson's process for identifying individuals on the Registry as of the date of a call is unsound because he used his personal records covering a portion of the relevant class period rather than a reliable vendor who maintained daily registration lists. *Id.* at 14. Next, they take issue with Woolfson reviewing the wrong database records to identify eligible calls in the Transfer Subclass. *Id.* at 15. Last, Defendants highlight the practical difficulties of Woolfson's proposal to subpoena hundreds of potential carriers to identify registered phone users from years ago. *Id.*

Based on his review of the data, Woolfson opined that Defendants violated the TCPA by calling 2,294,457 phone numbers in the National DNC Class, and transferring calls of 27,088 class members in the Transfer Subclass. Defendants' critique of Woolfson's opinion essentially falls into two buckets—(1) disagreements about how he interpreted certain datapoints to reach his specific conclusions; and (2) concerns about the difficulties of his proposed process for identifying class

members. However, neither contention constitutes a valid basis for exclusion of his opinions at the class certification stage or denial of class certification, for that matter.

First, with respect to the underlying data relied upon by Woolfson, the parties agree that the Ytel CDRs do not include call disposition information that affirmatively indicates if every telephone call placed by FDE actually connected to an active number on the Registry. Because of that, Woolfson determined that an appropriate measure of this critical detail was call duration. Defendants take issue with the fact that the CDRs contain multiple six-second calls, and many of those, according to Kostyun, but only some of those according to Woolfson, were misread as connected and placed to assigned residential numbers. Similarly, Defendants' challenge the scope of Registry lists Woolfson consulted to identify registered numbers, and argue that he misread a chart provided by Defendants in assessing which calls were transferred from FDE.

At bottom, Defendants attack the reliability of Woolfson's conclusions and whether they are supported by the data, not the validity of the methodology he employed in forming his opinions. "[T]he court's gatekeeping function focuses on an examination of the expert's methodology [while] [t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). "Assuming a rational connection between the data and the opinion. . . an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility." *Manpower, Inc. v. Ins. Co. of the State of Penn.*, 732 F.3d 796, 808 (7th Cir. 2013).

That is indeed the situation here. Both sides argue at length in their extensive briefs that the opposing expert has erroneously interpreted the relevant data, and as a result, the opinions reached are wrong. But such "arguments about how the selection of data inputs affect the merits

8

of the conclusions produced by an accepted methodology" are substantive considerations rather than proper *Daubert* challenges. *Manpower, Inc.*, 732 F.3d at 808. Woolfson sufficiently explained the process he used to query the data and then analyze the output. That Defendants disagree with Woolfson's ultimate decisions does not render his method or opinion excludable as unreliable.

Second, Defendants' attempt to connect the identification of exactly who falls within the proposed class to the ascertainability analysis is a nonstarter. As they conceded at oral argument, the Seventh Circuit soundly rejected any notion of this "heightened" ascertainability standard requiring proof of a reliable and administratively feasible way to identify class members at the certification stage. *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 658 (7th Cir. 2015). The cases cited by Defendants were all decided after *Mullins* and are therefore irrelevant. Because this is an issue that does not even impact class certification, the Court is hard-pressed to see how skepticism about Plaintiff's ability to actually track down proposed class members would be a consideration for *Daubert* purposes.

Accordingly, Defendants' motion to exclude Woolfson as an expert is denied.[3]

### 2. Jan Kostyun's Rebuttal Expert Report

After reviewing Woolfson's expert report, Kostyun reached the four conclusions discussed *supra*. (Kostyun Rebuttal Rep. at ¶15, Dkt. 134-1). Kostyun is an "independent technology consultant with over 35 years of experience covering the areas of telecommunications, enterprise architecture, and information technologies." (*Id.* at ¶3). He "developed expertise in areas such as . . . landline and wireless order entry, including the collection of subscriber contact information

---

[3] At oral argument and in their briefs, Defendants also argued in passing that Woolfson's opinion should be excluded on commonality and predominance grounds. As with ascertainability, the Court disagrees that either factor is relevant to the *Daubert* analysis. Defendants do raise substantive arguments that are addressed *infra* in connection with the class certification analysis and are mostly rejected as premature or more appropriate for a merits determination.

[and] initial implementation of the National Do Not Call registry" and has "extensive experience in database methodologies, data analysis, and data mining" in addition to "call center operations and various dialing systems, including those used for inbound and outbound calling campaigns." (*Id.* at ¶¶4-6). He has "personally performed database queries and data analysis against hundreds of data stores [such as] National Do Not Call lists, Wireless Block identifiers, Number Portability transaction lists and telephone call records produced by both wireless carriers and businesses involved in dialing campaigns." (*Id.* at ¶5). Defendants thus rely upon Kostyun's opinions in opposing class certification.

Similar to Defendants, Plaintiff does not take issue with Kostyun's qualifications as they too appear to be more than adequate for him to offer a rebuttal opinion as to this TCPA claim. Plaintiff contends, however, that Kostyun's methodology is not reproducible, as evidenced by his deposition testimony that he ran "hundreds and hundreds of queries against the data" which he cannot itemize or reproduce. (Pls. Mot. at 7, Dkt. 128). Essentially, Plaintiffs complain that Kostyun gave answers but did not and cannot show his work.

In his rebuttal report, Kostyun described his methodology as follows:

> I developed hypotheses regarding the methods used by Plaintiff's expert Woolfson to identify Plaintiff's classes. Those hypotheses are fundamental foundations of each of the opinions that I will detail in this report. I have tested and confirmed my hypotheses using a combination of related documentation, research, data analysis and experience – similar to the techniques that I have used during my career as a telecommunications system architect. I have analyzed the results of my analysis and testing, and used the results of the analysis to form my opinions and document them in this report.

(Kostyun Rebuttal Rep. at ¶14). True, this paragraph does not set forth step-by-step how Kostyun determined that Woolfson in fact made some mistakes, as evidenced by Woolfson's corrected errata sheets. That said, Defendants explained that Kostyun's analysis "was undertaken in a forensic

10

manner" that involved both "simplistic" and "more complex" queries of the data, and the "entire database and structure" were produced to Plaintiff. (Dfts.' Resp. at 10). Plaintiff does not contend that Kostyun used an unacceptable methodology for the relevant industry. In fact, given that Woolfson's reply (Dkt. 128-5) offers substantive grounds for some of the anomalies noted by Kostyun, this signals that Plaintiff, like Defendants, do nothing more than disagree with the opposing expert's conclusions. As already explained, the *Daubert* inquiry focuses on assessing if Kostyun's methodology lacks analytically sound bases, not if his rebuttal opinions are correct. Those remain questions for cross-examination, not motions to bar experts. All the ink spilled in the briefs about the flawed assumptions and misunderstandings of each expert clearly establish that these disputes go to the weight of their opinions, not their admissibility. *See Toney*, 323 F.R.D. at 579-580. As such, for the reasons outlined *supra* for rejecting the Defendants' *Daubert* challenge to Woolfson, Plaintiff's opposition to Kostyun also fails.

Accordingly, Plaintiff's motion to exclude Kostyun as an expert is denied.

**B. <u>Class is Ascertainable</u>**

In 2015, the Seventh Circuit articulated the governing standard in this circuit for assessing if a class is ascertainable:

> [The Seventh Circuit] and other courts have long recognized an implicit requirement under Rule 23 that a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind. In addressing this requirement, courts have sometimes used the term "ascertainability." They have applied this requirement to all class actions, regardless of whether certification was sought under Rule 23(b)(1), (2), or (3). Class definitions have failed this requirement when they were too vague or subjective, or when class membership was defined in terms of success on the merits (so-called "fail-safe" classes). This version of ascertainability is well-settled in our circuit .
> . . .

*Mullins*, 795 F.3d at 657. And while some circuits have imposed an additional hurdle that there be a "reliable and administratively feasible way to identify all who fall within the class definition," as discussed, the Seventh Circuit has stated in no uncertain terms that it declines to adopt such a requirement because "[n]othing in Rule 23 mentions or implies this heightened requirement." *Id.* at 657-58. In determining ascertainability, the focus is simply on whether the definition of the class is adequate, rather than the difficulty of identifying class members. *Id.* at 659.

Plaintiff's proposed National DNC Class and Transfer Subclass are ascertainable under that standard. First, the class and subclass definitions are not vague. A vague definition frustrates a court's ability to determine who, upon class certification, will receive notice, share in recovery, and be bound by judgment. *Id.* at 660. *Mullins* instructs that a definition generally avoids vagueness concerns if it identifies "a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.* Plaintiff's proposed class and subclass are clearly defined, and Defendants do not argue that the proposed definitions are vague.

Second, neither the class nor subclass definition involve subjective criteria or rely upon a proposed class member's state of mind. To the contrary, both use purely objective criteria—namely call records and transfer records—to determine class membership. In other words, the proposed classes are defined by FDE's conduct of placing the calls and transferring certain call recipients, rather than by any thoughts or actions by the proposed class members. Defendants do not contend that the Plaintiff's proposed class or subclass definitions are subjective. They also do not argue that Plaintiff has proposed a fail-safe class or subclass. To the extent there are concerns about identifying and managing class members and/or the claims process, any problems can be addressed through scheduling orders or other case management tools that district courts routinely use in overseeing these actions. *Mullins*, 795 F.3d at 664.

12

Accordingly, the Court finds the proposed National DNC Class and Transfer Subclass are ascertainable and thus proceeds to analyze the enumerated requirements for class certification under Rule 23.

## II. Rule 23(a)

### A. Numerosity

Class certification requires a class that "is so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). The focus of the numerosity requirement is the practicability of joinder, which requires evaluating "the nature of the action, the size of the individual claims, and the location of the members of the class" with forty class members typically satisfying this requirement. *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) (citation omitted). Plaintiff argues, and Defendant does not contest, that numerosity is met. The proposed class and subclass will include over 2.2 million members and over 27,000 members, respectively, who are dispersed across the country and whose individual claims would be small. (Pl.'s Mot. at 12).

Accordingly, numerosity is satisfied.

### B. Commonality

Questions of law or fact must be common to a class for that class to be certified. Fed. R. Civ. P. 23(a)(2). For this element to be met, every question need not be common to the class. *Wal-Mart v. Dukes*, 564 U.S. 338, 359 (2011). Indeed, "[i]t is routine in class actions to have a final phase in which individualized proof must be submitted." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). A mere superficial question, such as whether the proposed class members all suffered a violation of the same statute, will not suffice. *Wal-Mart*, 564 U.S. at 350. In analyzing whether there are common questions of law or fact among the class, it is the conduct of the

13

defendant that matters. "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek*, 764 F.3d at 756. "[C]laims must depend upon a common contention . . . [which] must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart,* 564 U.S. at 350. It is the generation of common answers to the common questions that matters. *Id.* Usually, commonality can be satisfied if there is "[a] common nucleus of operative fact." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

Plaintiff argues that there are common questions of law and fact, including the injury, the amount of statutory damages, and evidence of liability. Beyond this, Plaintiff contends that questions of standing and consent will include evidence that is common among class members. As stated, the fact that class members suffer the same injury does not render a class susceptible to class certification. On the other hand, even if every proposed class member would not receive the same statutory damages, that itself does not justify denial of class certification. *Mullins*, 795 F.3d at 671. Defendants do not contest that every class member would receive the same statutory damages.

Standing, consent, and vicarious liability are all common questions of law or fact. There is a common nucleus of operative fact in this case—Defendants allegedly contacted Plaintiff and proposed class members, without their consent, after they had been registered for more than 30 days on the National Do Not Call registry. Because the Defendant engaged in the same conduct against each proposed class member, the commonality requirement is met. *See, e.g.*, *Paldo Sign and Display Co. v. Topsail Sportswear, Inc.*, Case No. 08 C 5959, 2010 WL 4931001, at *2 (N.D. Ill. Nov. 29, 2010) (finding common questions of law and fact when "[t]he evidence presented to

14

the Court reflects that the [defendant] acted with regard to the class in a common and consistent way and engaged in a standardized course of conduct out of which the class members' alleged injuries arise.").

Accordingly, commonality is satisfied.

### C. **Typicality**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [plaintiff's] claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp*, *Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (citations and quotations omitted). Some factual variation among claims will not defeat typicality. *Id.* "Typicality . . . should be determined with reference to the [defendant's] actions, not with respect to particularized defenses it might have against certain class members." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996).

Plaintiff argues his claims are typical of those of the class because all claims in this case arise from the same course of conduct by the Defendants and are premised on the same legal theories of TCPA violations and vicarious liability. Pl.'s Mem. at 13. Defendants do not address typicality in their briefing.

The Court agrees that Plaintiff's claims are typical of the proposed class members. Just like Plaintiff, the proposed call members had phone numbers that were registered on the Registry and had been for at least 30 days prior to receiving a non-consensual phone call from FDE. The legal theories at issue in the case—that the calls violated the TCPA and that FSB is vicariously liable— are the same for each class member.

Accordingly, typicality is satisfied.

15

### D. Fairly and Adequately

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent" and to ensure that the representative party "possess[es] the same interest and suffer[s] the same injury as the class members." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).

According to Plaintiff, this requirement is met because he and the proposed class members have identical interests in prosecuting TCPA claims, Defendants do not have any unique defenses to Plaintiff's claims, and Plaintiff has retained competent counsel. (Pl.'s Mem. at 14). Defendants do not present any arguments to the contrary.

Accordingly, adequacy is satisfied.

### III. Rule 23(b)(3)

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Further, the rule identifies pertinent considerations in determining whether the predominance and superiority requirements are met. *Id.*

### A. Predominance

"An individual question is one where members of a proposed class will need to present evidence that varies from member to member; a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Gorss Motels*, 29 F.4th at 843-44. Notably, this Court need not decide, from a merits standpoint, whether any common question will be answered in the class's

16

favor. *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 376 (7th Cir. 2015). Additionally, the proposed class need not be devoid of individual questions; rather, the common questions must simply predominate. *Messner*, 669 F.3d at 815. While the Plaintiff says that no individualized issues are present, Pl.'s Mem. at 15, Defendants contend that consent, vicarious liability, standing require individualized inquiries and thus prevent class certification. The Court finds Defendants' arguments unpersuasive.

### 1. **Standing**

Defendants maintain that standing requires individualized inquiries as there is "strong evidence suggesting that individual class members may lack standing" and "the very existence of a transfer subclass negates an inference of injury." (Dfts.' Resp. at 28). Defendants are correct that standing requires a concrete harm. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2012). But the Plaintiff and the proposed class members have suffered a concrete harm. Determining whether TCPA violations constitute concrete injury for standing purposes requires looking to history and Congressional judgment. *Gahelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020). In terms of history, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Of course, intrusion upon seclusion has long been recognized in the common law, and the *Gahelhak* court notes that the "irritating intrusions" that such a common law tort protects against are analogous to "harm posed by unwanted text messages." *Id.* In recognition of this, "Congress identified a modern relative of a harm with long common law roots." *Id.*

Standing here is not an individualized question, though, as the Plaintiff and proposed class members suffered a concrete injury when they received unwanted telemarketing phone calls. In

17

*Aranda v. Caribbean Cruise Line, Inc.*, the district court held that "[b]oth history and the judgment of Congress suggest that violation of [the right to be free from unsolicited telemarketing calls to which the recipient did not consent] is sufficient to constitute a concrete, de facto injury." 202 F.Supp.3d 850, 857-58 (N.D. Ill. 2016). The harm lies in the unwanted contact itself; additional tangible harms such as "cell phone battery life, actual annoyance, and financial loss" are not required. *Id.* at 858. *See also Toney*, 323 F.R.D. at 582-83 ("Loss of time and privacy responding to unsolicited communications are concrete injuries that confer Article III standing . . . .").

Defendants' argument that "the very existence of a transfer subclass negates an inference of injury" fares no better. The *Aranda* court addressed a similar factual scenario. There, proposed class members received telemarketing calls offering a free cruise in exchange for the recipient completing a political survey. *Aranda*, 202 F.Supp.3d at 851-52. Some class members engaged with the call, completed the survey, and earned the free cruise. *Id.* at 859. Even those class members, the *Aranda* court held, had standing:

> [T]he intangible, concrete injury plaintiffs allege is that defendants violated a right Congress sought to protect through section 227: the right to be free from prerecorded non-emergency telemarketing calls they did not consent to receive. This concrete injury is alleged to have been suffered by every plaintiff—even plaintiffs who completed the survey, spoke with a [company] representative, and accepted defendants' vacation offer had a right to be free from unsolicited telemarketing calls, just as a homeowner has a right to be free from trespass even if she accepts a gift from the trespasser after he commits the offense. **The key common question is whether defendants made unlawful calls to plaintiffs using a prerecorded voice without consent to make them**; plaintiffs win if the answer to this question is yes, and defendants win if the answer is no.

*Id.* at 858-59 (emphasis added).

The same is true here for the proposed classes. Contrary to Defendants' argument that Transfer Subclass members demonstrated that they did not find the calls unwanted by engaging with the call, the concrete injury lies in the fact that the class as a whole is comprised of individuals

with phone numbers registered on the Registry but who were contacted anyway. This alone makes the contact unwanted, warranting a finding that every proposed class member has Article III standing.

### 2. **Consent**

Defendants also argue that whether proposed class members consented to FDE's calls involves individual questions rendering class certification improper. According to Plaintiff, Defendants would have needed prior, expressed, written consent to call the proposed class members without violating the FCPA, and Defendants obtained no such consent and have not provided evidence of consent by any class members.[4] In response, Defendants contend that they only purchased lead data for individuals who had already consented to the calls. (Dfts.' Resp. at 5-6).

"Whether issues of individualized consent defeat the predominance requirement in a TCPA case is made on a case-by-case basis after evaluating the specific evidence available to prove consent." *Legg v. PTZ Insurance Agency, Ltd.*, 321 F.R.D. 572, 577 (N.D. Ill. 2017)." Because consent is an affirmative defense, Defendants bear the burden of proof. *Blow v. Bijora, Inc.*, 855 F.3d 793, 806-07 (7th Cir. 2017). In *Gorss Motels*, the Seventh Circuit addressed whether a situation like the one in this case would require individualized inquiries:

> There are certainly instances in which the issue of prior express permission might be amenable to class-wide proof. For example . . . in some cases brought under the [TCPA], where the fax sender purchased a contact list from a third-party vendor and made no attempt to seek permission from any of the recipients before sending the fax advertisement, there is a generalized, class-wide manner of proving lack of consent.

---

[4] Plaintiff also argued that Defendants' "concede that they lacked consent when they voluntarily dismissed their counterclaim." (Pl.'s Mot. at 16). The Court disregards this point. Parties settle and dismiss claims for a variety of reasons that do not necessarily involve concessions of liability.

29 F.4th at 844. Similarly, in *Paldo Sign and Display Co. v. Topsail Sportswear, Inc.*, the court found that obtaining proposed class members' fax numbers by purchasing them from an outside source with no follow-up attempts to verify consent "likely rules out the possibility of individualized consent defenses." Case No. 08 C 5959, 2010 WL 4931001, at *2 (N.D. Ill. Nov. 29, 2010).

Unlike in *Gorss Motels*, where the defendant obtained proposed class members' phone numbers from a variety of sources (including non-uniform franchise agreements, badges that were swiped at trade conventions, prior existing relationships, etc.), Defendants contend that FDE obtained all the proposed class members' numbers from the same commercial source, making the question of consent suitable for class-wide resolution, just as *Gorss Motors* contemplated. Further, Defendants have not pointed to any evidence to suggest that any attempts to obtain consent were made prior to making the calls.

Defendants make much of the fact that the Transfer Subclass cannot challenge their consent because they agreed to the transfer. However, just as the *Aranda* court rejected the reasoning that those who engaged with the illegal call lacked standing, this Court finds that those who were transferred are not deemed to have waived consent. As Plaintiff points out, the TCPA serves to stop unwanted calls from being made in the first place. At the time the call has been placed, any potential harm has already occurred.

### 3. **Vicarious Liability**

Finally, the parties disagree about whether evidence used to establish vicarious liability presents individualized questions precluding class certification. TCPA actions may involve questions of federal common law agency.[5] *See Bilek v. Federal Insurance Co.*, 8 F.4th 581, 587

---

[5] *See Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6584 (2013) ("seller may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers;" "seller may

(7th Cir. 2021). Plaintiff argues that the same evidence will be used to establish vicarious liability through actual authority, apparent authority, or ratification. (Pl.'s Mot. at 17-20). Defendants contend that because FDE had multiple clients, determining which of the calls were placed on FSB's behalf requires individualized inquiry. In the event that FSB was not FDE's only client, Plaintiff argues that this would render others jointly and severally liable,[6] thus maintaining that it does not preclude class certification. (Pl.'s Mot. at 20).

### a.  Actual Authority

The parties spend a great deal of time arguing about whether the facts demonstrate actual authority in this case, specifically regarding whether FDE was an independent contractor hired by FSB. The merits of the question are not before the Court, though. The only issue to be decided now is whether the evidence used to establish actual authority will be common to all class members. Instead of addressing the salient question, Defendants' response offers argument on the merits only. Failing to see how evidence of actual authority would vary from class member to class member, the Court finds that the question presents common evidence and thus supports class certification.

### b.  Apparent Authority

Apparent authority is a closer call. "Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is

---

be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification;" "Federal statutory tort actions, such as those authorized under the TCPA, typically are construed to incorporate federal common law agency principles of vicarious liability where, as here, the language of the statute permits such a construction and doing so would advance statutory purposes. Consistent with the precent, and the presumption that 'legislatures act with case law in mind,' we find that section 227(c)(5) contemplates, at a minimum, the application of such principles of vicarious seller liability for do-not-call violations.")

[6] The Court notes that Plaintiff discusses joint and several liability in his briefing. (*See* Pl.'s Mot. at 20). At this juncture, the Court need not address the merits of any such argument, but only whether the question requires common or individualized evidence.

reasonable and is traceable to a manifestation of the principal." *Toney*, 323 F.R.D. 567 at 744 (quoting Restatement (Third) of Agency § 2.03 cmt. c (2006)). *Toney* held that "to plead apparent authority, [plaintiff] must allege that she reasonably believed that [telemarketer] called her as [company's] agent and that her belief is traceable to a manifestation of [telemarketer's] authority from [company]." *Id.* According to Defendants, the fact that apparent authority relies upon subjective belief requires individualized analysis precluding class certification.

Defendants' argument is not entirely without merit. *See Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020) ("Apparent authority exists when a third-party reasonably relies on the principal's manifestation of authority to an agent."). Indeed, Plaintiff notes that FDE only identified FSB after identifying a potential customer, that FDE does not identify itself unless someone asks, and that "*in certain instances*, FSB loan officers represented to consumers that FSB called them." (Pl.'s Mot. at 21 (emphasis added)). However, the FCC has provided "illustrative examples of evidence that may demonstrate that the telemarketer is the seller's authorized representative with apparent authority to make the seller vicariously liable for the telemarketer's section 227(b) violations," among which are:

- evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information;

- the ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant;

22

- whether the seller approved, wrote or reviewed the outside entity's telemarketing scripts; and

- whether the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

*In re Petition Filed by Dish Network, LLC*, 28 F.C.C. Red. 6574, 6592-93 (F.C.C. 2013). While the FCC's opinion is not binding, the Court finds persuasive its examples and that the answers to these and similar questions will require common rather than individualized evidence.

Defendants also contend that determining whether a call matched the criteria for FSB, as opposed to a different client, requires individualized inquiry. According to Defendants, "[v]endors do not know when they place the call if it is for FSB or another of the vendor's clients, because the filters are premised on the answers provided on the phone call. [] [W]hen a vendor places a call if is not for FSB—it is for the vendor which may transfer the lead to FSB, or to any number of other clients they may have at the time." (Dfts.' Resp. at 3 (citing Ex. C at 19:1-6)). Apparently, there were times when FSB was FDE's only client, and other times when FSB had multiple clients. Defendants argue that at some points in time, FSB was FDE's sole client; at other times, FDE had many clients. (Dfts.' Resp. at 24). Therefore, Defendants insist, "agency cannot be determined by common proof and would require the type of fact-specific, individualized inquiry dependent on the number of FDE clients at any given time when a particular call was placed." *Id.*

The Court fails to see how whether FDE had one or multiple clients at a given time creates individual questions. It is undisputed that FDE placed the calls. There are three possible outcomes regarding FSB's liability and agency: agency never existed, agency always existed, or agency existed only when FSB was FDE's sole client. If the latter is true, the result may be that FSB is

23

liable to a smaller subset of class members who were illegally contacted by FDE during a particular timeframe. At most, this lends itself to the creation of different subclasses, not a decision to deny class certification altogether. After all, Rule 23 permits more than one subclass, Fed. R. Civ. P. 23(c)(5), and the Court has discretion to modify a class. *See Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 599 (7th Cir. 2021) (finding that in light of new evidence, the court properly exercised its discretion in modifying the class and holding that "[i]n many cases, a modified class may satisfy Rule 23 for the reasons the original class did, and a court may simply say so."). Defendants will be afforded "a fair opportunity to present its defenses when putative class members actually come forward." *Mullins*, 795 F.3d at 670.

### c. **Ratification**

The parties' arguments regarding ratification also focus on the merits of the question, which is not before this Court at this time. The Court sees no reason why the evidence that is discussed in the briefing would not apply equally to all class members. As a result, the question of ratification does not require individualized considerations that may preclude class certification.

### B. **Superiority**

Finally, and undoubtedly, a class action is the superior method for fairly and efficiently adjudicating this case. "Rule 23(b)(3)'s superiority requirement, unlike the freestanding ascertainability requirement, is comparative: the court must assess efficiency with an eye toward other available methods." *Mullins*, 795 F.3d at 664 (quotations omitted). Of the pertinent matters to be considered, as identified in Rule 23, only two are applicable in this case: the class members' interests in individually controlling the prosecution of separate actions, and the likely difficulties

in managing this case were it to proceed as a class action. Fed. R. Civ. P. 23(b)(3)(A), (D). Both support class certification.

Cases brought pursuant to the TCPA are often worth far too little to justify bringing an individual suit. The Seventh Circuit has gone as far as to state that in claims of relatively small value, "only a lunatic or a fanatic would litigate the claim individually." *Mullins*, 795 F.3d at 665 (quoting *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)). As a result, courts have long recognized the value of the class action mechanism for claims of low value, as failure to do so could have the unintended consequences of insulating defendants from liability so long as the alleged damage to each individual is outweighed by the cost of litigation. The *Carnegie* court addressed this exact concern, stating that a realistic alternative to a class action in suits of low value is "not 17 million individual suits, but zero individual suits." 376 F.3d at 661.

As most, an individual Plaintiff may receive $1,500 per TCPA violation if they can demonstrate a willful or knowing violation. 47 U.S.C. § 227(b)(3). But that maximum figure of $1,500 must be considered in light of a plaintiff knowing his rights, his willingness and ability to find (and pay) an attorney and subject himself to the sometimes slow and cumbersome process of litigation, all over what may have initially been a 10-second unwelcomed phone call. *See Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 345 (7th Cir. 1997) (discussing these factors in reviewing denial of class certification in a case alleging violation of the FDCPA, where maximum recovery is $1,000). The case at hand is precisely the type of scenario where the class action mechanism is valuable, rendering it a superior alternative to individual suits.

Similarly, the difficulties in managing the case as a class action do not preclude class certification. It is a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns," as "a district judge has discretion to (and [the Seventh

Circuit] think[s] normally should) wait and see how serious the problem may turn out to be after settlement or judgment . . . [a]nd if a problem is truly insoluble, the court may decertify the class at a later stage of the litigation." *Mullins*, 795 F.3d at 654, 663-64. In responding to Plaintiff's argument that a class action is superior, Defendants again argue that the inability to identify class members renders individualized suits superior.

The fact that it may be difficult to identify class members does not persuade this Court that a class action is not a superior method of adjudication in this case. *See Mullins*, 795 F.3d at 664 ("[B]efore refusing to certify a class that meets the requirements of Rule 23(a), the district court should consider the alternatives as Rule 23(b)(3) instructs rather than denying certification because it may be challenging to identify particular class members."). Having considered the alternatives, this Court is satisfied that there are options for alleviating Defendants' concerns regarding class member identification. But in the event that those prove unworkable, this may be revisited at a later stage in the litigation. *Id.* at 664 ("[I]f a problem is truly insoluble, the court may decertify the class at a later stage of the litigation.").

# CONCLUSION

For all the foregoing reasons, Plaintiff's combined motion for class certification and motion to bar defense expert Jan Kostyun is granted as to class certification[7] and denied as to excluding Kostyun. Both Plaintiff's proposed "National DNC Class" and "Transfer Subclass" are certified for the period of 12/11/2019 to 2/4/2022. Defendants' cross-motion to bar Plaintiff's expert Aaron Woolfson is denied.

**DATED**: November 6, 2025          **ENTERED**:

*LaShonda A. Hunt*
_____
LASHONDA A. HUNT
United States District Judge

---

[7] Plaintiff also argues that his proposed class and subclass satisfy the requirements of Rule 23(b)(2), because "[g]iven the potential liability for past violations Defendants face in this litigation, there is a substantial possibility that Defendants may be unable to satisfy money judgments in *subsequent* class actions." (Pl.'s Mot. at 15 (emphasis in original)). However, Plaintiff offers no evidentiary support for this contention, and Defendants fail to address the point in any briefing. Because Plaintiff offers only a conclusory allegation for this Court to consider regarding whether injunctive relief is "necessary" to fully protect any proposed class, class certification based on Rule 23(b)(2) is denied.

# EXHIBIT 7

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    5:24-cv-01833-MWC-AGR                    Date: December 18, 2025

Title:      Mason v. Spring EQ, LLC

Present:  The Honorable Michelle Williams Court, United States District Judge

| T. Jackson | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:
N/A                                         N/A

**Proceedings: (In Chambers) The Court DENIES Defendant's motion to dismiss (Dkt. # [141]) and DENIES Defendant's motion to decertify the class (Dkt. # [144])**

Before the Court are two matters.  First is a motion to dismiss filed by Defendant Spring EQ LLC ("Defendant" or "Spring EQ").  Dkt. # 141 ("*MTD*").  Plaintiff Robert Mason ("Plaintiff") opposed, Dkt. # 152 ("*Opp.*"), and Defendant replied, Dkt. # 156 ("*Reply*").  Second is Defendant's motion to decertify the class.  Dkt. # 144 ("*Mot. Decertify*").  Plaintiff opposed, Dkt. # 153 ("*Decertify Opp.*"), and Defendant replied, Dkt. # 159 ("*Decertify Reply*").  The Court finds the matters appropriate for decision without oral argument.  *See* Fed. R. Civ. P. 78; L.R. 7-15.  Having considered the papers, the Court **DENIES** Defendant's motion to dismiss and **DENIES** Defendant's motion to decertify the class.

I.      Background

The Court has summarized the allegations underlying the First Amended Complaint ("FAC") in a prior order, so it repeats only those necessary to decide the current motions.  *See* Dkt. # 118 ("*Class Cert. O.*").

This matter arises under the Telephone Consumer Protection Act ("TCPA"), which makes it unlawful for any person or entity to "initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or his telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."  *See* Dkt. # 18 ("*FAC*") ¶ 32, citing 47 C.F.R. § 64.1200(c).  Plaintiff alleges Defendant, a national mortgage lender,

---

CV-90 (03/15)                    Civil Minutes – General                    Page **1** of **14**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    5:24-cv-01833-MWC-AGR                     Date: December 18, 2025

Title:      Mason v. Spring EQ, LLC

promotes its services by purchasing lead information from non-party LendingTree, LLC ("LendingTree"), including residential cellular telephone numbers.  *Id.* ¶¶ 2, 11, 12.  Plaintiff alleges he visited the LendingTree website; then, Defendant sent him telemarketing text messages.  *Id.* ¶¶ 12, 17.  Plaintiff alleges he did not provide Defendant express written consent to receive telemarketing text messages from Defendant.  *Id.* ¶¶ 13–14.  Plaintiff also alleges he was contacted despite being on the National Do Not Call Registry for more than 30 days prior to receiving Defendant's telemarketing texts.  *Id.* ¶¶ 30–31.  Plaintiff, on behalf of himself and all others similarly situated, brings this class action against Defendant asserting one cause of action for violation of the TCPA, 47 U.S.C. § 227.  *See id*.

On September 25, 2025, the Court certified the following class, finding the requirements of Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(2)–(3) met:

> Do Not Call Registry Class: All persons in the United States who, within the four years prior to the filing of this action: (1) were sent a text message by or on behalf of Defendant; (2) more than one time within any 12-month period; (3) where the person's cellular telephone number had been listed on the National Do Not Call Registry for at least thirty days; (4) for the purpose of selling Defendant's products and services; and (5) whose cellular telephone number Defendant obtained solely from LendingTree.

*See generally Class Cert. O.*

II.     Motion to Dismiss

First, Defendant moves under Federal Rule of Civil Procedure ("Rule") 12(b)(2) to dismiss the claims brought by non-California resident class members for lack of personal jurisdiction.  *See generally MTD.*

Motions under Rule 12(b)(2) may be waived if a defense available to a party was not asserted before a responsive pleading.  *See* Fed. R. Civ. P. 12(g)(2), (h)(1)(A).  A court order certifying a class "brings unnamed class members into the action and triggers due process limitations on a court's exercise of personal jurisdiction over their claims." *Moser v. Benefytt, Inc.*, 8 F.4th 872, 878 (9th Cir. 2021) (quoting *Molock v. Whole Foods*

---

CV-90 (03/15)                     Civil Minutes – General                     Page **2** of **14**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   5:24-cv-01833-MWC-AGR                     Date: December 18, 2025

Title:     Mason v. Spring EQ, LLC

*Mkt. Grp., Inc.*, 952 F.3d 293, 298 (D.C. Cir. 2020) (concluding the issue was "premature" to decide on a motion to dismiss because "prior to class certification putative class members are not parties to the action.")).  The defense Defendant raises—that the Court may not exercise personal jurisdiction over it with respect to the claims asserted by unnamed, non-California class members—was not "available to the party" prior to class certification.  *See* Fed. R. Civ. P. 12(g)(2).  Therefore, the defense was not waived and is now ripe for adjudication. *See Moser*, 8 F.4th at 877–78.

       A.     Legal Standard

"Personal jurisdiction must exist for each claim asserted against a defendant." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (citation omitted).  When a defendant objects to the Court's personal jurisdiction over it pursuant to Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008).  Absent an evidentiary hearing, however, the plaintiff need only make a prima facie showing of personal jurisdiction.  *Id.*  "Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)).  "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Id.* at 800–01.  For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least "minimum contacts" with the relevant forum such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted).

       B.     Discussion

Since the Supreme Court's "seminal decision in *International Shoe*," courts "have recognized two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773, 1779–80 (2017) (citation omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    5:24-cv-01833-MWC-AGR                    Date: December 18, 2025

Title:      Mason v. Spring EQ, LLC

### i.    *General Jurisdiction*

For general jurisdiction to exist over a nonresident defendant, the defendant must engage in "continuous and systematic general business contacts" that "approximate physical presence" in the forum state. *Schwarzenegger* at 801, quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984).

Plaintiff does not dispute Defendant's contention that it is not subject to general jurisdiction in California, because it is a Delaware company with its principal place of business in Pennsylvania. *Not. Mot.* 2:12-13. Nor do the parties dispute the Court may exercise specific jurisdiction over the named California Plaintiff. Accordingly, the Court finds Defendant is not subject to general jurisdiction and turns to whether it may exercise specific personal jurisdiction over Defendant with regard to non-plaintiffs' claims.

### ii.    *Specific Jurisdiction Over Non-resident, Unnamed Class Members*

The Ninth Circuit has "established a three-prong test for analyzing a claim of specific personal jurisdiction." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). In particular:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Id*. (citing *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)) (emphasis added). "The plaintiff bears the burden on the first two prongs," and once those are established, the defendant must show a "'compelling case' that the exercise of jurisdiction would be unreasonable." *Ayla, LLC v. Alya Skin Pty. Ltd*., 11 F.4th 972, 983 (9th Cir. 2021)

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   5:24-cv-01833-MWC-AGR                    Date: December 18, 2025

Title:   Mason v. Spring EQ, LLC

(citation omitted).  "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law."  *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270–71 (9th Cir. 1995).

The core dispute here concerns the second prong of the test.  Defendant, relying on *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty*., 582 U.S. 255 (2017), argues that the Court lacks specific jurisdiction over claims brought by non-California residents in the nationwide class, because those class members "do not claim to have suffered harm in [this] State."  Mot. 9, quoting *Bristol-Myers*, 582 U.S. at 265.  Without having suffered harm in California, a non-resident's "claims do not arise from or relate to Spring EQ's actions in California."  *Not. Mot.* 2.

In *Bristol-Myers*, the Supreme Court held that a California state court did not have personal jurisdiction over consumer claims asserted by nonresident plaintiffs in a mass tort action because there was no "adequate link" between California and the claims of the nonresident plaintiffs, who did not allege that they had purchased the defendant's product in California or suffered any injury there.  *Bristol-Myers*, 582 U.S. at 264–65.  The only connections between the plaintiffs' claims and the defendant's conduct arose in connection with other named plaintiffs' claims.  *Id*.

Defendant also analogizes this case to *Harrington v. Cracker Barrel Old Country Store, Inc.*, 142 F.4th 678, 687 (9th Cir. 2025).  There the Ninth Circuit applied *Bristol-Myers* to a Fair Labor Standards Act ("FLSA") collective action and found that the court lacked specific personal jurisdiction over absent plaintiffs' claims, because the FLSA does not include nationwide service of process.  *Harrington*, 142 F.4th at 682, 685–86.

Whether *Bristol-Myers* applies to a class action where a plaintiff injured in the forum state seeks to represent a nationwide class of plaintiffs, not all of whom were injured in that state, has not been squarely addressed by either the Supreme Court or the Ninth Circuit.  *See Bristol-Myers*, 582 U.S. at 278 n.4 (Sotomayor, J., dissenting) ("The Court today does not confront the question whether its opinion here would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there."); *Harrington*, 142 F.4th at 686 ("[W]e [the Ninth Circuit] have not yet considered the application of *Bristol-Myers* in a class action[.]").  Nonetheless, Defendant argues the reasoning of *Bristol-Myers* and *Moser*, and their application to an FLSA collective action in *Harrington*, "compel the conclusion" that *Bristol-Myers* applies equally to class actions.  *Reply* 10:25-26.  Thus, a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    5:24-cv-01833-MWC-AGR                    Date: December 18, 2025

Title:      Mason v. Spring EQ, LLC

nationwide class action may only be properly heard where a defendant is subject to general jurisdiction.  *Reply* 10:26-11:1.

The Court declines to extend *Bristol-Myers'* holding as Defendant suggests. Absent binding authority to the contrary, the Court turns to persuasive authority from other circuits and California district courts and finds the weight of decisions decline to apply the *Bristol-Myers* personal jurisdiction inquiry to absent class members.  *See, e.g.*, *Owino v. CoreCivic, Inc.*, 700 F. Supp. 3d 939, 950 (S.D. Cal. 2023) ("to exercise personal jurisdiction over the claims of the class as a whole, the Court need determine only whether it may exercise specific jurisdiction over the claims of the named class representatives."); *Choi v. Kimberly-Clark Worldwide, Inc.*, No. SA CV 19-0468, 2019 WL 4894120, at *5 (C.D. Cal. Aug. 28, 2019) ("While the claims of non-resident named plaintiffs were 'pertinent to the issue of specific jurisdiction in *Bristol-Myers*,' [citation], the claims of unnamed class members are 'irrelevant to the question of specific jurisdiction.'"); *Lyngaas v. Curaden Ag*, 992 F.3d 412, 433 (6th Cir. 2021) ("We decline to extend *Bristol-Myers Squibb* in this manner.  Long-standing precedent shows that courts have routinely exercised personal jurisdiction over out-of-state defendants in nationwide class actions, and the personal-jurisdiction analysis has focused on the defendant, the forum, and the *named plaintiff*, who is the putative class representative."); *Zuehlsdorf v. FCA US LLC*, No. EDCV 18-1877, 2019 WL 4422673, at *6 (C.D. Cal. Aug. 7, 2019) (concluding that "*BMS* did not alter the consensus that specific personal jurisdiction is based on the claims of the class representative only."); and *McCurley v. Royal Seas Cruises*, Inc., No. 17-CV-00986-BAS-AGS, 2019 WL 3006469, at *7 (S.D. Cal. July 10, 2019) ("In the wake of *Bristol-Myers* . . . , numerous federal courts have rejected the personal jurisdiction defense [defendant] raises to the claims of absent class members precisely because class actions are fundamentally different than the mass tort action at issue in *Bristol-Myers*. In particular, class actions do not call for a personal jurisdiction inquiry for absent class members, thus rendering *Bristol-Myers* inapposite.").

The Court finds the reasoning of these decisions persuasive, as they rely on Rule 23's rigorous certification procedures, which do not apply to mass tort or collective actions.  The certification process ensures that the addition of nonnamed class members' claims does not render the class representative's chosen forum unduly burdensome, thereby protecting defendants' due process rights.  *See Owino*, 700 F.Supp.3d at 947. Given "the procedural protections built into class actions—including the inquiry into the common nature of the named plaintiffs' and the absent plaintiffs' claims," and the fact

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   5:24-cv-01833-MWC-AGR                      Date: December 18, 2025

Title:     Mason v. Spring EQ, LLC

that the *Bristol-Myers* court sought to cabin its holding to its particular circumstances, the requirements of Rule 23 offer sufficient "additional due process protections for nonnamed class members that justify treating them differently than [parties] in nonclass litigation." *Id.*

      *Moser* and *Harrington* do not compel a different result.  Regarding *Moser*, the sentence on which Defendant relies—that class certification "brings unnamed class members into the action and triggers due process limitations on a court's exercise of personal jurisdiction over their claims"—is quoting an opinion from the D.C. Circuit (*Molock*) that the *Moser* court specifically notes the "did not reach whether *Bristol-Myers* applied to class actions."  8 F.4th at 878, citing *Molock*, 952 F.3d 293.  Therefore, the Court may not extrapolate from *Moser* that *Bristol-Myers*, or even *Molock*, applies to class actions.  Even if the principle stated in *Molock* could apply here, Rule 23's certification procedures address the "due process limitations on a court's exercise of personal jurisdiction over the[] claims" of unnamed class members triggered by class certification.  *Moser*, 8 F.4th at 878.  For these reasons, the Court does not rely on *Moser* to extend *Bristol-Myers* to a nationwide class action.

      Regarding *Harrington*, the Ninth Circuit expressly stated "that a collective action under the FLSA is not a comparable form of representative action [to class actions].  The FLSA collective mechanism is more accurately described as a kind of mass action, in which aggrieved workers act as a collective of *individual* plaintiffs with *individual* cases."  142 F.4th at 686 (citation omitted) (emphasis original).  Thus, a collective action is much more similar to the mass tort at issue in *Bristol-Myers*, whereas this case is more similar to the aforementioned class action cases that this Court finds persuasive.

      To exercise personal jurisdiction over the claims of the class as a whole, the Court need determine only whether it may exercise specific jurisdiction over the claims of the named class representative.  *Owino*, 700 F. Supp. 3d at 950.  It is undisputed that the Court may exercise specific jurisdiction over Plaintiff's claim.  Therefore, the Court may exercise specific jurisdiction over Defendant with respect to the claims of the class as a whole.

      Accordingly, the motion to dismiss for lack of specific jurisdiction over claims brought by unnamed non-resident plaintiffs is **DENIED.**

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    5:24-cv-01833-MWC-AGR                    Date: December 18, 2025

Title:      Mason v. Spring EQ, LLC

III.    Motion to Decertify the Class

The Court turns to Defendant's motion to decertify the class.

A.    Legal Standard

An order granting or denying class certification may be altered or amended at any time before the entry of final judgment.  Fed. R. Civ. P. 23(c)(1)(C).  A district court retains "the flexibility to address problems with a certified class as they arise, including the ability to decertify." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 809-10 (9th Cir. 2010) ("Federal Rule of Civil Procedure 23 provides district courts with broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court.") (internal citations and quotation marks omitted).

"The standard used by the courts in reviewing a motion to decertify is the same as the standard used in evaluating a motion to certify." *Id*. at 410.  The Court incorporates the relevant legal standards pertaining to Rule 23 class certification from its Class Certification Order.  *See Class Cert. O.* 3.

B.    Discussion

The thrust of Defendant's motion to decertify is that "new evidence regarding the actual content of the millions of text messages at issue and the circumstances pursuant to which the messages were sent" reveals that individual issues have come to predominate. *Mot. Decertify* 1.

Defenses that must be litigated on an individual basis can defeat class certification. *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018).  At the same time, courts may certify a Rule 23(b)(3) class "even though other important matters will have to be tried separately, such as some affirmative defenses peculiar to some individual class members." *Id*. (ellipsis omitted) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).  Thus, the Court is to "analyz[e] the consent defenses [defendant] has actually advanced and for which it has presented evidence." *True Health Chiropractic, Inc.*, 896 F.3d at 931.  On a motion for class certification, the Court may consider all material evidence submitted by the parties to determine whether

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.     5:24-cv-01833-MWC-AGR                    Date: December 18, 2025

Title:       Mason v. Spring EQ, LLC

the Rule 23 requirements are satisfied. *Blackie v. Barrack*, 524 F.2d 891, 900–01 (9th Cir. 1975).

The Court addresses Defendant's arguments for decertification in turn.

>    *i.      Whether Individualized Analysis is Needed to Determine*
>    *Defendant's Messages Were Unsolicited Solicitations*

Defendant has begun evaluating text messages sent to phone numbers associated with a California address in connection with implementing a stipulated class member discovery plan. *Mot. Decertify* 9. Defendant avers its analysis of the text messages confirm they "are not at all uniform," and that many demonstrate Defendant's messages were not unsolicited and/or not solicitations. *Id*. Therefore, the fact finder will need to evaluate individualized evidence regarding the issues such as (1) which of Defendant's texts constitute "solicitations," (2) which class members gave consent, and (3) which class members had an existing business relationship ("EBR") with Defendant. *Id*. 12–19.

>    *a.      Solicitations*

Regarding whether Defendant's texts constitute solicitations, Defendant argues that the Court will need to review millions of messages, message-by-message. Gregory Gentek, Defendant's Senior Vice President of Sales, attests that in just the preliminary review of text messages to and from California class members, thousands of class members sent individualized communications to Spring EQ over the class period, and Spring EQ received more than 24,000 text messages that did not contain the word "stop." Dkt. # 144-9 ("*Gentek Decl.*") ¶ 13. Defendant, in turn, has sent thousands of individualized text messages to class members such as, "Yes, that is correct," "Likewise!", and "Just sent you an email." *Id*. ¶ 12. Defendant argues messages like these are not sent "for the purpose of selling Defendant's products and services" and are thus not solicitations, and each message would need to be reviewed to determine whether they are solicitations. *Mot. Decertify* 13-15.

The Court finds the issue of whether Defendant's texts constitute solicitations may be resolved through common proof. Plaintiff proffers excerpts from Mr. Gentek's deposition where Mr. Gentek describes a standard protocol that Defendant employs to engage in telemarketing. Opp. 2; *see* Dkt. # 153-2 (Gentek Dep. Tr.) at 185:22–188:17, 190:1-4, 191:8–20, 193:14–16, 195:7–16, 199:5-25. Overall, Mr. Gentek describes

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    5:24-cv-01833-MWC-AGR                    Date: December 18, 2025

Title:    Mason v. Spring EQ, LLC

Defendant's text message marketing as an automated system.  Thus, common proof concerning Defendant's marketing "system," "cadence," and automated messages can resolve the issue of whether text messages from Defendant's representatives to class members were sent for the purpose of selling Defendant's products and services.

> b.    *Established Business Relationship ("EBR")*

Regarding EBRs, Defendant argues that "the content of each inbound message from class members must also be evaluated to determine if it constitutes an 'inquiry' about Spring EQ's products (i.e. home equity loans), which would exempt Spring EQ's subsequent communications over the next three months" from TCPA liability.  *Mot. Decertify* 17-19; *see* 47 C.F.R. § 64.1200.  Defendant contends that its "records indicate that Spring EQ received more than 24,000 text messages from potential California class members that did not have some iteration of the word 'STOP' to start the message."  *Mot. Decertify* 18; *see Gentek Decl.* ¶ 13.  Defendant avers these individualized messages from class members, including "Can you please call me now?", "I'm interested in HELOC. What are the rates[?]", and "What are the terms for a heloc?", constitute voluntary two-way communications that establish an EBR.  Determining if the EBR defense applies thus requires message-by-message analysis.

Other California district courts have declined to certify TCPA class actions where an individualized inquiry is required to determine whether each class member had an EBR with the defendant.  *See, e.g. Sapan v. Yelp., Inc.*, No. 3:17-cv-03240-JD, 2021 WL 5302908, at *5 (N.D. Cal. 2021) (denying motion for class certification because defendant had "identified evidence in the record showing an [EBR] with, or other prior consent provided by, putative class members," such as "some putative class members provid[ing] their residential phone numbers to Yelp sales employees via e-mail"); *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, 557-58 (C.D. Cal. 2012) (denying class certification because defendant presented evidence that most of the putative class members had an EBR with defendant).

Nonetheless, the Court finds Plaintiff has sufficiently demonstrated individualized issues as to the existence of EBRs do not predominate.  In *Sapan*, "[t]he crucial shortfall for Sapan's certification request [was] that he ha[d] not proposed a method of identifying class members without individualized inquiries along the lines [defendant] Yelp described."  2021 WL 5302908, at *6.  Here, Plaintiff has proposed such a method.  Plaintiff proffers the expert report of Aaron Woolfson, stating that he implemented a

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    5:24-cv-01833-MWC-AGR                    Date: December 18, 2025

Title:    Mason v. Spring EQ, LLC

---

"Waterfall" methodology to identify and remove from the certified Class any data related to telephone numbers that responded to Spring EQ's messages with a non-"stop" message. *Opp.* 13–14; see Dkt. # 153-1 ("*Woolfson Decl.*") Ex. A ¶¶ 33-35.

In response, Defendant argues that "neither Plaintiff nor Woolfson account for the Spring EQ texts that appear to follow-up on inquiries made via phone calls or email (without a record of a text message response). . . . Additionally, many class members repeatedly submitted inquiries via LendingTree; thousands of phone numbers that appear to survive Woolfson's waterfall analysis are associated with multiple leads" or multiple phone numbers. *Decertify Reply* 10, citing to Dkt. # 159-1 (Kiser Reply Decl.) Ex. B, Declaration of Douglas Kidder ¶¶ 27-28; *id.* Ex. A ("*Kidder Rebuttal Decl.*") ¶¶ 10-11. In support of the motion to decertify, Defendant's expert, Douglas Kidder, attests he has identified text messages in the dataset "post-Waterfall" that indicate contact was occurring on another platform, such as by phone or email. Examples of non-"stop" messages indicating the recipient welcomed the texts but may have responded elsewhere include "I sent you an email," and "I see that I missed your call." *Kidder Rebuttal Decl.* ¶ 11.

Rule 23(b) "predominance" does not require that no individual questions exist, but those issues may not predominate over the action. The Court finds, in light of Plaintiff's proposed method to filter out class members who responded to Spring EQ in a manner other than opting out, the examples included in the Kidder declarations do not establish the EBR issue is sufficiently pervasive to defeat commonality. Thus the case is still suitable for adjudication on a classwide basis.

        *c.*     *Consent*

Regarding consent, Defendant bolsters its prior showing of the declarations of a dozen satisfied customers, with additional messages from class members demonstrating their desire to be contacted. These include messages like, "Get back to me, want to know about different equity lines," and "I want info on home equity loan." *Mot. Decertify* 16. Defendant argues "[t]hese messages provide evidence that thousands of potential California class members understood that by completing the LendingTree sign-up process, they were providing permission for up to five lenders to contact them with information on loan options." *Id.* 17.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.     5:24-cv-01833-MWC-AGR                    Date: December 18, 2025

Title:       Mason v. Spring EQ, LLC

The Court finds Defendant's argument regarding consent goes to the merits of their defense: that Plaintiff and Class members' provision of their information to the LendingTree website constituted consent to receive marketing text messages from Defendant. As the Court previously held, whether Defendant violated 47 C.F.R. § 64.1200(c) and the privacy rights of the class is a common question that can be answered by review of the language and form of the disclosures—in other words, common evidence. *Class Cert O.* 7. The issue of consent is not an appropriate argument for class certification purposes, and is better reserved for summary judgment or trial.

> ii.     *Whether Individualized Analysis is Needed to Determine If Messages Were Received on Residential Phone Lines*

Defendant argues that new evidence shows "thousands of potential California class members linked their phone numbers to loan requests related to investment properties and therefore used their telephone numbers for business purposes." *Mot. Decertify* 9, citing to *Gentek Decl.* ¶ 5. Mr. Gentek's declaration lists ten exemplar phone numbers of leads received by Defendant, from LendingTree, where the individual indicated the loan would be used for an investment property. *Gentek Decl.* ¶¶ 7, 8, 17. Plaintiff's expert, in turn, attests that reviewed those numbers and found most were not part of the post-Waterfall dataset, and that the numbers did not "indicate" investment purposes. *Woolfson Decl.* ¶¶ 36–40.

The Court finds the short list of exemplar phone numbers provided by Defendant does not defeat commonality. As the Court noted previously, "Plaintiff has sufficiently identified a method by which an expert can separate residential from business numbers," which "has been deemed reliable by other courts to trim numbers with business associations from the class." *Class Cert O.* 8– 9, citing *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 388 (D. Mass. 2024). The fact that most of the numbers identified by Defendant did not appear in the post-Waterfall dataset, as Mr. Woolfson attests, further suggests the method is reliable. Defendant's new evidence does not compel a different result.

> iii.    *Individualized Analysis is Needed as to Which Class Members Agreed to Arbitration*

Defendant argues the Class "includes many individuals who agreed to pursue their claim against Spring EQ in individual arbitration." *Mot. Decertify* 10, 19. Those who

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    5:24-cv-01833-MWC-AGR                     Date: December 18, 2025

Title:        Mason v. Spring EQ, LLC

used LendingTree's website or services after April 1, 2025, "accepted the Dispute Resolution Section in the April 2025 Terms and agreed to arbitrate any TCPA claim against Spring EQ on an individual basis." *Id.* 10-11. Defendant points to ten examples of individuals who requested rates from LendingTree during the class period and after April 1, 2025. *Gentek Decl.* ¶ 17. Therefore, Defendant argues "the fact finder will have to determine whether a particular member of the Certified Class requested rates through LendingTree *or* used LendingTree's website after April 1, 2025. The latter inquiry cannot be resolved with Spring EQ's data and can only be determined by individualized discovery." *Id.* 22. Plaintiff argues that, by thoroughly litigating this action, Defendant has waived its rights to compel any unnamed class members to individual arbitration and, even if it had not, the issue of arbitrability is capable of classwide resolution. *Decertify Opp.* 19-23.

Without deciding the issue of whether Defendant has waived its rights to arbitration as to class members who visited the website after April 1, 2025, this issue goes to the merits of Defendant's defense and is capable of being resolved through common evidence, so it does not defeat certification.

> iv.    *Personal Jurisdiction Over Non-California Residents' Claims*

Defendant argues "[t]he threshold issue of identifying members of the Certified Class whose claims are not subject to the personal jurisdiction of this Court will be highly individualized and fact-intensive," because "where a class member was located when he or she received the at-issue text message must be conducted on a plaintiff-by-plaintiff basis." *Mot. Decertify* 24.

For the reasons stated above, the Court rejects the argument that it may not exercise specific jurisdiction over unnamed non-California residents' claims, so the issue of jurisdiction over non-California residents does not compel the Court to decertify the Class. *See supra* Section II.B.ii.

> v.    *The Class does not meet the requirements of Rule 23(b)(2)*

Finally, since the Court does not find the action "overrun with individual issues," and because the wrongful conduct alleged can be enjoined with respect to all class members, Rule 23(b)(2) certification remains appropriate.

---

CV-90 (03/15)                     Civil Minutes – General                     Page **13** of **14**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   5:24-cv-01833-MWC-AGR                     Date: December 18, 2025

Title:      Mason v. Spring EQ, LLC

Because none of Defendant's arguments justify decertifying the Class, the Court **DENIES** Defendant's motion to decertify.

IV.   <u>Conclusion</u>

For the foregoing reasons, the Court **DENIES** Defendant's motion to dismiss (Dkt. # 141) and **DENIES** Defendant's motion to decertify the class (Dkt. # 144).

**IT IS SO ORDERED.**

:

**Initials of Preparer**   TJ

# EXHIBIT 8

# Produced in Native Format

# EXHIBIT 9

# Produced in Native Format